**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| | **:** | |
| SHAWN NELSON MANNING, | **:** | |
| 7505 39th Avenue, SE | **:** | |
| Lacey, WA 98503 | **:** | |
| | **:** | |
| And | **:** | |
| | **:** | Case No._____ |
| AUTUMN MANNING | **:** | |
| 7505 39th Avenue, SE | **:** | |
| Lacey, WA 98503 | **:** | |
| | **:** | |
| And | **:** | |
| | **:** | |
| AMANDA ASTORGA, | **:** | |
| 566 Hargrave Street | **:** | |
| Inglewood, CA 90302, | **:** | |
| | **:** | |
| And | **:** | |
| | **:** | |
| EDUARDO CARAVEO, | **:** | |
| 5366 S. Chiswick Lane | **:** | |
| Tucson, AZ 85706, | **:** | |
| | **:** | |
| And | **:** | |
| | **:** | |
| FERNANDO CARAVEO, | **:** | |
| 3219 E. Missouri | **:** | |
| El Paso, TX 79903, | **:** | |
| | **:** | |
| And | **:** | |
| | **:** | |
| ANGELA G. RIVERA-CARAVEO, as the | **:** | |
| widow and personal representative of the | **:** | |
| estate of Major Libardo Eduardo Caraveo, | **:** | |
| and as guardian for JOHN PAUL | **:** | |
| CARAVEO, MEGAN RIVERA, and | **:** | |
| TIFFANY RIVERA, | **:** | |
| 7261 Tinsley Way | **:** | |
| Manassas, VA 20111, | **:** | |
| | **:** | |
| And | **:** | |
| | **:** | |

1

JOSE A. CARAVEO,                         :
625 W. Madison Street                    :
Chicago, IL 60661,                       :
                                         :
And                                      :
                                         :
RAFAEL CARAVEO,                          :
241 Arisano Drive                        :
El Paso, TX 79932,                       :
                                         :
And                                      :
                                         :
MARIA ELENA GARCIA,                      :
1037 Miss Bev. Avenue                    :
El Paso, TX 79932,                       :
                                         :
And                                      :
                                         :
CARMEN RUIZ,                             :
3919 Midland Street                      :
Los Angeles, CA 90031,                   :
                                         :
And                                      :
                                         :
ISABEL ZUNIGA,                           :
3030 Richmond                            :
El Paso, TX 79930,                       :
                                         :
And                                      :
                                         :
DANIEL D E CROW as the father and co-    :
personal representative of the estate of Staff :
Sergeant Justin Michael DeCrow,          :
6770 S. 250 West                         :
Rochester, IN 46975,                     :
                                         :
And                                      :
                                         :
RHONDA THOMPSON, as the mother and       :
co-personal representative of the estate of :
Staff Sergeant Justin Michael DeCrow,    :
15179 West 9 th Road                     :
Plymouth, IN 46563,                      :
                                         :
And                                      :
                                         :

CRISTIE M. GREENE as the widow and      :
personal representative of the estate of      :
Specialist Frederick Z. Greene, and as      :
guardian for ALLISON J. GREENE and      :
HALEY B. GREENE,      :
1502 Sylvan Park Ct.      :
Mt. Juliet, TN 37122,      :
     :
And      :
     :
KAREN E. NOURSE,      :
115 Harber Lane      :
Johnson City, TN 37601,      :
     :
And      :
     :
ROBERT H. NOURSE,      :
115 Harber Lane      :
Johnson City, TN 37601,      :
     :
And      :
     :
JENNIFER N. HUNT, as the widow and      :
personal representative of the estate of      :
Specialist Jason Dean Hunt,      :
760 Lakeside Drive      :
Noble, OK 73068,      :
     :
And      :
     :
GALE HUNT,      :
300 N. Broadway      :
Wausa, NE 68786,      :
     :
And      :
     :
GARY DEAN HUNT,      :
1117 W. Comanche      :
Norman, OK 73019,      :
     :
And      :
     :
ANGELA L. SMITH,      :
101 Black Powder Cir.      :
Noble, OK 73068,      :
     :

And                                             :
                                                :
JERILYN M. KRUEGER as mother and                :
personal representative of the estate of        :
Sergeant Amy S. Krueger,                         :
14902 S. Cedar Lake Road                        :
Kiel, WI 53042,                                 :
                                                :
And                                             :
                                                :
CASEY J. KRUEGER,                               :
14902 S. Cedar Lake Road                        :
Kiel, WI 53042,                                 :
                                                :
And                                             :
                                                :
JESSICA KRUEGER BRYANT,                         :
10207 7th Street                                :
Kiel, WI 53042,                                 :
                                                :
And                                             :
                                                :
CYNTHIA SEAGER, as the widow and                :
personal representative of the estate of        :
Captain Russell G. Seager,                       :
1714 Redcoat Drive                              :
Racine, WI 53401,                               :
                                                :
And                                             :
                                                :
JOSEPH SEAGER                                   :
1714 Redcoat Drive                              :
Racine, WI 53401,                               :
                                                :
And                                             :
                                                :
VERNON SEAGER                                   :
N. 4892 State Road 80                           :
Elroy, WI 53929,                                :
                                                :
And                                             :
                                                :
BARBARA B. PRUDHOMME,                           :
9706 Riverview Lane                             :
Caledonia, WI 53108,                            :
                                                :

4

And                                                    :
                                                       :
JUAN G. VELEZ,                                         :
P.O. Box 832109                                        :
Miami, FL 33283,                                       :
                                                       :
And                                                    :
                                                       :
EILLEN RODGRIGUEZ, as the mother and                   :
grandmother of and representative of the               :
estates of Private Francheska Velez and Baby           :
Velez                                                  :
1041 N. Ridgeway Avenue,                               :
Chicago, IL 60651,                                     :
                                                       :
And                                                    :
                                                       :
JUAN G. VELEZ,                                         :
1041 N. Ridgeway Avenue,                               :
Chicago, IL 60651,                                     :
                                                       :
And                                                    :
                                                       :
EVA M. WADDLE, as mother and acting as                 :
personal representative as the estate of               :
Lieutenant Colonel Juanita Warman,                     :
1215 Foster Avenue                                     :
Pittsburgh, PA 15205,                                  :
                                                       :
And                                                    :
                                                       :
MELISSA CZEMERDA,                                      :
161 Marion Drive                                       :
McMurray, PA 15317,                                    :
                                                       :
And                                                    :
                                                       :
RENEE A. GAMBONI,                                      :
183 Delaware Drive                                     :
Damascus, PA 18415,                                    :
                                                       :
And                                                    :
                                                       :
TAWNYA PATTILLO,                                       :
5439 Lemon Tree Lane                                   :
Gulf Shores, AL 36542,                                 :

                    :

And                    :

                    :

KRISTINA RIGHTWEISER,    :
4732 N. 103 rd Lane        :
Phoenix, AZ 85037,        :

                    :

And                    :

                    :

PRISCILLA J. SHEADER,    :
1328 Sandstone Drive      :
McDonald, PA 15057,      :

                    :

And                    :

                    :

DONNA WADDLE,        :
3334 Duquesne Avenue     :
West Mifflin, PA 15122,    :

                    :

And                    :

                    :

MARGARET YAGGIE,     :
39 Hilltop Lane         :
Roaring Branch, PA 17765,   :

                    :

And                    :

                    :

SHOUA HER, as the widow and personal  :
representative of the estate of Private Kham  :
See Xiong, and as guardian of DEVYN  :
XIONG, JONAH XIONG and KAYLEE  :
XIONG,                  :
2183 7th Street N.        :
North St. Paul, MN 55109,   :

                    :

And                    :

                    :

CHOR XIONG,         :
245 E. Congress Street, Apt. D,  :
St. Paul, MN 55107,       :

                    :

And                    :

                    :

DANBEE XIONG,        :
764 Hoyt Avenue East      :
St. Paul, MN 55106,      :

                                                                           :

And                                                            :

                                                                           :

JENNIEXIONG,                                         :
66134<sup>th</sup>StreetNorth,                                :

...

66134 [th] StreetNorth,
Oakdale,MN55128,

And

KEVINXIONG,
245E.CongressStreet,Apt.D
St.Paul,MN55107,

And

MAXYXIONG,
245E.CongressStreet,Apt.D
St.Paul,MN55107,

And

MEEXIONG,
844GaltierStreet
St.Paul,MN55117,

And

NELSONXIONG,
245E.CongressStreet,Apt.D
St.Paul,MN55107,

And

PANOUXIONG,
245E.CongressStreet,Apt.D
St.Paul,MN55107,

And

PHILLIPXIONG,
245E.CongressStreet,Apt.D
St.Paul,MN55107,

And

RICHARDXIONG,

245 E. Congress Street, Apt. D
St. Paul, MN 55107,

And

ROBERT XIONG,
245 E. Congress Street, Apt. D
St. Paul, MN 55107,

And

TIFFANY XIONG,
3310 Davey Street
Eau Claire, WI 54703,

And

JAMES ARMSTRONG,
1597 Augusta Road
Bowdoin, ME 04287,

And

KEARA BONO TORKELSON,
1487692 nd Cir.
Otsego, MN 55330,

And

JOSEPH TORKELSON
1487692 nd Cir.
Otsego, MN 55330

And

STEVEN MICHAEL BONO, personally and
as guardian for KAITLYNN MARIE JOY
BONO, KIRSTEN BREANN PEARL
BONO,
3610 Kings Highway
Kansas City, MO 64137

And

DUSTIN M. BONO
2829 B Tepee Avenue

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Independence, MO 64057          :
                                       :

And                                     :
                                       :

MICHAEL J. MCCARTY         :
20113 E. 13 [th] Street S.        :
Independence, MO 64057         :
                                       :

And                                     :
                                       :

MARGARET A. MCCARTY, personally :
and as as guardian for LOGAN D. :
MCCARTY         :
20113 E. 13 [th] Street S.         :
Independence, MO 64057         :
                                       :

And :
                                       :

MICHAEL J. MCCARTY, as guardian for :
GRACE L. MCCARTY and EMILY J. :
MCCARTY, :
20113 E. 13 [th] Street S. :
Independence, MO 64057 :
                                       :

And :
                                       :

LOGAN M. BURNETT :
6053-1 Ruffer Spur :
Fort Hood, TX 76544 :
                                       :

And :
                                       :

VICTORIA ELIZABETH BURNETT :
6053-1 Ruffer Spur :
Fort Hood, TX 76544 :
                                       :

And :
                                       :

LOVICKIE DENISE BYRD personally and :
as guardian for DOMINIQUE LAMAR :
BYRD, :
5202 Deerwood Trail :
Killeen, TX 76542 :
                                       :

And :
                                       :

JOELEWISBYRD                          :
5202DeerwoodTrail                     :
Killeen,TX76542                       :
                                      :
And                                   :
                                      :
JOELEWISBYRDII                        :
5202DeerwoodTrail                     :
Killeen,TX76542                       :
                                      :
And                                   :
                                      :
DOROTHYCARSKADON                      :
3815MononaDrive#8                     :
Madison,WI53714                       :
                                      :
And                                   :
                                      :
JULIECARSKADON                        :
3815MononaDrive#8                     :
Madison,WI53714                       :
                                      :
And                                   :
                                      :
MATTHEWDENNISONCOOKE                  :
HQ,1 <sup>st</sup>BnWTB               :
FortHood,TX76544                      :
                                      :
And                                   :
                                      :
CHRISTINADANIELLECOOKE                :
5022RollingOaksLane                   :
Charlotte,NC28227                     :
                                      :
And                                   :
                                      :
MATTHEWDENNISONCOOKE,                 :
asguardianforGABRIELTUCKER-LEE        :
COOKE,ZACHARYALANCOOKE                :
301N.21 <sup>st</sup>                 :
Duncan,OK73533                        :
                                      :
And                                   :
                                      :
CARLCOOKE,                            :
31½PleasantStreet                     :

10

Sidney, NY 13838                               :
                                              :
And                                           :
                                              :
JENNIFER LYNN FRAPPIER                        :
372 Eastover Avenue                           :
Norwood, NC 28128                             :
                                              :
And                                           :
                                              :
DIANE MARIE FRAPPIER                          :
372 Eastover Avenue                           :
Norwood, NC 28128                             :
                                              :
And                                           :
                                              :
GERARD LEO FRAPPIER                           :
372 Eastover Avenue                           :
Norwood, NC 28128                             :
                                              :
And                                           :
                                              :
KIMBERLY EV MILLER                            :
120 River Street                              :
Apt. 1E                                       :
Oneonta, NY 13820                             :
                                              :
And                                           :
                                              :
ANNA E. ELLIS                                 :
1512 McCarthy Avenue                          :
Killeen, TX 76549                             :
                                              :
And                                           :
                                              :
MICK ENGNEHL                                  :
1908 Twilight Drive                           :
Killeen, TX 76543                             :
                                              :
And                                           :
                                              :
AUTUMN ENGNEHL, personally and as as          :
guardian for BRENDEN GIST                     :
1908 Twilight Drive                           :
Killeen, TX 76543                             :
                                              :

And                                              :
                                                 :
JOSEPH T. FOSTER                                 :
5502-2 Cutler Street                             :
Ft. Hood, TX 76544                               :
                                                 :
And                                              :
                                                 :
MANDY M. FOSTER                                  :
5502-2 Cutler Street                             :
Ft. Hood, TX 76544                               :
                                                 :
And                                              :
                                                 :
AMBER MARIE GADLIN                               :
1703 Mulford Street                              :
Killeen, TX 76541,                               :
                                                 :
And                                              :
                                                 :
CHELSEA GARRETT                                  :
2707 Windmill Dr.                                :
Killeen, TX 76549                                :
                                                 :
And                                              :
                                                 :
MICHELLE R. HARPER, personally and as            :
guardian for TYLER HARPER and                    :
ALYIAH MAGEE,                                    :
2802 Hydrangea Avenue                            :
Killeen, TX 76549                                :
                                                 :
And                                              :
                                                 :
GEORGE HARPER                                    :
2802 Hydrangea Avenue                            :
Killeen, TX 76549                                :
                                                 :
And                                              :
                                                 :
ALYSSA MAGEE                                     :
1615 Parker Lane                                 :
Harker Heights, TX 76548                         :
                                                 :
And                                              :
                                                 :

NATHAN HEWITT                                              :
8121 Walnut Ridge Road                                    :
Lafayette, IN 47909                                       :
                                                          :
And                                                       :
                                                          :
CLIFFORD ALAN HOPEWELL                                    :
6025 Wonder                                               :
Fort Worth, TX 76133                                      :
                                                          :
And                                                       :
                                                          :
TRENA HOPEWELL                                            :
6025 Wonder                                               :
Fort Worth, TX 76133                                      :
                                                          :
And                                                       :
                                                          :
NAJEEM ONELL HULL                                         :
1000 Holbrook Road, Apartment T                           :
Homewood, IL 60430                                        :
                                                          :
And                                                       :
                                                          :
NANETTE MONIQUE HULL                                      :
1000 Holbrook Road, Apartment T                           :
Homewood, IL 60430                                        :
                                                          :
And                                                       :
                                                          :
NATHANIEL HULL                                            :
41 N. Willow Lane                                         :
Glenwood, IL 60425                                        :
                                                          :
And                                                       :
                                                          :
YVONNE HULL-PEARSON, personally                           :
and as guardian for NALA M. PEARSON                       :
1000 Holbrook Road, Apartment T                           :
Homewood, IL 60430                                        :
                                                          :
And                                                       :
                                                          :
JUSTIN TIMOTHY JOHNSON                                    :
25945 Aysend Dr.                                          :
Punta Gorda, FL 33983                                     :

```
                                        :
And                                     :
                                        :
ROXANNESIMONS-JOHNSON                    :
25945AysendDr.                          :
PuntaGorda,FL33983                      :
                                        :
And                                     :
                                        :
LINDALONDRIE                            :
1104SearcyDrive                         :
Killeen,TX76543                         :
                                        :
And                                     :
                                        :
ALONZOM.LUNSFORD,JR.,personally         :
andasguardianforCANDICEJ.WESTON,        :
AJIONAD.LUNSFORD,ALONZOM.               :
LUNSFORDIII,ANDHARLANWESTON,            :
6458EasthamptonRoad                     :
Fayetteville,NC28314                    :
                                        :
And                                     :
                                        :
JOHNSYEA.LUNSFORD-BLOOMFIELD,           :
3204JohnsonCourt                        :
Glenarden,MD20706                       :
                                        :
And                                     :
                                        :
KIMBERLYD.MUNLEY,personallyand          :
asguardianforJAYDENALYSSA               :
MUNLEYANDMARYLYNHOPE                     :
HERNANDEZ-BARBOUR,                       :
P.O.Box73                               :
KureBeach,NC28449,                      :
                                        :
And                                     :
                                        :
HOWARDEDWARDRAY                         :
5308LionsGateLane                       :
Killeen,TX67549                         :
                                        :
And                                     :
                                        :
RACHAELSALONERAY,personallyand          :
```

as guardian for JADEN CHARLES RAY,      :
LOGAN CARL RAY, and MICHAEL             :
PAUL RAY,                                :
5308 Lions Gate Lane                     :
Killeen, TX 76549                        :
                                         :
And                                      :
                                         :
DAYNA F. ROSCOE                          :
104 Cooney St.                           :
Ft. Huachuca, AZ 85613                   :
                                         :
And                                      :
                                         :
LEVAL. FERGUSON                          :
18806 Remington Springs Dr.              :
Houston, TX 77073                        :
                                         :
And                                      :
                                         :
JAMES R. FERGUSON                        :
18806 Remington Springs Dr.              :
Houston, TX 77073                        :
                                         :
And                                      :
                                         :
CHRISTOPHER H. ROYAL, personally and     :
as guardian for CHRISTOPHER S. ROYAL,    :
II                                       :
6300 Suellen Lane                        :
Killeen, TX 76542,                       :
                                         :
And                                      :
                                         :
STEPHANIE J. ROYAL,                      :
6300 Suellen Lane                        :
Killeen, TX 76542,                       :
                                         :
And                                      :
                                         :
JONATHAN SIMS                            :
231 Bridal Drive                         :
Copperas Cove, TX 76522                  :
                                         :
And                                      :
                                         :

MICHELLE SIMS                                    :
6620 Lyndale Dr.                                 :
Watauga, TX 76148                                :
                                                 :
And                                              :
                                                 :
JERRY LEE SIMS                                   :
6620 Lyndale Dr.                                 :
Watauga, TX 76148                                :
                                                 :
And                                              :
                                                 :
REX A. STALNAKER                                 :
333 Peterson Road                                :
Knoxville, TN 37934                              :
                                                 :
And                                              :
                                                 :
KATHRYN E A. STALNAKER                           :
333 Peterson Road                                :
Knoxville, TN 37934                              :
                                                 :
And                                              :
                                                 :
CLIFTON MIKEAL STONE                             :
886 Beverly Circle                               :
Lenoir, NC 28645                                 :
                                                 :
And                                              :
                                                 :
DIANE BROOKE STONE, personally and               :
as guardian for                                  :
OAKLEY MIKEAL STONE AND ALYSSA                   :
KAYLEIGH STONE,                                  :
886 Beverly Circle                               :
Lenoir, NC 28645                                 :
                                                 :
And                                              :
                                                 :
KAREN DENISE MIKEAL                              :
886 Beverly Circle                               :
Lenoir, NC 28645                                 :
                                                 :
And                                              :
                                                 :
GEORGE O. STRATTON III                           :

122 S. Scott Street         :
Post Falls, ID 83854       :
                                :
And                        :
                                :

GEORGE STRATTON JR.    :
122 S. Scott Street         :
Post Falls, ID 83854       :
                                :
And                        :
                                :

LYNN E R. STRATTON    :
122 S. Scott Street         :
Post Falls, ID 83854       :
                                :
And                        :
                                :

LAWRENCE STRATTON    :
122 S. Scott Street         :
Post Falls, ID 83854       :
                                :
And                        :
                                :

DAVID CLUNE              :
122 S. Scott Street          :
Post Falls, ID 83854       :
                                :
And                        :
                                :

MATTHEW CLUNE        :
1769 N. Cecil Road        :
Post Falls, ID 83854       :
                                :
And                        :
                                :

MIGUEL A. VALDIVIA    :
36 N. Edison Avenue       :
Elgin, IL 60123-5234      :
                                :
And                        :
                                :

MARK ANTHONEY WARREN :
2208 Price Drive           :
Killeen, TX 76542         :
                                :
And                        :

CARLA SUE WARREN                                :
2208 Price Drive                                :
Killeen, TX 76542                               :
                                                :
And                                             :
                                                :
DIANA J. WHITE                                  :
1901 N. WS Young Dr. #C                          :
Killeen, TX 76543                               :
                                                :
And                                             :
                                                :
JULIA WILSON (ADEE)                             :
6909 Shannon Circle                             :
Killeen, TX 76542                               :
                                                :
And                                             :
                                                :
ELIZABETH WILSON                                :
6909 Shannon Circle                             :
Killeen, TX 76542                               :
                                                :
And                                             :
                                                :
JULIA WILSON (ADEE), as guardian for            :
WYATT WILSON (a minor)                          :
6909 Shannon Circle                             :
Killeen, TX 76542                               :
                                                :
        Plaintiffs,                             :
                                                :
v.                                              :
                                                :
JOHN McHUGH, in his official capacity as        :
Secretary of the Army                           :
101 Army Pentagon                               :
Washington, DC 20310                            :
                                                :
And                                             :
                                                :
LEON B. PANETTA, in his official capacity       :
as Secretary of Defense                         :
1000 Defense Pentagon                           :
Washington, DC 20301                            :
                                                :

And                                               :
                                                  :
ROBERT MUELLER III, in his official               :
capacity as Director of the Federal Bureau of     :
Investigation,                                     :
FBI Headquarters                                   :
935 Pennsylvania Avenue, N.W.                      :
Washington, D.C. 20535                             :
                                                  :
And                                               :
                                                  :
JOHN DOE #1, in his individual capacity,          :
c/o the United States Army                         :
101 Army Pentagon                                  :
Washington, DC 20310,                             :
                                                  :
And                                               :
                                                  :
JOHN DOE #2, in his individual capacity,          :
c/o the United States Army                         :
101 Army Pentagon                                  :
Washington, DC 20310,                             :
                                                  :
And                                               :
                                                  :
JOHN DOE #3, in his individual capacity,          :
c/o the United States Army                         :
101 Army Pentagon                                  :
Washington, DC 20310,                             :
                                                  :
And                                               :
                                                  :
JOHN DOE #4, in his individual capacity,          :
c/o the United States Army                         :
101 Army Pentagon                                  :
Washington, DC 20310,                             :
                                                  :
And                                               :
                                                  :
JOHN DOE #5, in his individual capacity,          :
c/o the Federal Bureau of Investigation           :
FBI Headquarters                                   :
935 Pennsylvania Avenue, N.W.                      :
Washington, D.C. 20535,                           :
                                                  :
And                                               :

| | |
|---|---|
| JOHNDOE#6,inhisindividualcapacity, | : |
| c/otheUnitedStatesArmy | : |
| 101ArmyPentagon | : |
| Washington,DC20310, | : |
| | : |
| And | : |
| | : |
| NIDALHASAN,inhisindividualcapacity, | : |
| c/otheUnitedStatesArmy | : |
| 101ArmyPentagon | : |
| Washington,DC20310, | : |
| | : |
| And | : |
| | : |
| NASSERal-AULAQIinhiscapacityasthe | : |
| personalrepresentativeoftheestateof | : |
| ANWARal-AULAQI, | : |
| c/oAmericanCivilLibertiesUnionofthe | : |
| Nation'sCapital | : |
| 4301ConnecticutAvenueN.W.,Suite434 | : |
| Washington,DC20008 | : |
| | : |
| Individually,jointlyandseverally, | : |
| | : |
| Defendants. | : |
| | : |
| | : |

## COMPLAINT

(FOR WRONGFUL DEATH, SURVIVORSHIP, ASSAULT AND BATTERY, DUE PROCESS
VIOLATIONS, LOSS OF CONSORTIUM, CIVIL CONSPIRACY, VIOLATION OF 42 U.S.C. §1985(3),
NEGLIGENCE, GROSS NEGLIGENCE, NEGLIGENT AND INTENTIONAL MISREPRESENTATIONS)

## SUMMARY

1.      PlaintiffsarevictimsoftheFortHoodterrorista         ttackofNovember5,2009.

2.      Defendants are John McHugh, Secretary of the Army (        "Army"); Leon Panetta,

Secretary of the Department of Defense ("DOD"); Rob      ert Mueller III, Director of the Federal

Bureau of Investigation ("FBI"); John Does ##1-6, w      hose actions as individuals and as Army,

DODand/orFBIemployeesareknowntoplaintiffs,b          utwhosenamesarenot;Armypsychiatrist

20

Major Nidal Malik Hasan ("Hasan"); and Nasser al-Aulaqi as the personal representative of the estate of Anwar al-Aulaqi ("Aulaqi").

3.      The Army, DOD, FBI and John Does are jointly and severally called the "government defendants" in this Complaint. Hasan and Aulaqi are jointly and severally called the "terrorist defendants" in this Complaint.

4.      Hasan, an open and notorious Islamic extremist, carried out the Fort Hood terrorist attack with cold-blooded premeditation and the critical support, approval and religious sanction of Aulaqi and the Al-Qaeda terrorist organization.

5.      Aulaqi was a prominent Islamic and al-Qaeda propagandist and terrorist leader killed in a September, 2011 U.S. drone strike in Yemen.  At all times relevant, Al-Qaeda - established by Osama bin Laden - was a designated Foreign Terrorist Organization operating through a global network of terror cells, members, associates and supporters (like Hasan) dedicated to the establishment of a pan-Islamic caliphate worldwide.  In February, 1998, Al-Qaeda issued a religious pronouncement titled "the World Islamic Front for Jihad against Jews and Crusaders" saying it was the duty of Muslims to kill Americans – civilians and military – and their allies everywhere. This is what Aulaqi and Hasan believed and this is what Hasan did at Fort Hood.

6.      On or before December, 2008, the government defendants knew that Al-Qaeda and its Pakistani, Somali, and Yemeni allies had established a terrorist recruitment, radicalization, and operational infrastructure in the United States with effects both at home and abroad. Put simply, at all times relevant, the government defendants knew that Aulaqi and al-Qaeda were seeking out and using Muslim extremists such as Hasan to attack and kill Americans inside the United States.

7.      The Special Report by Joseph I. Lieberman, Chairman        , and Susan M. Collins, Ranking Member, United States Senate Committee on H        omeland Security and Governmental Affairs dated February 3, 2011 ("Senate Report") (a        ttached and incorporated by reference as Exhibit 1 ), and the Final Report of the William H. Webster C        ommission on the Events at Fort Hood, Texas on November 5, 2009 (the "Webster Repor        t") (attached and incorporated by reference as Exhibit 2   ), demonstrate that the government defendants did n        ot "miss" Hasan, and lay to rest any claims or assertions that Hasan som        ehow "slipped through the cracks" of their security.

8.      Instead, these Reports prove the government defenda        nts knew to a moral certainty that Hasan was a radical extremist who supported vi        olent jihad against the United States and who considered himself a devoted fellow-traveler and "s        oldier" of al-Qaeda and Aulaqi. They also prove that the government defendants knew to a mora        l certainty both that Hasan's conduct and beliefs rendered him unfit to serve as an officer i        n the U.S. Army, and that he was a "ticking time bomb" who posed an unreasonable risk of harm to pla        intiffs.

9.      At multiple points in time and on many different oc        casions, beginning as early as 2005 and continuing up until the very day of the at        tack, non-discretionary Army rules, FBI tradecraft and constitutional duties required the g        overnment defendants to act against Hasan, to discipline him, to investigate him, to interview hi        m, to inform his superiors about his communications with Aulaqi, to prosecute him, to di        scharge him from the service, and/or to imprison him.

10.     Yet, contrary to law, to their own rules and to pla        in common sense, the government defendants elevated illegal ethnic and r        eligious preferences and "political correctness" over national security and their own n        on-discretionary legal and moral duties to

protect plaintiffs' lives and legal rights. As a d      irect, proximate and foreseeable result of the government defendants' negligence, gross negligence   , political correctness and deliberate indifference to and reckless disregard for plaintif      fs' lives and legal rights, Hasan was able to kill 14 Americans, wound by gunshot 32 others, and injur      e many more.

11.     Thereafter, the government defendants, for politica      l reasons and to protect both the policies of political correctness and the high      ranking officials who advocated and enforced same, engaged in "damage control" including efforts      to obscure Hasan's religious motives; to obfuscate the fact that the government defendants'      ethnic and religious preferences proximately caused the plaintiffs' injuries; and to convince pl      aintiffs and the public that the Fort Hood attack was merely "workplace violence," and not Al-Qaeda-i      nspired terrorism.

12.     Ironically, the very same government defendants who      gave Hasan preferential treatment because of his ethnicity and religion hav      e given his victims - the soldiers and civilians who were casualties in the Fort Hood terror attack      - inferior and degrading treatment relative to the soldiers and civilians injured in other terrori      st attacks.

13.     To this day, three years after the Fort Hood terror      attack, the Army, DOD and FBI have never apologized, taken responsibility for the      ir mistakes, or expressed any regret to plaintiffs. In fact, no high ranking civilian or m      ilitary command official has been disciplined or lost his or her job because of the acts, errors and      omissions that proximately caused the attack, and plaintiffs' deaths, wounds and injuries.

## BACKGROUND

14.     The Senate Report and the Webster Report paint a ve      ry stark picture of the government defendants' deliberate indifference to a      nd reckless disregard for plaintiffs' physical safety and legal rights.

15.     By May 17, 2007, the Army, DOD and John Does ##1-4        knew to a moral certainty that Hasan was a shockingly substandard d     octor who demonstrated a lack of professionalism, poor judgment, a poor work ethic a     nd a studied disregard for professional standards of care for his patients and Army rules a     nd discipline.  *See* Memorandum from Major Scott Moran to National Capital Consortium Psychiat     ry Residency Program dated May 17, 2007 (attached as Exhibit 3   ).

16.     By 2005, these defendants knew to a moral certainty       that Hasan was a fanatic Islamist extremist who openly and notoriously suppo     rted jihad, suicide attacks and violence against the United States. According to the Senate       Report, at least one of Hasan's supervisors was so alarmed by Hasan's Islamic radicalism that h     e tried on at least two occasions to convince Hasan to resign from the service.

17.     By December, 2008, the Army, DOD and FBI and John D     oes ##4 and 5 knew to a moral certainty that Aulaqi and Al-Qaeda terrorist       groups had actively recruited individuals in the U.S., deliberately motivated others to carry ou     t terrorist attacks on U.S. soil, and/or directed trained operatives in the execution of coordinated       strikes against American targets within our borders. They also knew to a moral certainty that A     l-Qaeda and its Pakistani, Somali, and Yemeni allies had established a terrorist recruitme     nt, radicalization, and operational infrastructure in the United States that was attrac     ting Muslims who were American citizens to be operatives in Al-Qaeda's broader global battlefield     , with effects at home and abroad.

18.     By January 7, 2009, the FBI and Doe #5 knew to a mo     ral certainty that Hasan was an active security threat, as the result of his int     ercepted communications with Al-Qaeda's Aulaqi. In the emails reviewed by these defendants, Hasan -     who was at all times an active duty U.S. military officer - sought religious sanction for fr     atricide, supported the government of Iran,

justified suicide attacks against innocents and off      ered material support for terrorism, among

other things. Hasan also made clear his deep devot          ion to the terrorist leader, writing in rhapsodic

terms of meeting Aulaqi in the Muslim "after-life."

19.    By June 30, 2009, the government defendants knew or      should have known that

Hasan supported the jihadi murder of Americans at t          he Little Rock, Arkansas Army recruiting

office and that he believed Muslims needed to "stra          p bombs on themselves and go into Times

Square" to kill Americans.

20.    By August, 2009, the Army, DOD and John Doe #6 knew          or should have known

that Hasan was abusing his patients, who were Ameri          can soldiers returning from the battlefields

of Iraq and Afghanistan, by calling them "war crimi          nals" in the course of psychiatric treatment

sessions, and promising criminal prosecution agains          t them because these soldiers had killed

Taliban and other terrorists in Afghanistan and Ira          q.

21.    At all times relevant, the government defendants kn      ew that Hasan's conduct

violated Army regulations and U.S. law; that the FB          I had a non-discretionary and constitutional

duty to interview Hasan, to notify his superiors of          the communications with Aulaqi, and to

monitor his weapons purchases, among other things;          and that the Army had a non-discretionary

and constitutional duty to discipline, discharge, p          rosecute and/or imprison Hasan. In short, the

government defendants had a non-discretionary and c          onstitutional duty to protect plaintiffs.

22.    At all times relevant, the government defendants kn      ew or should have known that

their failure to meet their obligations and do thes          e things unreasonably threatened plaintiffs' lives

and violated their legal rights.

23.    Yet, bowing to political correctness because of Has      an's ethnicity and religion

(Arab Muslim), and with unreasonable and deliberate          indifference to, and reckless and willful

disregard for, plaintiffs' lives and legal rights,      the government defendants afforded Hasan preferential treatment, thereby proximately causing   the Fort Hood terrorist attack.

24.     For example, they awarded Hasan a fellowship that h      e did not earn; sanitized and falsified his Officer Evaluation Reports ("OERs") t      o hide both his Islamist jihadi ideology and his professional incompetence; intentionally ignore      d his constant violations of Army regulations and professional standards; wrongfully and intentio      nally disregarded, or "spiked," the multiple reports from his peers calling him a security risk      and a "ticking time bomb;" promoted him to Major; chose not to discipline, prosecute, discharg      e and/or imprison him; and terminated the security investigation into his ties to Aulaqi and      Al-Qaeda without a personal interview, an appropriate database review or the disclosure of th      e fact and content of his communications with this international terrorist chieftain to his comma      nding officers.

25.     On November 5, 2009, after extensive planning, prac      tice and preparation, Hasan carried out the Fort Hood terror attack.

26.     At approximately 1:00 pm local time, he took up a p      re-planned firing position designed to maximize the carnage, yelled "Allah Akb      ar" (meaning "God is Great" in Arabic), just as Aulaqi had recommended, and began shooting.      He killed 14 Americans, wounded 32 with gunshots and injured many others, before he wa      s shot and paralyzed. "Allah Akbar" was the rallying cry for the 9/11 terrorists and for th      e terrorists who beheaded the American journalist Daniel Pearl, and it is used by other jihadists wor      ldwide when attacking non-Muslims.

27.     The government defendants' unreasonable and deliber      ate indifference to, and reckless disregard for, plaintiffs' lives and legal      rights, proximately and foreseeably caused the Fort Hood terror attack and plaintiffs' injuries. T      his attack was predictable and preventable - but for the government's own intentional acts and delib      erate omissions in violation of Army rules,

regulations and discipline, and their patently ille      gal ethnic and religious preferences and sensitivities, Hasan could not have killed, wounded      and maimed plaintiffs and the other Americans at Fort Hood.

28.      Within minutes after shooting had stopped the gover      nment defendants knew that Hasan's rampage was religiously motivated; that he      acted on behalf of Al-Qaeda, and in support of its objectives, with religious and operational i      nspiration and support from Aulaqi; that the attack was "terrorism" as defined by U.S. Army Fiel      d Manual No. FM 3-0, Chapter 9, 37 and the DOD Joint Publication 1-02, the "DOD Dictionary of      Military and Associated Terms" (the "DOD Dictionary"); and that the government defendan      ts' political correctness, which manifested itself in the unreasonable, knowing and deliberate      indifference to and reckless disregard for plaintiffs' lives and legal rights, had proximately      caused the most lethal terror attack on U.S. soil since 9/11.

29.      At all times relevant, the government defendants kn      ew that Hasan was a dedicated Islamist and jihadist who openly and notoriously de      clared himself a "Soldier of Allah;" supported suicide attacks, fratricide and the murde      r of innocents; was a devoted follower of al-Qaeda's Aulaqi; and who yelled "Allah Akbar" as ins      tructed by Aulaqi, when he shot down unarmed Americans, among other things.

30.      At all times relevant, the government defendants kn      ew or should have known that Hasan considered himself and conducted himself as a      n enemy of the United States, and that he had carried out a "hostile act" against it, as defi      ned by the DOD Dictionary.

31.      Yet, to avoid culpability, to protect the very poli      cies of preference that proximately caused the Fort Hood terror attack, and      to mitigate political embarrassment, the government defendants, led by John Doe #4, undertoo      k "damage control" that included covering

up and/or obscuring Hasan's employment history; his         communications with Aulaqi; his religious

motivations and purposes in carrying out the attack        ; and the Army's reasons for failing to

discipline or otherwise act against Hasan the way i        t would have against any other non-Muslim

soldier.

32.     It also included calling the Fort Hood terror attac        k "workplace violence."

33.     This damage control and cover up was conducted with         unreasonable and

deliberate indifference to and reckless disregard f        or the truth; good military morale, discipline

and order; and for plaintiffs' legal rights. At a        ll times relevant, the government defendants knew

that their slavish devotion to political correctnes        s, and their unreasonable deliberate indifference

to and reckless disregard for plaintiffs' lives and        legal rights caused plaintiffs actionable mental

distress.

34.     Ironically, the very same government defendants who         gave Hasan preferential

treatment because of his ethnicity and religion hav        e given his victims, the soldiers and civilians

who were casualties in the Fort Hood terror attack,        inferior and degrading treatment relative to

soldiers and civilians injured in other terrorist a        ttacks.

35.     In the immediate aftermath of the attack, high rank        ing political and military

officials, including the President and the Chairman        of the Joint Chiefs of Staff, visited with some

of the wounded soldiers, civilians and their family        members, promising them the best care,

support and assistance from the Army and DOD.

36.     However, these promises disappeared into the ether         when the television cameras

left Fort Hood.

37.     Many of the seriously wounded and injured plaintiff        s were left abandoned to their

own means and devices to obtain decent medical care        . One injured soldier was able to obtain

28

proper treatment for a traumatic brain injury cause        d by a bullet to the head only because the treatment was paid for by a private benefactor.

38.      In multiple cases, the Army has refused to admit th        e seriousness the Fort Hood victims' injuries.  For example, one soldier, who w        as diagnosed with crippling post traumatic stress syndrome, was denied treatment and a medical        discharge by a Captain who specifically refused to sign the appropriate certifications beca        use his injuries were sustained at Fort Hood. In another case, a soldier was kept on active duty des        pite doctors' recommendations that he be transferred to a wounded warrior unit if not discha        rged from the Army on disability entirely. After the last of several major surgeries, he had t        o enlist the help of his brigade surgeon in begging his brigade commander to approve surgery to        remove a bullet that was moving into the nerve wrap around an artery that could have caused        internal bleeding from the axilla artery leading to death. His medical care has been so ina        dequate that he has been forced to get civilian care off base.

39.      Another soldier who was shot by Hasan five times an        d almost died due to medical neglect of his head and belly wounds at Darnell Arm        y Hospital and has been in a Wounded Warrior unit for over two years. Although he is un        able to lift anything heavy, or walk more than a short distance, or even ride a bicycle, he has be        en denied a medical discharge and been taunted by his commanders. He has been told that if he had        been wounded in Iraq, he would have been retired and deemed disabled long ago.  However, bec        ause the DOD views his injuries as a workplace violence matter, he remains in limbo.

40.      Another soldier, whom the Veterans' Administration        has since diagnosed with post traumatic stress disorder so severe that he ca        nnot work, drive a car, or even bathe himself was sent to Iraq immediately after the Fort Hood at        tack without any treatment whatsoever.

Upon returning from Iraq, he had a breakdown and requested treatment. The Army refused and instead put him on a punitive duty that involved 24-48 hour shifts. He was not allowed off base, and was forced to sleep in a hallway on a cot for 3 weeks. When he was allowed to return home he received discharge papers and was told that he was lucky to have an honorable discharge because he was such an embarrassment to his company. Since he was not medically discharged as he should have been, his family went without any income for two years, until in August 2012 the VA classified him 100% disabled. But for assistance from his mother and mother-in-law, this soldier and his family would have been homeless.

41.     Others were denied retirement benefits on specious grounds through administrative appeal proceedings fatally tainted by undue command influence. Still others were subjected to insults, taunts, abuse and neglect from their command because they sought treatment for Fort Hood-related injuries, exacerbating their psychiatric injuries.  One plaintiff, who was harassed by his commander simply because of his connection to the Fort Hood terror attack, was even subjected to an Article 15 disciplinary proceeding which resulted in a demotion, forfeiting of pay and extra duty.

42.     In yet another case, the Armed Forces Chief of Staff had given a wounded soldier his card with instructions to call if he (the soldier) needed anything.  Severely injured and disabled, unable to even drive himself to his doctor appointments, and on the verge of economic disaster because his wife had to quit her job and provide him with full time care, he called for help. No one answered. No help was provided.

43.     Contrary to its own regulations, the Army has refused to deem the soldiers killed and wounded in the attack eligible for a Purple Heart decoration, with its attendant recognition and medical and retirement benefits.

44.     As for the civilians injured by Hasan, the governme        nt defendants have done nothing of substance at all in the way of decent me        dical care, assistance or support.

45.     Upon information and belief, this deliberate indiff        erence and reckless disregard for plaintiffs was the result of a determination by        John Doe #4 and other political and command officials to obfuscate Hasan's religious motivation        s and Al-Qaeda ties, to cover up the government defendants' culpability for plaintiffs'        injuries and protect the policies of ethnic and religious preference that proximately caused the Fo        rt Hood terror attack, and to push plaintiffs down a memory hole to spare the Army, DOD and other        s from critical scrutiny and liability.

46.     The Army, DOD and FBI have never apologized or expr        essed any regret to plaintiffs for their mistakes. In fact, no high ra        nking civilian or military command official has been disciplined or lost his or her job because of        the acts, errors and omissions that proximately caused the attack.  Instead, the Army has "discipli        ned" junior officers in hopes of deflecting blame for its failings from the responsible officia        ls in the bureaucracy, DOD and elsewhere in the Executive Branch.

47.     The government defendants' reckless and willful pos        t-attack cover up to protect the patently illegal policies of preference and pol        itical correctness, as well as the high ranking officials responsible for their development and imp        lementation, has angered, bewildered and injured the plaintiffs, compounding the damage done        by the terror attack itself.

48.     Defendants' tortious misconduct and gross negligenc        e, misguided obedience to political correctness, and unreasonable, deliberate        indifference to and reckless disregard for plaintiffs' lives, emotional well-being and constit        utional rights, have proximately and foreseeably caused plaintiffs physical injury, incl        uding but not limited to terror, wrongful death, disfigurement, permanent and temporary disability,        neurological damage, pain and suffering;

emotional distress, including but not limited to di        sabling post-traumatic stress disorder, anger, depression, sleeplessness and nightmares, crippling       anxiety, feelings of constant fear and helplessness, an inability to work, psychiatric dis        orders, adverse personality changes and a host of physical ailments and disorders that are manifes        tations thereof, including high blood pressure, headaches and other physical disorders; a loss of t        he ability to enjoy a normal life, including but not limited to loss of consortium, marital problems        , and social disorders; and economic losses, including but not limited to lost wages, lost benef        its and medical expenses.

## FACTS

### Pre-Attack Misconduct of the Army and DOD

49.     From 2003 to 2007, Hasan was a resident in the psyc        hiatric program at Walter Reed Army Medical Center in Washington, D.C.

50.     From 2007 to 2009, Hasan was a fellow in a post-res        idency graduate program at the Uniformed Services University for the Health Sc        iences, also in Washington, D.C.

51.     At all times relevant, Hasan was employed by and su        bject to the supervision of the Army and DOD.

52.     As set forth in the Senate Report, the Army and DOD        knew that Hasan was an unfit officer and an incompetent and dangerous empl        oyee who posed an unreasonable risk of harm to his patients and to plaintiffs. For exampl        e:

a.   Hasan refused to make presentations on patients and        medical subjects, as required of all others similarly situated, but inst        ead was allowed to make off-topic and irrelevant presentations of Islamist propaganda.

b.   Hasan, openly and notoriously, justified suicide bo        mbing, "jihad," killing non-Muslims and the attacks on the World Trade Center b        y Osama bin Laden.

32

c.   Hasan said, openly and notoriously, that Muslims in    the U.S. military should commit fratricide to protect their religion.

d.   Hasan said, openly and notoriously, that suicide bo    mbers were "rewarded with 72 virgins."

e.   Hasan, openly and notoriously, identified himself a    s a "Soldier of Allah" and told his peers and superiors that the U.S. was at w    ar with Islam.

f.   Hasan openly and notoriously told his superiors tha    t he could not engage in combat against Muslims and that Islam "sharia law"    took precedence over the U.S. Constitution.

g.   Hasan's presentation for his medical residency grad    uation "Grand Rounds" consisted almost entirely of Koranic verses support    ing the killing of non-Muslims.

h.   Hasan was viewed as a security threat and as a "tic    king time bomb" by his fellow officers who reported him for discipline and    appropriate action by defendants.

i.   Hasan said, openly and notoriously, that he was "ha    ppy" when a U.S. soldier was killed in a June 1, 2009 jihadi attack on an Ar    my recruiting office in Little Rock, Arkansas.

j.   Hasan said, openly and notoriously, that Muslims sh    ould "strap bombs on themselves in Times Square."

k.   Hasan said, openly and notoriously, that Muslims ne    eded to "stand up against the aggressor" – i.e., the United States.

l.   Hasan considered himself, and conducted himself, a    s an enemy of the United States.

m.   Hasan was known by the Psychiatric Residency Program Director to be "lazy" and a "religious fanatic."

n.   Hasan was a chronic poor performer during his residency and fellowship, placed on probation and remediation for failing to meet basic job expectations such as showing up for work and being available when he was the physician on call, and for improperly proselytizing Islamic beliefs to his patients.

o.   Hasan displayed "a pattern of poor judgment and lack of professionalism" as a doctor, failing to appropriately handle an emergency room encounter with a homicidal patient "who subsequently eloped from the ER [emergency room]," among other things.

p.   Hasan was placed on administrative probation for failing medical skills certification exams.

q.   Hasan was "counseled" for "having a poor record of attendance at didactics" and being consistently late for National Naval Medical Center morning report.

r.   Hasan had unsatisfactory Psychiatry Resident-In-Training Examination test scores and, in one year, he failed to show up for the examination at all.

s.   Hasan intentionally avoided and refused to provide medical services to military and other patients. During his fourth post-graduate year his superiors discovered that he failed to carry out his duties and saw only 30 outpatients in 38 weeks of outpatient continuity clinic.

t.   Hasan, openly and notoriously, abused his patients in the course of their psychiatric treatment by calling them "war criminals" for killing terrorists in Iraq and Afghanistan.  Hasan then went to his superiors, contrary to all standards of medical

practice, breached his patients' confidences and de    manded that they be criminally prosecuted.

53.    Under Army rules, the Army, DOD and John Does ##1-4    and 6 all had non-discretionary duties to protect plaintiffs and to a    ct against Hasan, to discipline him, to prosecute him, to imprison him and/or to dishonorably dischar    ge him from military service.

54.    As stated in the Senate Report, the Army, DOD and J    ohn Does ##1-3 and 6 knew that Hasan was unfit to serve as a U.S. Army office    r. Yet, they promoted Hasan to Major from Captain, sent him to Fort Hood, and gave him the pr    ivilege of providing psychiatric treatment to American combat soldiers.

55.    They did these things, in whole or material part, b    ecause of Hasan's ethnicity and religion (Arab Muslim), and with unreasonable and d    eliberate indifference to, and reckless and willful disregard for, both Army regulations and th    e plaintiffs' lives and legal rights.

56.    At all times relevant, the Army, DOD and John Does    ##1-4 and 6 unreasonably, knowingly, contrary to law, and with deliberate ind    ifference to and reckless disregard both for Army regulations and for plaintiffs' lives and lega    l rights, operated a scheme of politically correct ethnic and religious preferences that benef    itted Hasan.

57.    Pursuant thereto, Hasan was given financial and pro    fessional benefits, promotions, exemptions from generally applicable st    andards of practice and discipline, and other preferences that were not available or given to sim    ilarly situated non-Muslims. For example, the Army, DOD and John Does ##1-4 and 6:

    a.    Exempted Hasan from generally applicable Army and p    rofessional rules, standards and discipline.

b.   Affirmatively declined to discipline Hasan for his       multiple and consistent violations of Army regulations and discipline.

c.   Awarded Hasan a highly valuable and competitive fel      lowship and gave him other preferences and benefits that were not availa      ble to similarly situated non-Muslims, with the knowledge that Hasan had not earned and wa      s not qualified for same.

d.   Affirmatively declined to discipline Hasan, to trea      t him as a security risk and/or to refer him for investigation or criminal p      rosecution and discharge from the service although at all relevant times Hasan public      ly supported and promoted jihad and suicide attacks against "enemies of Muslims" includ      ing the United States, among other things.

e.   Sanitized and falsified Hasan's OERs to cover up hi      s dangerous Islamic extremism, his professional incompetence and his re      ckless disregard for the health and safety of his patients.

f.   Intimidated Hasan's immediate superior officers thr      ough political correctness directives that led them to fear for their military       careers if they treated Hasan like any similarly situated soldier, causing these officers       to ignore and show deliberate indifference to and recklessly disregard both Army       regulations and plaintiffs' lives and legal rights by covering up Hasan's dangerous Islam      ist radicalism, manifest professional failings and gross disregard for the health and saf      ety of his patients.

g.   Disregarded generally applicable Army rules and reg      ulations in order to avoid disciplining Hasan in response to his claims that "       Islamic law" justified or even mandated fratricide.

36

h.   Disregarded reports by other soldiers that Hasan was a dangerous religious fanatic who repeatedly affirmed the primacy of "Islamic law" over the U.S. Constitution, contrary to his oath as an officer and who posed a risk of harm to others.

i.   Promoted Hasan from Captain to Major notwithstanding his failure to meet basic job expectations such as showing up for work and being available as the physician on call, his disregard for basic good medical practices or his Islamist ideology.

j.   Assigned Hasan to treat combat soldiers at Fort Hood who had killed Islamic terrorists even though Hasan was a self-described "Soldier of Allah" who openly and notoriously praised the jihadi killing of American soldiers and who was described as a "ticking time bomb" by those in the military who knew him.

k.   Allowed Hasan to keep his rank and freedom notwithstanding his patient abuse.

l.   Classified Hasan's attack at Fort Hood as "workplace violence," and not "terrorism," contrary to all of their applicable definitions of the term.

m.   Failed to comply with applicable Army policies and regulations solely because of Hasan's ethnicity and religion, all as set forth in a classified report in the Army's and DOD's sole possession and control.

58.   At all times relevant, the Army, DOD and John Does ##1-4 and 6 knew that they each had a non-discretionary duty of care to properly train and supervise Hasan; to hold Hasan to the same standards of professional performance and military discipline as any other soldier; to ensure Hasan's OERs were true and accurate in all material respects; to protect plaintiffs from their dangerous and unfit employee Hasan; and to protect, guard and respect plaintiffs' lives and legal rights.

59.    Each of them negligently, knowingly, with deliberate indifference to and reckless disregard for Army regulations and plaintiffs' lives and legal rights, breached and disregarded these duties of care, all as set forth in this Complaint.

60.    As a proximate and foreseeable result of their negligence, gross negligence, deliberate indifference to and reckless disregard for Army regulations and for plaintiffs' lives and legal rights, Hasan killed, wounded, injured and damaged plaintiffs, all as set forth in this Complaint.

61.    But for these defendants' political correctness and scheme of ethnic and religious preferences, the Fort Hood terror attack and plaintiffs' grievous injuries could not have occurred.

### Pre-Attack Misconduct of the FBI

62.    As set forth in the Webster Report, the FBI's San Diego Field Office's ("SDFO") investigation of Aulaqi uncovered Hasan's communications with him in late 2008.

63.    SDFO read Hasan's emails to mean that an U.S. Army officers sympathetic to the Iranian government was communicating with an al-Qaeda leader about violence against fellow soldiers and therefore, the SDFO referred the lead to the FBI's Washington Field Office ("WFO") for action.

64.    However, SDFO negligently failed to send an Intelligence Information Report ("IIR") to the Army and/or DOD, even though dissemination of such information in this fashion was provided for by FBI guidelines. The Webster Report states that this mistake "had serious consequences, because IIRs are a primary means by which the FBI shares information. An IIR could have provided notice to senior DOD officials of Hasan's communications [with Aulaqi]." *See* Webster Report at 74.

65.   For its part, WFO was grossly negligent in its handling of the Hasan lead, acting with deliberate indifference to and reckless disregard for both FBI tradecraft and its non-discretionary duty to protect plaintiffs' lives and legal rights, in whole or in part because of political correctness due to Hasan's ethnicity and religion. For example:

a.   WFO did not read and assign the Hasan lead until February 25, 2009, nearly fifty days after it had been sent by SDFO.

b.   John Doe #5, aka "WFO-TFO," was required to act on the Hasan lead within ninety days.  On the ninetieth day, he read it for the first time, gave it four hours of review, and then negligently, and with deliberate indifference to and reckless and willful disregard for plaintiffs' lives and legal rights, and for his non-discretionary duty to protect them from Hasan, unreasonably closed the investigation.

c.   John Doe #5 unreasonably decided not to interview Hasan about his communications with Aulaqi, contrary to the FBI's tradecraft, and then rejected SDFO's specific request that he do so, because of political sensitivities in WFO due to Hasan's ethnicity and religion.

d.   John Doe #5 unreasonably relied on the falsified OERs to terminate the Hasan investigation.

e.   WFO unreasonably failed to fully respond to requests for information and additional investigation from the SDFO.

f.   WFO unreasonably failed to search appropriate computer databases, which would have revealed critical information about Hasan, contrary to FBI requirements.

66.   SDFO was dissatisfied with WFO's careless approach.  Therefore, the San Diego agent in charge took the extraordinary step of conducting "follow up" with WFO.  He asked an

employee identified in the Webster Report as Task Officer 3 ("SD-TFO3") to call John Doe #5 and tell him that WFO had mishandled the investigation. SD-TFO3 and John Doe #5 were both Defense Criminal Investigation Service employees.

67.     After multiple communications requesting more diligent investigation were ignored by WFO, SD-TFO3 called WFO-TFO and said that, upon receiving a lead like this one, San Diego would have conducted, at the least, an interview of the subject. According to SD-TFO3, John Doe #5 replied, in effect (paraphrased, not a quotation): "This is not SD, it's DC and WFO doesn't go out and interview every Muslim guy who visits extremist websites. Besides, this guy has a legitimate work related reasons [sic] to be going to these sites and engaging these extremists in dialogue. WFO did not assess this guy as a terrorism threat."

68.     Most significantly, SD-TFO3 also recalls that John Doe #5 indicated that *this subject is "politically sensitive for WFO"* (emphasis added). *See* Webster Report at 60.

69.     John Doe #5 denies this call occurred. The Webster Report says that the FBI does not have the phone call records, so it does not opine if SD-TFO3 or John Doe #5 is telling the truth.

70.     At all times relevant, the FBI knew or should have known that:

a.   Aulaqi was a highly influential voice, perhaps the most influential voice, of Islamist radicalism among English-speaking extremists such as Hasan.

b.   Aulaqi had served as vice president of a "charity" that was an al-Qaeda front group raising money in the United States to fund terrorism during the 1990s.

c.   Aulaqi had direct contact with and was the spiritual advisor to two or three 9/11 hijackers.

d. Aulaqi was a key player in al-Qaeda's U.S. network prior to the 9/11 attacks with some degree of foreknowledge thereof.

e. Aulaqi, in the aftermath of 9/11, made inquiries in Northern Virginia about recruiting young Muslims for "violent jihad".

f. Aulaqi repeatedly and effectively encouraged Muslims in America to engage in terrorism after 9/11, including unsuccessful attacks against American Soldiers at Fort Dix, New Jersey, in 2007 and American Marines at Quantico, Virginia, in 2008, and the successful attack at Little Rock on June 1, 2009, among other things.

g. Hasan's December 17, 2008 email to Aulaqi asked whether a Muslim U.S. Army member called Hasan Akbar was a "shaheed" or religious martyr for committing fratricidal murder of non-Muslim American Soldiers in Kuwait during 2003.

h. Hasan identified himself as a "SOA," or "Soldier of Allah," to Aulaqi.

i. Hasan offered Aulaqi material financial support.

j. Hasan said he looked forward to joining Aulaqi in the "afterlife."

k. Hasan supported suicide attacks, stating in one email intercepted by the FBI "[In] the Qur'an it states to fight your enemies as they fight you but don't transgress. So, I would assume that suicide bomber whose aim is to kill enemy soldiers or their helpers but also kill innocents in the process is acceptable."

l. Hasan considered himself a clandestine agent and extension of Aulaqi and al-Qaeda in the Islamic fight against the United States.

71. Nevertheless, to protect Hasan's military career because of the "political sensitivities" associated with Hasan's ethnicity and religion (Arab Muslim), and with deliberate indifference to and reckless and willful disregard for plaintiffs' lives and legal rights, the FBI

41

failed to notify either the DOD or the Army about Hasan's communications with Aulaqi and paid no more attention to him until November 5, 2009, when Hasan carried out the Fort Hood terror attack.

72.     The FBI's preferential treatment of Hasan, and its deliberate indifference to and reckless disregard for plaintiffs' safety and legal rights, and for its non-discretionary duty to protect them from Hasan, continued even in the attack's bloody aftermath.

73.     Shortly after the media began reporting Hasan's attack on plaintiffs at Fort Hood, a San Diego FBI agent told a colleague "You know what is? That's our boy!"

74.     At all times relevant, the FBI and John Doe #5 had actual knowledge of their unique relationship with plaintiffs and of their corresponding non-discretionary and unique duties of care to protect plaintiffs from Hasan; to use good FBI tradecraft and reasonably investigate Hasan with the same diligence it would have used with any similarly situated non-Muslim, including an in-person interview; to maintain a system wherein Hasan's activities were properly documented, assessed and evaluated; and to reasonably perform their duties and protect plaintiffs' lives and legal rights by notifying the Army of Hasan's communications with Aulaqi, monitoring Hasan's weapons purchases, and/or arresting him, among other things.

75.     Plaintiffs justifiably relied on these defendants to perform their duties.

76.     The FBI and John Doe #5, however, unreasonably, knowingly and with deliberate indifference to and reckless disregard both for good FBI tradecraft and for plaintiffs' lives and legal rights, breached these duties.

77.     As proximate and entirely foreseeable result of the ir negligence, unreasonable deliberate indifference to, and reckless disregard for, good FBI tradecraft and plaintiffs' lives and legal rights, Hasan killed, wounded, injured and damaged plaintiffs.

78.     But for the FBI and John Doe #5's political correctness, the Fort Hood terror attack and plaintiffs' injuries could not have occurred.

### The Post-Attack Spin and Cover Up

79.     At all times relevant, the government defendants knew that the Fort Hood attack was "terrorism" as they defined the term.

80.     At all times relevant, they knew that the Fort Hood attack was defined as a "high fatality terrorist attack" by the National Counterterrorism Center ("NCTC") which, pursuant to 22 U.S.C. §2656f(d)(2), defined "terrorism" as the "premeditated, politically motivated violence perpetrated against noncombatant targets by subnational groups or clandestine agents." By law, NCTC is the primary U.S. government organization for integrating and analyzing all intelligence pertaining to counterterrorism, except for information pertaining exclusively to domestic terrorism.

81.     At all times relevant, they knew that the U.S. Department of State ("State Department") classified the Fort Hood attack as "terrorism" in its "Country Report on Terrorism 2009", citing it as an example of "al-Qa'ida and violent Sunni radicals [continuing] to succeed…in persuading people to adopt their cause, even in the United States." The State Department also said that "we have also seen U.S. citizens rise in prominence as proponents of violent extremism. The most notable is…[Aulaqi], who has become an influential voice of Islamist radicalism among English-speaking extremists….Ft. Hood attacker Nidal Hasan sought him out for guidance..."

82.     At all times relevant, they knew that Hasan had a strongly-held jihadi ideology and religious motives for the Fort Hood terror attack; that Hasan had sought and received religious and operational inspiration from Aulaqi; that Hasan self-identified as a "soldier of

Allah;" that Hasan had openly and notoriously suppo      rted suicide attacks against innocent non-Muslims and called for more attacks against the "ag      gressor" United States, including suicide bombings in Times Square; and that Hasan had yelled       "Allah Akbar" ("God is great" in Arabic) as he shot down unarmed Americans, just as instruct      ed by Aulaqi, among other things.

83.     At all times relevant, they knew that although Hasa      n wore the uniform of an American Army Major, he considered and conducted hi      mself as an enemy of the United States and in fact carried out a "hostile act" against the       U.S., as defined in the DOD Dictionary.

84.     At all times relevant, they knew that DOD offered s      oldiers one set of benefits for injuries sustained in terrorist attacks, and anothe      r, lesser set for "non-combat" injuries and that classification of Fort Hood as "workplace violence      " could have significant, life-long economic consequences for the soldiers.

85.     At all times relevant, they knew that a "workplace       violence" classification would deprive the soldiers killed and wounded in the Fort       Hood terror attack of appropriate military honors and recognition, including the Purple Heart.

86.     At all times relevant, they knew that they had a un      ique relationship with the plaintiffs and that they owed them a heightened dut      y of care.

87.     Nevertheless, beginning within hours of the attack       and continuing to this day, the government defendants used a cynical program of "da      mage control" to cover up their culpability, to prevent plaintiffs from learning the truth and e      xercising their legal rights, and to preserve the very policies of political correctness and religiou      s and ethnic preference that proximately caused the attack in the first instance.

88.     Senior political and national security officials kn      ew, within minutes or at most hours after Hasan was taken down by plaintiff Kimbe      rly D. Munley and others, that the Fort

Hood attack was the work of a radical jihadist receiving operational and religious inspiration from Aulaqi. These officials knew at that time, or learned shortly thereafter, that the Army, DOD and the FBI were fully aware of Hasan's activities, and that he had been promoted and exempted from discipline, investigation, prosecution, imprisonment and/or discharge from the Army because of his ethnicity and religion. These officials also knew at that time, or learned shortly thereafter, that the Fort Hood attack occurred not because the government defendants had "missed" Hasan, but because they had elevated illegal ethnic and religious preferences and political correctness over both national security and their non-discretionary legal and moral duties to protect plaintiffs' lives and legal rights.

89.     At all times relevant, the facts about causation with respect to the government defendants' culpability and causation with respect to plaintiffs' injuries were (and substantially remain) under the government defendants' sole and exclusive control.

90.     However, at all times relevant the government defendants knew that these facts were less than optimal for them and for other senior U.S. political officials.

91.     Therefore, the government defendants formulated and implemented - upon information and belief, at the direction and under the control of John Doe #4 and others in the Executive Branch - a "damage control" program to hide the truth. This "damage control" was aimed at first deflecting attention from the illegal ethnic and religious preferences and political correctness that proximately caused the attack, and then distracting the public from Hasan's open and notorious religious fanaticism, extremism and his support for al-Qaeda and jihadi violence. The "damage control" included, among other things:

a.     In the immediate aftermath of the Fort Hood terror attack, making efforts to "turn the media narrative" and focus on a fabricated "risk" of anti-Muslim backlash.

b.   Having the Army tell reporters on the scene that the Fort Hood attack was not terrorism immediately after the attack had concluded.

c.   Having the President refuse and refrain from calling the attack "terrorism"; directing the public and plaintiffs on multiple occasions "not to jump to conclusions" about Hasan's jihadist motives; and praising "diversity."

d.   Having the Secretary of Homeland Security say on November 8, 2009 in a statement to Arab Persian Gulf officials that "U.S. Homeland Security officials are working with groups around United States to head of any possible anti-Muslim backlash following the shootings at Fort Hood in Texas" without referencing Hasan's Al-Qaeda ties or open and notorious jihadism.

e.   Having Army Chief of Staff Gen. George Casey and others deflect attention from Hasan's religious motivation and long-standing support for violent extremism to cover up the fact that the government defendants had elevated patently illegal political correctness policies, and Hasan's career, ethnicity and religion, over and above plaintiffs' lives and legal rights.  For example, Gen. Casey's media talking points on Sunday, November 8, 2009, a mere four days after the attack, were that it was important for the public not to "get caught up in speculation about Hasan's Muslim faith"; that he (Casey) had "instructed his commanders to be on the lookout for anti-Muslim reaction to the killings;" that "focusing on the Islamic roots of the suspected shooter could heighten the backlash" against all Muslims in the military; and that "what happened at Fort Hood was a tragedy, but I believe it would be an even greater tragedy if our diversity becomes a casualty here."

     f.   Blaming junior Army officers for failing, contrary to applicable regulations, to take appropriate action against Hasan without menti oning, much less analyzing or addressing, the corrosive impact of ethnic and reli gious preferences and political correctness on the command chain, military morale a nd discipline.

     g.   Calling the attack "workplace violence" and not ter rorism.

     h.   Intentionally concealing from plaintiffs and the pu blic the fact that the Army, DOD and John Does ## 1-4 and 6 proximately caused p laintiffs' injuries through their patently illegal practices of political correctness and through their negligence, gross negligence, and deliberate indifference to and reck less disregard for plaintiffs' lives. For example, after the statements by the President and others as set forth above, the Army, the Navy, the Marine Corps, the Air Force and the F ort Hood Army Internal Review team each issued "reports" about the Fort Hood terror at tack. Not one of these reports, which together total well over 1000 pages, even mentions Hasan's Islamic extremism or his Al- Qaeda connections, much less suggest, admit, explai n, discuss or explore the government defendants' failings that proximately caused plaint iffs' injuries. Plaintiffs and the public were reasonably entitled to rely on the statements of their President and their military commanders, and they in any event did not have actu al notice of the truth, and of causation, until the independent Senate Report was released in February, 2011.

     i.   Intentionally concealing from plaintiffs and the pu blic the FBI's and John Doe #5's negligence, gross negligence, and deliberate indifference to and reckless disregard of plaintiffs' lives and legal rights. Plaintiffs and the public were reasonably entitled to rely on the statements of their President and their military commanders, and they in any event did not have actual notice either of the trut h and/or that FBI and John Doe # 5

proximately caused their injuries until the independent Webster Report was released in July, 2012.

      j.   Wrongly denying some soldiers important medical treatment, disability and retirement benefits, and treating the Fort Hood casualties in a manner and fashion substantially inferior to the treatment given other terror casualties.

      k.   Wrongly denying the dead and injured wounded soldiers Purple Hearts, notwithstanding the fact that Hasan considered and conducted himself as an "enemy of the United States," contrary to Army Regulation 600-8-22 (Sept. 15, 2011).

92.    The government defendants' reckless and willful post-attack spin and cover up to protect the patently illegal policies of preference and political correctness, and to shield the responsible senior officials from accountability, has angered, bewildered and injured the plaintiffs, compounding the damage done by the terror attack itself.

93.    The government defendants did these things knowing that they had a unique relationship with plaintiffs, one that necessarily implicated their emotional well-being. The government defendants also knew that there was an especially likely risk that their negligence, unreasonable deliberate indifference to, and reckless and willful disregard for plaintiffs' lives and legal rights would proximately and foreseeably cause plaintiffs actionable emotional distress, as it in fact did.

94.    As set forth in this Complaint, the government defendants have treated plaintiffs with a shocking, appalling and indefensible measure of disdain, indifference and disregard. To begin with, the Fort Hood terror attack occurred because the government defendants valued political correctness and Hasan's ethnicity, religion and career more than they valued plaintiffs' lives and legal rights.

95.     This disdain, indifference, and disregard continued     after the attack as well. For example, upon information and belief, armed FBI age     nts, over the objections of an Army nurse, pulled Private Mick Engnehl from a medivac helicopt     er and ordered that the helicopter be given to Hasan for his medical care. Private Engnehl had     been shot by Hasan in the neck while he and a fellow soldier were attempting to aid the mortall     y wounded Private Francheska Velez and Baby Valez. The FBI knew that Private Engnehl was uncon     scious and in imminent danger of death, yet it left Private Engnehl to die. Notwithstandin     g the FBI's reckless and shocking disregard for Engnehl's life, heroic efforts by the Army nurse an     d other medical personnel saved his life.

96.     High ranking political and military officials, incl     uding the President and the Chairman of the Joint Chiefs of Staff, visited with     some of the wounded soldiers, civilians and their family members.  They pledged, promised and g     uaranteed that plaintiffs would receive appropriate care, support and assistance from the A     rmy and DOD.

97.     However, these promises disappeared into the ether     when the news cameras left Fort Hood.

98.     Many of the seriously wounded and injured plaintif     fs were left abandoned to their own means and devices to obtain decent medica     l care.  One injured soldier was able to obtain proper treatment for a traumatic brain injur     y caused by a bullet to the head only because the treatment was paid for by a private benefactor.     In another case, the Army has refused to admit the seriousness of one soldier's debilitating     injuries and has kept him on active duty despite his medical doctors' recommendation that he be tran     sferred to a wounded warrior unit, if not discharged from the Army on disability. After the     last of several major surgeries, he had to enlist the help of his brigade surgeon in begging his brig     ade commander to approve surgery to remove a bullet that was moving into the nerve wrap around     an artery that could have caused internal

bleeding from the axilla artery leading to death.        His medical care has been so inadequate that he has been forced to get civilian care off base.

99.     Many of the seriously wounded and injured plaintiff       s were left abandoned to their own means and devices to obtain decent medical care       . One injured soldier was able to obtain proper treatment for a traumatic brain injury cause      d by a bullet to the head only because the treatment was paid for by a private benefactor.

100.    In multiple cases, the Army has refused to admit th       e seriousness the Fort Hood victims' injuries. For example, one soldier, who w       as diagnosed with crippling post traumatic stress syndrome, was denied treatment and a medical       discharge by a Captain who specifically refused to sign the appropriate certifications beca      use his injuries were sustained at Fort Hood.

101.    In another case, a soldier was kept on active duty        despite doctors' recommendations that he be transferred to a wounded       warrior unit if not discharged from the Army on disability entirely. After the last of sev       eral major surgeries, he had to enlist the help of his brigade surgeon in begging his brigade commande       r to approve surgery to remove a bullet that was moving into the nerve wrap around an artery tha       t could have caused internal bleeding from the axilla artery leading to death.  His medical ca       re has been so inadequate that he has been forced to get civilian care off base.

102.    In yet another case, a soldier who was shot by Hasa       n five times and almost died due to medical neglect of his head and belly wounds       at Darnell Army Hospital, has been in a Wounded Warrior unit for over two years. Although       he is unable to lift anything heavy, or walk more than a short distance, or even ride a bicycle,       he has been denied a medical discharge and taunted by his commanders. He has been told that i       f he had been wounded in Iraq, he would

have been retired and deemed disabled long ago. However, because the Army and DOD view his injuries as a workplace matter, he remains in limbo.

103.    Other plaintiffs were denied retirement benefits on specious grounds through administrative appeal proceedings fatally tainted by undue command influence. Still others were subjected to insults, taunts, abuse and neglect from their command because they sought treatment for Fort Hood-related injuries, exacerbating their psychiatric injuries. One plaintiff, who was harassed by his commander simply because of his connection to the Fort Hood terror attack, was even subjected to an Article 15 disciplinary proceeding which resulted in a demotion, forfeiting of pay and extra duty.

104.    Another soldier, whom the Veterans' Administration has since diagnosed with posttraumatic stress disorder so severe that he cannot work, drive a car, or even bathe himself was sent to Iraq immediately after the Fort Hood attack without any treatment whatsoever. Upon returning from Iraq, he had a breakdown and requested treatment. The Army refused and instead put him on a punitive duty that involved 24-48 hour shifts. He was not allowed off base, and was forced to sleep in a hallway on a cot for 3 weeks. When he was allowed to return home he received discharge papers and was told that he was lucky to have an honorable discharge because he was such an embarrassment to his company. Since he was not medically discharged as he should have been, his family went without any income for two years, until in August 2012 the VA classified him 100% disabled. But for assistance from his mother and mother-in-law, this soldier and his family would have been homeless.

105.    In yet another case, the Armed Forces Chief of Staff had given a wounded soldier his card with instructions to call if he (the soldier) needed anything. Severely injured and disabled, unable to even drive himself to his doctor appointments, and on the verge of economic

disaster because his wife had to quit her job and provide him with full time care, he called. There was no answer.

106. Contrary to its own regulations, the Army has refused to deem the soldiers killed and wounded in the attack eligible for a Purple Heart decoration, with its attendant recognition and medical and retirement benefits.

107. As for the civilians injured by Hasan, the government defendants have done nothing of substance at all in the way of decent medical care, assistance or support.

108. Ironically, the very same government defendants who gave Hasan preferential treatment because of his ethnicity and religion has given his victims, the soldiers who were casualties in the Fort Hood terror attack, inferior treatment relative to soldiers and civilians who were injured in other terrorist and Al-Qaeda attacks.

109. Upon information and belief, this inferior treatment, deliberate indifference and reckless disregard for plaintiffs was the result of a determination by John Doe #4 and other political and command officials to obfuscate Hasan's religious motivations and Al-Qaeda ties, to cover up the government defendants' culpability for plaintiffs' injuries and to protect the policies of ethnic and religious preference that proximately caused the Fort Hood terror attack. At all times relevant, the government defendants have a aim to push plaintiffs down a memory hole to spare the Army, DOD and others from critical scrutiny and liability.

110. The government defendants' ethnic and religious preferences, their post-attack spin and cover up, and their deliberate indifference to and reckless disregard for the lives and legal rights of American soldiers and civilians have damaged the public's trust in the U.S. government and its military commanders; harmed troop morale, discipline and order; and grievously betrayed plaintiffs, causing devastating physical and emotional injuries.

111.    Defendants' conduct as set forth in this Complaint is so egregious and outrageous that it shocks the conscience.

112.    The government defendants' deliberate indifference to and reckless disregard for plaintiffs' lives and legal rights, as set forth in this Complaint, is an indefensible disgrace that must be counted among the most reprehensible abdica tions of command and civilian authority and responsibility in the long history of the U.S. military.

## JURISDICTION AND VENUE

113.    This court has jurisdiction of plaintiffs' tort cla ims for relief under the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq. ("FTCA") a nd 28 U.S.C. § 1346(b)(1). Plaintiffs have fully complied with the applicable provisions of 28 U.S.C. § 2675 and are not subject to any FTCA exceptions, including 28 U.S.C. § 2680(j). Al so, unless otherwise noted, plaintiffs have served notice of their claims for relief on defenda nts within two years of their accrual as required by 28 U.S.C. § 2401 and more than six months have e lapsed without defendants formally responding thereto.

114.    Plaintiffs' tort claims for relief against the Army , DOD and John Does ## 1-4 and 6 accrued no earlier than the Senate Report's publi c release on or about February 3, 2011. Plaintiffs' tort claims for relief against the esta te of Aulaqi, the FBI and John Doe # 5 accrued no earlier than the Webster Report's public release on or about July 19, 2012.

115.    This Court has jurisdiction of plaintiffs' claim fo r relief regarding defendants' constitutional violations under 28 U.S.C. § 1328.

116.    This Court has jurisdiction of plaintiffs' claim fo r Administrative Procedure Act relief under 5 U.S.C. §§ 701–706 and 28 U.S.C. § 1331.

117.    To the extent relevant, this Court has jurisdiction      of plaintiffs' claims for relief pursuant to 28 U.S.C. § 1332(a), diversity jurisdic     tion, as the parties to this matter are citizens of different states and the amount in controversy for      each plaintiff exceeds $75,000.

118.    This Court has jurisdiction of each and every claim       for relief brought by each and every plaintiff, including the soldiers and their f      amilies, against the Army and DOD. The "Feres Doctrine," based on   *Feres v. United States*  , 340 U.S. 135, 146 (1950), is inapplicable for man      y reasons, including but not limited to:    *Feres*  should be overruled for the reasons stated in    *United States v. Johnson*  , 481 U.S. 681, 692 - 673 (1987) (Scalia, J. disse      nting); application of the *Feres*  bar to injuries proximately caused by patently ille      gal ethnic and religious preferences is not rationally related to a legitimate government i      nterest and is therefore unconstitutional; application of the   *Feres*  bar to injuries proximately caused by patently ille      gal ethnic and religious preferences will substantially erode military disci      pline and interfere with U.S. combat efficiency; and certain plaintiffs' injuries were not sustained      "incident to military service" under   *Feres*.

119.    Venue is proper in that all or a substantial part o      f the acts and omissions forming the basis of these claims occurred in the District      of Columbia.

<u>PARTIES</u>

**A.    Plaintiffs**

<u>The Soldiers Killed in the Fort Hood Terror Attack       and Their Families.</u>

120.    <u>Angela G. Rivera-Caraveo</u>, acting as the personal representative of Major Li      bardo Eduardo Caraveo . Major Caraveo was shot and killed by Hasan. He      had reenlisted in January 2009, knowing that he was to be deployed to Afghani      stan. Major Caraveo was the pride of his family and the first to graduate from college, earn      ing a doctorate in psychology. His death has left an enormous void.

    a.   <u>Angela G. Rivera-Caraveo</u> as Major Caraveo's widow. His death has forced Ms. Rivera-Caraveo to to drop out of a Master's progra    m at Liberty University and she now works full time to make up for the loss of Major Ca        raveo's income, leaving even less time to care for her children, for whom she is the        sole support.

    b.   <u>John Paul Caraveo</u> is a five-year old minor child of Major Caraveo.

    c.   <u>Megan Rivera</u> is a minor step-child of Major Caraveo.

    d.   <u>Tiffany Rivera</u> is a minor step-child of Major Caraveo. Tiffany re        mains severely depressed, takes multiple antidepressants,     and has developed a sleep disorder due to Major Caraveo's killing.

    e.   <u>Eduardo Caraveo</u> , an adult child of Major Caraveo.

    f.   <u>Jose A. Caraveo</u>  , an adult child of Major Caraveo.

    g.   <u>Rafael Caraveo</u> is a sibling of Major Caraveo.

    h.   <u>Fernando Caraveo</u> is a sibling of Major Caraveo.

    i.   <u>Carmen Ruiz</u> is a sibling of Major Caraveo.

    j.   <u>Amanda Astorga</u> is a sibling of Major Caraveo.

    k.   <u>Maria Elena Garcia</u>  is a sibling of Major Caraveo.

    l.   <u>Isabel Zuniga</u> is a sibling of Major Caraveo.

121.   <u>Daniel DeCrow</u>  and <u>Rachel Thompson</u>   , acting as the personal representatives of <u>Staff Sergeant Justin Michael DeCrow</u>    who was shot and killed by Hasan.  Staff Sergeant DeCrow was helping soldiers fill out paperwork for        deployment to Afghanistan. He had learned that same day that he would soon be deployed to Afg        hanistan as well, and was honored to serve his country.

    a.   <u>Daniel DeCrow</u> is Staff Sergeant DeCrow's father.

    b.  <u>Rachel Thompson</u> is Staff Sergeant DeCrow's mother. After losing h er son, Ms. Thompson has suffered severe emotional distress and dealt with suicidal thoughts. This has disrupted her ability to live a normal lif e, and caused her to lose a promotion at her work, among other things.

122.  <u>Christie M. Greene</u>, acting as the personal representative of Speciali st Frederick Z. Greene, who was shot and killed by Hasan.

    a.  <u>Cristie M. Greene</u> as Specialist Greene's widow. She is now the sole support for, and single parent of, their two minor children .

    b.  <u>Allison J. Greene</u> is Specialist Greene's daughter.

    c.  <u>Haley B. Greene</u> is Specialist Greene's daughter.

    d.  <u>Karen E. Nourse</u> is Specialist Greene's mother.

    e.  <u>Robert H. Nourse</u> is Specialist Greene's stepfather.

123.  <u>Jennifer Hunt</u>, acting as personal representative of Sp ecialist J ason Dean Hunt, who was shot and killed by Hasan. Specialist Hunt had been in the military for three and a half years, and had served proudly in Iraq.

    a.  <u>Jennifer Hunt</u> as Specialist Hunt's widow. Ms. Hunt had married Specialist Hunt just a few months before the November 5 attack . Tragically, Ms. Hunt's husband was taken from her while she was still a newlywed. Ms. Hunt now raises her three children by herself, and is the sole family provide r.

    b.  <u>Gale Hunt</u> is Specialist Hunt's mother.

    c.  <u>Gary Dean Hunt</u> is Specialist Hunt's father.

    d.  <u>Angela Smith</u> is Specialist Hunt's sister.

124.   <u>Jerilyn Krueger</u> as personal representative for <u>Sergeant Amy S. Krueger</u>, who was shot and killed by Hasan.

     a.   <u>Jerilyn Krueger</u> as Sergeant Krueger's mother.

     b.   <u>Jessica Krueger Bryant</u> is Sergeant Krueger's sister.

     c.   <u>Casey Krueger</u> is Sergeant Krueger's brother.

125.   <u>Cynthia Seager</u> acting as personal representative of <u>Captain Russell G. Seager</u> who was shot and killed by Hasan. Captain Seager was a reservist who had just been called up to serve in Afghanistan for the first time. A nurse practitioner in private life, Captain Seager had joined the Army Reserve in 2005 at age 47 specifically to provide mental health treatment to soldiers.

     a.   <u>Cynthia Seager</u> as Captain Seager's widow. Ms. Seager is now undergoing treatment for cancer, and must fight this terrible disease without her husband's love and assistance.

     b.   <u>Joseph Seager</u> is Captain Seager's son.

     c.   <u>Vernon Seager</u> is Captain Seager's father. Captain Seager was his only son. Mr. Seager has suffered tremendously since the death of Captain Seager, including emotional distress, nightmares, extreme anxiety, depression, insomnia, and feelings of dread.

     d.   <u>Barbara Prudhomme</u> is Captain Seager's only sister. Ms. Prudhomme has lost her only sibling, mentor, and close friend. She suffers from anxiety, depression, insomnia, panic attacks, and fatigue.

126.   <u>Eillen Rodriguez</u>, acting as personal representative for <u>Private Francheska Velez</u>, who was shot and killed by Hasan. Having just returned from deployment to Iraq, Private Velez

was filing paperwork to continue her education. Private Velez was also pregnant with her first child. After Hasan shot her, she lived for a short time in terrible pain and agony, knowing that she and her child were dying.

    a. <u>Eillen Rodriguez</u> as Private Velez's mother.

    b. <u>Juan G. Velez</u> is Private Velez's father. Mr. Velez is left feeling an empty man after the loss of his only daughter. He has trouble eating, sleeping, and working, and lost his marriage because of Private Velez's death.

    c. <u>Juan Velez</u> is Private Velez's brother. Mr. Velez is devastated by the loss of his baby sister of whom he was so protective.

127. <u>Eva Mae Waddle</u>, acting as personal representative of Lieutenant Colonel Juanita Warman who was shot and killed by Hasan. Lieutenant Colonel Warman was processing out for her final deployment to Kuwait before she retired from the military. Lieutenant Colonel Warman had spent her military career treating soldiers with mental illness, especially post traumatic stress disorder ("PTSD"). She was shot while shielding another soldier from Hasan's gunfire.

    a. <u>Eva Mae Waddle</u> as Lieutenant Colonel Warman's mother. Ms. Waddle has been devastated not only by Lieutenant Colonel Warman's death, but by the manner in which this loss has torn apart the family.

    b. <u>Melissa Czemerda</u> is Lieutenant Colonel Warman's daughter.

    c. <u>Tawnya Patillo</u> is Lieutenant Colonel Warman's daughter.

    d. <u>Margaret Yaggie</u> is Lieutenant Colonel Warman's sister.

    e. <u>Donna Waddle</u> is Lieutenant Colonel Warman's sister.

    f. <u>Kristina Rightweiser</u> is Lieutenant Colonel Warman's sister.

g.   Priscilla Sheader is Lieutenant Colonel Warman's sister.

h.   Renee W. Gamboni is Lieutenant Colonel Warman's sister.

128.   Shoua Her acting as personal representative for Private Kham See Xiong, who was shot and killed by Hasan. Private Xiong was being processed for his first deployment to Afghanistan, and he was proud to serve. Private Xiong came from a very tight-knit Hmong family in Minnesota. His parents had immigrated to the United States after providing assistance to the U.S. government during the Vietnam War. Three generations of his family have served the U.S. military. Private Xiong's impact on the lives of others is remembered to this day, and there are several memorials to him in his high school in Minnesota. Private Xiong was the glue of their family, and a father figure to many of his siblings. His death in the Fort Hood terror attack, which was caused by the defendants' political correctness, has filled the family with sadness and anger. He is deeply missed.

a.   Shoua Her as Private Xiong's widow. Ms. Her has lost her soulmate and best friend, and still struggles to adapt to the void in her life. She is the sole support for and single parent to three minor children.

b.   Kaylee Xiong is Private Xiong's minor child.

c.   Devyn Xiong is Private Xiong's minor child.

d.   Jonah Xiong is Private Xiong's minor child.

e.   Chor Xiong is Private Xiong's father.

f.   PaNou Xiong is Private Xiong's mother.

g.   Jennie Xiong is Private Xiong's sister.

h.   Mee Xiong is Private Xiong's sister.

i.   Robert Xiong is Private Xiong's brother.

59

    j.   <u>Dan Bee Xiong</u> is Private Xiong's brother.

    k.   <u>Nelson Xiong</u> is Private Xiong's brother.

    l.   <u>Richard Xiong</u> is Private Xiong's brother.

    m.   <u>Tiffany Cho Xiong</u> is Private Xiong's sister.

    n.   <u>Phillip Xiong</u> is Private Xiong's brother.

    o.   <u>Kevin Xiong</u> is Private Xiong's brother.

    p.   <u>Maxy Xiong</u> is Private Xiong's sister.

<u>Soldiers Wounded by Gunshots in the Fort Hood Terror Attack and their Families.</u>

129.   <u>Specialist James Armstrong</u> was shot three times by Hasan. One bullet wounded Specialist Armstrong just above the knee, which has caused permanent damage and loss of mobility. Another bullet remains lodged near his kidney. Specialist Armstrong's injuries have required significant attention from his wife, causing her to quit work for nearly three months to care for him. This has only led to further financial difficulties. Specialist Armstrong has also been diagnosed with PTSD, and remains traumatized by the shooting.

130.   <u>Specialist Keara Bono Torkelson</u> was shot multiple times by Hasan and hit in the head. She was preparing for her first deployment to Iraq and was 20 feet away from Hasan when he began his terror attack. Today she is 80% disabled, and suffers from mild traumatic brain injury, PTSD, depression, chronic headaches, back spasms, and severe emotional distress.

    a.   <u>Joseph Torkelson</u> is Specialist Torkelson's husband. He suffered severe emotional distress and pain at his wife's injuries.

    b.   <u>Steven M. Bono</u> is Specialist Torkelson's father.

    c.   <u>Margaret A. McCarty</u> is Specialist Torkelson's mother. She suffers from PTSD, anxiety, depression, and severe emotional trauma.

    d. <u>Michael J. McCarty</u> is Specialist Torkelson's step-father.

    e. <u>Emily J. McCarty</u> is Specialist Torkelson's sister.

    f. <u>Logan McCarty</u> is Specialist Torkelson's half-brother.

    g. <u>Dustin M. Bono</u> is Specialist Torkelson's brother.

    h. <u>Grace L. McCarty</u> is Specialist Torkelson's step-sister.

    i. <u>Kaitlynn M.J. Bono</u> is Specialist Torkelson's sister.

    j. <u>Kirsten B.P. Bono</u> is Specialist Torkelson's sister.

131. <u>Specialist Logan M. Burnett</u> was shot multiple times by Hasan, one bullet penetrating through his left hip and into his intestines, colon, and kidney. He has had two operations to address this, but still has hip displacement and spinal misalignment along with two bullets in his stomach. He was also shot in his left elbow and left hand. He has had nine surgeries on his left hand, including one to remove two knuckles. He has neuropathy in his left knee and nerve damage in his left leg. He cannot drive, struggles to sleep, and suffers from PTSD.

    a. <u>Victoria Burnett</u> is Specialist Burnett's wife. Ms. Burnett suffers from depression and PTSD. She takes medication and undergoes counseling to deal with her mental distress. She also cannot work because of the care she must provide to her husband.

132. <u>Captain Dorothy Carskadon</u> was shot multiple times by Hasan, and is now permanently disabled. Captain Carskadon rushed to assist Private Velez, who had been shot along with Baby Velez. But while providing comfort to the mortally wounded Private Velez, Captain Carskadon was gravely wounded by gunshots to the leg, head, hip, and stomach. She underwent 15 hours of surgery, during which time her heart stopped twice. Although she has

made some physical recovery, she still suffers from          PTSD, sleep apnea, and constant pain from the bullet wounds. She left the military in 2011.

a.  <u>Julie Carskadon</u> is Captain Carskadon's domestic partner.  She has          suffered severe emotional distress.

133.  <u>Specialist Matthew D. Cooke</u>   was shot and wounded by Hasan. He had performed two tours of duty in Iraq and was due to be deploye          d again when he was shot by the terrorist Hasan. He was giving blood on November 5, and was          directly in front of Hasan when he began shooting. Specialist Cooke was shit three times. S          pecialist Cooke was dragged outside by Private Gadlin and taken to Darnell Hospital. However, doc          tors failed to diagnose him with any serious injuries, leading to a lengthy delay in receiving t          reatment.  This delay cost Specialist Cooke massive quantities of blood and may result in blind          ness.  Eventually, he did receive treatment, enduring multiple surgeries, excruciating pain, and          a two-month hospital stay. Specialist Cooke now suffers from severe PTSD, which has been largel          y untreated by the Army. He and his wife have divorced, and his life has been forever change          d.

a.  <u>Diane Marie Frappier</u> is Specialist Cooke's mother.

b.  <u>Carl Cooke</u> is Specialist Cooke's father.

c.  <u>Gerard Leo Frappier</u> is Specialist Cooke's stepfather.

d.  <u>Christina Danielle Cooke</u> is Specialist Cooke's sister.

e.  <u>Jennifer Lynn Frappier</u> is Specialist Cooke's step-sister.

f.  <u>Kimberly E. Miller</u> is Specialist Cooke's sister.

g.  <u>Gabriel Tucker-Lee Cooke</u> is Specialist Cooke's minor child.

h.  <u>Zachary Alan Cooke</u> is Specialist Cooke's minor child.

134.  <u>Private Mick Engnehl</u>  was shot by Hasan in the neck and shoulder as he w          as attempting to aid Private Velez and her baby. Seri          ously wounded, Private Engnehl was forcibly removed from a "medivac" helicopter by agents of th          e FBI and left to die. Because of the heroic work of an Army nurse, another helicopter was found          for Private Engnehl, he was airlifted to a hospital and survived.  Private Engnehl spent the n          ext several days in the intensive care unit of Scott and White Hospital, where he was in a room ne          xt door to Hasan. Engnehl retired from the military in 2011 on 80% disability.  He still has p          artial paralysis in his right arm and severe PTSD.

    a.  <u>Autumn Engnehl</u>  is Private Engnehl's wife.  Ms. Engnehl was planni          ng to marry Private Engnehl just a week after the Novembe          r 5, 2009 attack, but had to postpone those plans after her husband was shot. S          he now cares for her disabled husband and suffers from PTSD.

    b.  <u>Brendan Gist Engnehl</u>  is Private Engnehl's minor son.  He suffers from emotional and other maladies attributable to the at          tack's impact on his parents.

135.  <u>Private Joseph T. Foster</u>  was shot and wounded by Hasan.  He has suffered significant severe physical and emotional pain.

    a.  <u>Mandy M. Foster</u>  is Private Foster's wife. She has suffered severe          emotional distress, interfering with her ability to live a no          rmal life.

136.  <u>Private Amber Marie Gadlin</u>  was shot and wounded by Hasan.  She pulled Specialist Cooke to safety. She has suffered signi          ficant physical and emotional pain.

137.  <u>Sergeant Nathan Hewitt</u>  was shot and wounded by Hasan while he was process          ing for his second deployment to Afghanistan.  He susta          ined two gunshot wounds to his leg that required hospitalization and rehabilitation. He st          ill struggles with PTSD, anxiety, and insomnia.

138.   <u>Private Najee M. Hull</u>   was shot and wounded by Hasan in the chest, abdomen, and knee, and suffered a collapsed lung and ruptured spleen. After lengthy hospitalization and therapy, Private Hull remains in severe pain and still has a bullet fragment in his chest. He also suffers from PTSD, depression, anxiety, panic attacks, loss of confidence and loss of trust.

    a.   <u>Nanette Monique Hull</u>  is Private Hull's sister.

    b.   <u>Nathaniel Hull</u> is Private Hull's brother.

    c.   <u>Nala M. Pearson</u>  is Private Hull's sister.

    d.   <u>Yvonne Hull-Pearson</u>  is Private Hull's mother.

139.   <u>Private Justin T. Johnson</u>   was shot and wounded by Hasan in the back and foot, puncturing his lungs, fracturing his ribs, and breaking bones in his foot. A bullet remains lodged in his chest, and he continues to suffer from PTSD, anxiety, and loss of trust.

    a.   <u>Roxanne Simons-Johnson</u> is Private Johnson's mother. Ms. Simons-Johnson suffered extreme emotional distress as she was on the phone with her son when he was shot.

140.   <u>Staff Sergeant Alonzo M. Lunsford, Jr.</u>   was shot and wounded by Hasan six times and nearly died. He endured numerous surgeries, including one as recent as June 19, 2012. He is assigned to a Wounded Warrior unit at Fort Bragg, but remains injured and unable to do his job. Despite his serious injuries, he has not received the care and treatment he deserves and has been denied a promotion because of his criticism of the defendants' treatment of Hasan's victims and their refusal to acknowledge the Fort Hood terrorist attack.

    a.   <u>Johnsye A. Lunsford-Bloomfield</u>  is Staff Sergeant Lunsford's mother.

    b.   <u>Candice J. Weston</u>  is Staff Sergeant Lunsford's daughter.

    c.   <u>Ajiona D. Lunsford</u>  is Staff Sergeant Lunsford's minor daughter.

    d.  <u>Alonzo M. Lunsford, III</u>  is Staff Sergeant Lunsford's minor son.

    e.  <u>Harlan J. Weston</u>  is Staff Sergeant Lunsford's minor step-son.

141.  <u>Staff Sergeant Shawn N. Manning</u>  was shot six times by Hasan. Once in the left upper chest, with the bullet traveling through his sternum, right lung and liver; once in the left midback, where the bullet traveled parallel to his spine and remains lodged today behind his left kidney; once in the lower right thigh, where the bullet traveled into his pelvic region and later migrated back down right thigh where it remains tod ay; once in the upper right thigh, where the bullet traveled into abdomen, lacerated his colon a nd was removed; once in the right foot; and once in the lower right side, a graze wound. Serg eant Manning was taken to a civilian hospital for initial treatment, but then was taken to a Texa s military hospital. There, he had surgery that took out his intestines because a bullet traveled i nto his liver, but a surgical staple was left behind. This became infected and was removed, leav ing a hole in his belly. After three months in the Texas hospital, he complained of pain in rig ht leg. He was told that the pain was from scar tissue. Subsequently, he went to a Seattle hospital that checked and found two bullets in his leg. Also, the government classified Sergeant Manning's injuries as being caused by "workplace violence." At time of attack, Shawn was an activat ed reservist. While in Army Reserves his pay was less than his compensation as a federal civilia n, which would have been matched had his injuries been deemed the result of terrorism. Howev er, because his injuries have been deemed workplace violence-related, he has lost approximate ly $40,000 in compensation, as well as significant retirement benefits. He has bullet fra gments in several places in his body and remains in severe and constant pain three years after the a ttack. He suffers from PTSD, depression, and sleep apnea.

a. <u>Autumn Manning</u> is Staff Sergeant Manning's wife. Ms. Manning suffers from PTSD and emotional distress.

142.   <u>Specialist Dayna Ferguson Roscoe</u> was shot and wounded by Hasan in the arm, shoulder, and thigh at close range. Her left arm was completely shattered, her left lung was collapsed, and her ovaries and fallopian tubes were damaged. After a major surgery, she was eventually released from the hospital. Her orthopedist cleared her to return to duty, but Specialist Roscoe could barely even dress herself. She received a second opinion and was told she needed significant surgery on her arm. Today, she is still in pain, and suffers from PTSD, anxiety, depression, flashbacks, and emotional distress.

a. <u>Leva L. Ferguson</u> is Specialist Roscoe's mother.

b. <u>James R. Ferguson</u> is Specialist Roscoe's father. The Fergusons endured six hours of horrible uncertainty as they attempted to learn whether their daughter was dead or alive. Both suffer from PTSD and emotional distress.

143.   <u>Chief Warrant Officer Christopher H. Royal</u> was shot multiple times by Hasan on November 5, 2009. In addition to the bullet wounds Chief Warrant Officer Royal suffered, he continues to deal with PTSD and severe emotional trauma.

a. <u>Stephanie J. Royal</u> is Chief Warrant Officer Royal's wife.

b. <u>Christopher S. Royal II</u> is Chief Warrant Officer Royal's minor son.

144.   <u>Specialist Jonathan Sims</u> was shot and wounded by Hasan in the chest and back, where one bullet still remains. Just months after being discharged from the hospital, Specialist Sims then deployed to Afghanistan. Despite his wounds, he has again re-enlisted for five more years. He has been diagnosed with PTSD in addition to his chronic pain. He is proud to serve his country.

    a.   <u>Jerry Lee Sims</u> is Specialist Sims's father.

    b.   <u>Michelle Sims</u> is Specialist Sims's mother.

145.   <u>Specialist George O. Stratton, III</u>  was shot and wounded by Hasan in the shoulder at close range, resulting in serious physical injur    ies.  Specialist Stratton has also suffered debilitating psychological wounds, including severe    PTSD.  After mistreatment from his superiors, arising from their efforts to play down      the terror attack, Specialist Stratton requested a transfer from Fort Hood. His request was denied.          He requested counseling for his PTSD, but was refused.  In fact, he was even demoted in rank         and released from the Army without disability. The Army's mistreatment has only exace    rbated the effects of his PTSD.

    a.   <u>George O. Stratton Jr.</u>  is Specialist Stratton's father.

    b.   <u>Lynne Stratton</u> is Specialist Stratton's step-mother. Both parents      have had to deal with Specialist Stratton's violent mood swings      and severe PTSD. Ms. Stratton now must take medication as a result.

    c.   <u>Lawrence Stratton</u> is Specialist Stratton's brother.

    d.   <u>David Clune</u> is Specialist Stratton's step-brother.

    e.   <u>Matthew Clune</u> is Specialist Stratton's step-brother. Each sibli      ng has suffered severe emotional distress as a result of their brot      her's injuries.

146.   <u>Sergeant Miguel A. Valdivia</u>  was shot and wounded by Hasan, suffering three gunshot wounds, including one bullet that shattered     his right femur.  After one unsuccessful attempt to place a rod in his leg, he had to have a      nother surgery to correct the error. Sergeant Valdivia was discharged in February of 2011 and has      been unemployed since.

The Soldiers Injured in the Fort Hood Terror Attack       and their Families.

147.   <u>Staff Sergeant Chelsea Garrett</u>   suffered severe psychological trauma on November 5, 2009. She was a medic who was preparin         g to attend her graduation ceremony on the morning of November 5. When news of Hasan's t         error ist attack reached her, she rushed to help her fallen comrades, still wearing her graduat         ion gown and unsure of Hasan's whereabouts. She and her colleagues performed heroically despite         the danger they faced.  Today Staff Sergeant Garrett suffers from PTSD, anxiety, and de         pression. Not a day goes by when she is not accosted by nightmarish thoughts of the massacre.         She is on disability and cannot work, and experiences debilitating anxiety when in public. T         he Army has not offered or provided her with treatment.

148.   <u>Major Dr. Clifford A. Hopewell</u>   suffered severe psychological trauma on November 5, 2009.  Major Hopewell, a neuropsycholog         ist, was Officer-in-Charge of the Traumatic Brain Injury Clinic in charge of evaluati         ng all Soldiers suspected of brain injuries processing through Ft. Hood. When Hasan began shoo         ting, Major Hopewell and his staff were trapped in their building.  Major Hopewell now suff         ers from chronic PTSD, for which he has undergone extensive therapy. He also struggles wit         h insomnia, high blood pressure, fatigue, and diminished cognitive functioning.  In addition, Maj         or Hopewell's clinic was completely destroyed and impounded as a result of the terror a         ttack. He operated from a parking lot using a cell phone for close to a year, and was forced to r         etire from the military following the shooting, thus depriving the Army of the very professionals m         ost needed to treat the victims of the Fort Hood massacre.

a.   <u>Trena Hopewell</u> is Major Hopewell's wife. She has suffered severe         emotional distress.

149. <u>Sergeant Howard E. Ray</u> suffered severe psychological trauma on November 5, 2009. Sergeant Ray was involved in a counseling session at the Traumatic Brain Injury clinic for injuries received as a result of combat. Sergeant Ray narrowly escaped several bullets as he helped colleagues escape from Hasan. He was awarded the Army Commendation Medal for his conduct in saving the lives of six of his comrades. Sergeant Ray now suffers from PTSD, which has exacerbated the emotional wounds he had already suffered in combat. He has undergone extensive counseling, but remains emotionally scarred. After nearly 13 years in the Army, Sergeant Ray retired on 70% disability in 2010.

    a. <u>Rachael Salone Ray</u> is Sergeant Ray's wife. Ms. Ray has dealt with her husband's emotional distance and psychological scars while trying to raise a family with little assistance.

    b. <u>Jaden C. Ray</u> is Sergeant Ray's minor child.

    c. <u>Logan C. Ray</u> is Sergeant Ray's minor child.

    d. <u>Michael P. Ray</u> is Sergeant Ray's minor child. Each child has suffered emotional distress due to the attack. They have seen their father suffer and become withdrawn and distant, a dramatic and terrible change from their previous family dynamic.

150. <u>Sergeant Rex A. Stalnaker</u> suffered severe psychological trauma on November 5, 2009. As he saw his comrades gunned down in front of him, Sergeant Stalnaker helped to get soldiers to safety. He received a Meritorious Service Medal for his conduct. Sergeant Stalnaker was then deployed to Afghanistan almost immediately. But the Fort Hood terror attack has left lasting emotional damage. Sergeant Stalnaker suffers from chronic PTSD, anxiety, panic

attacks, hyper-vigilance, paranoia, violent rages,     depression, sleep disorders, and various other psychological injuries, most of which the Army igno     red. He is 70% disabled and unemployable.

    a.  <u>Kathryne A. Stalnaker</u>  is Sergeant Stalnaker's wife.  She has also been diagnosed with PTSD.  She and her husband's lives h      ave been engulfed by PTSD, and extensive counseling provides little relief.  Ms. S     talnaker has been forced to give up her career and income so that she can provide constant      care for her husband.

151.  <u>Specialist Clifton Mikeal Stone</u>  suffered  severe  psychological  trauma  on November 5, 2009.  He was awaiting an anthrax vacci      nation in preparation for his first deployment to Iraq when Hasan began shooting. Spec      ialist Stone feared for his life but provided care for the wounded soldiers that surrounded him.       Soaked in blood, he eventually returned to his barracks, only to be deployed two weeks later.       Today, Specialist Stone suffers from severe PTSD, depression, and anxiety, which has consumed h      is life.  Despite his evident emotional trauma, the Army did nothing to care for Specialist      Stone, minimizing his psychological injuries at every turn.  Specialist Stone was honorably disc      harged in January 2011.  In August, 2012, he was classified by the Veterans' Administration as 1      00% disabled.

    a.  <u>Diane Brooke Stone</u>  is Specialist Stone's wife. Ms. Stone has been a      primary caregiver for her husband, who cannot function with      out significant assistance. She has seen her life turned upside down as her husband's d      ream of serving his country has instead become a nightmare of PTSD.

    b.  <u>Oakley Mikeal Stone</u>  is Specialist Stone's minor daughter.

    c.  <u>Alyssa Kayleigh Stone</u>  is Specialist Stone's minor daughter.

    d.  <u>Karen D. Mikeal</u>  is Specialist Stone's mother.  She has suffered se      vere emotional distress.

152. <u>Staff Sergeant Mark Anthony Warren</u> suffered severe emotional distress on November 5, 2009. Since that day his life has become a nightmare of PTSD. He cannot be in crowds and even the sound of a door shutting is enough to trigger painful flashbacks. Staff Sergeant Warren has temporarily retired on 100% disability.

     a. <u>Carla Sue Warren</u> is Staff Sergeant Warren's wife. Ms. Warren now deals with her husband's crippling PTSD and anxiety. Her life was permanently changed on November 5, 2009.

<u>The Civilian Killed in the Fort Hood Terror Attack and her Family.</u>

153. <u>Eileen Rodriguez</u>, acting as personal representative for <u>Baby Velez</u>, the unborn child shot and killed by Hasan. Hasan also shot and killed Baby Velez's mother, Private Francheska Velez.

     a. <u>Eileen Rodriguez</u>, as Baby Velez's grandmother. She grieves for her loss.

     b. <u>Juan G. Velez</u> is Baby Velez's grandfather. He mourns every day for his granddaughter.

<u>The Civilians Injured in the Fort Hood Terror Attack and their Families.</u>

154. <u>Lovickie D. Byrd</u> was a civilian federal employee who had just finished processing Lieutenant Colonel Warman when Hasan began shooting. She injured her left knee and sustained serious psychological injuries in the attack. She suffers from PTSD, depression, panic attacks, insomnia, irritability, and incontinence. Ms. Byrd's psychological trauma caused her work performance to decline and she is now disability retired.

     a. <u>Joe L. Byrd</u> is Ms. Byrd's husband. He has struggled to deal with Ms. Byrd's emotional distance, irritability, depression, and psychological damage.

     b. <u>Joe L. Byrd, II</u> is Ms. Byrd's son.

     c.  <u>Dominique L. Byrd</u> is Ms. Byrd's son. Both children have put their lives on hold to care for their mother, who has only grown more distant and irritable since the November 5 attack.

155.  <u>Anna E. Ellis</u> was a civilian federal human relations employee. She suffered a spinal injury and nerve damage as a result of Hasan's attack, and had ten screws placed in her neck. She still has injuries to her knees and hands, all of which has prevented her from returning to work. After two surgeries, she is facing yet another operation to improve her mobility and pain level. She also suffers from PTSD and sleep disorders.

156.  <u>Michelle R. Harper</u> was a civilian nurse who was injured in her neck, back, and knees during the attack. Ms. Harper has been diagnosed with PTSD and experiences severe panic attacks.

     a.  <u>George Harper</u> is Ms. Harper's husband. He has suffered severe emotional distress.

     b.  <u>Tyler Harper</u> is Ms. Harper's minor son.

     c.  <u>Alyiah Magee</u> is Ms. Harper's daughter.

     d.  <u>Alyssa Magee</u> is Ms. Harper's daughter.

157.  <u>Kimberly D. Munley</u> was the civilian DoD police officer who was the first person to return fire on Hasan. She rushed to the scene of the shooting to confront Hasan and exchanged fire with Hasan from six feet away. Ms. Munley acted bravely to stop Hasan's attack but suffered gravely as a result, suffering multiple life-threatening gunshot wounds, including a major arterial wound. After a lengthy surgery and nearly a week in intensive care, Ms. Munley's life was saved. But she remains injured and unable to perform the work she used to. After receiving a knee replacement she can walk again, but she cannot run or train. She has been out

of work for 10 months, and cannot take a police job        because of her physical limitations. The defendants have washed their hands of Ms. Munley, w     ho as part of the defendants' political coverup and damage control effort was even invited        to attend a State of the Union speech and sit next to the First Lady of the United States, ignori        ng her recovery and suffering and even placing obstacles in the way of her attempts to return to w        ork. Ms. Munley suffers from severe PTSD and anxiety.

    a.   <u>Jayden A. Munley</u> is Ms. Munley's minor daughter.

    b.   <u>Marylyn H. Hernandez-Barbour</u> is Ms. Munley's minor daughter. Both children have suffered severe emotional distress, a     nd their lives have been forever changed, because of their mother's tremendous physi     cal pain and emotional strain.

158.   <u>Linda J. Londrie</u>, a civilian DoD employee, suffered severe psycholo        gical trauma due to the terrorist attack. She consoled Sergeant        Krueger in the last minutes of her life, and believed Sergeant Krueger was dead when she left the        r. Ms. Londrie had no military training or experience, and learned that day what it was like i        n a combat situation. Even as she consoled Sergeant Krueger, Ms. Londrie believed she was goin        g to die too.  Ms. Londrie has been diagnosed with PTSD, and is haunted daily by the ev        ents of November 5.  She suffers from survivor's guilt, anger, isolation, insomnia, night     mares, anxiety, and panic attacks. Ms. Londrie remains in counseling, but she is changed forever.

159.   <u>Diana J. White</u> suffered severe psychological trauma on November 5        , 2009. Ms. White was a civilian speech pathologist working wit        h Sergeant Ray at the time Hasan began shooting. As she fled the scene of the shooting wi        th Sergeant Ray, she barely escaped Hasan's gunfire. Sergeant Ray helped lead her to safety, b        ut only after she quite literally dodged a bullet.

Ms. White has been diagnosed with PTSD, severe anxiety disorder, and severe depression. Her life has changed irrevocably, and she still sleeps with a gun at her side nearly three years later.

160.    <u>Julia Wilson Adee</u> is a civilian DoD employee suffered severe psychological trauma on November 5, 2009. Ms. Wilson was pregnant the day of Hasan's attack. She had just parked near the SRP when Hasan began shooting. Ms. Wilson was panicked and terrified as she tried to escape. She continues to suffer from PTSD following Hasan's attack, but as a single mother must work grueling hours away from her home in order to provide for her son.

       a.    <u>Elizabeth Wilson</u> is Ms. Wilson's mother. She has suffered severe emotional distress, particularly since she was on the phone with her daughter during the attack.

       b.    <u>Wyatt Wilson</u> is Ms. Wilson's minor son. He also has suffered severe emotional distress.

161.    <u>Chelsea Garrett</u>, <u>Jerry and Michelle Sims</u>, <u>Carl Cooke</u> and the <u>Royal family</u> have each filed FTCA claims within the past six months.

**B. Defendants**

<u>The Terrorist Defendants</u>

162.    Hasan is a radical Islamist and follower of Aulaqi and al-Qaeda who is also a Major in the United States Army. He is named in his personal capacity. He is incarcerated in, and a resident of, Texas.

163.    Aulaqi was the al-Qaeda terrorist leader and Islamic authority who conspired with Hasan, and provided him with operational and inspirational guidance for the Fort Hood terror attack. Aulaqi is deceased due to a U.S. drone strike. Therefore, this action is brought against Nasser al-Aulaqi as personal representative of Aulaqi's estate. Nasser al-Aulaqi is, upon

information and belief, a resident of Yemen, but the    and the estate are identified as being located in the offices of the American Civil Liberties Unio    n in the District of Columbia.

The Government Defendants

164.    Secretary of the Army John McHugh is named in his o    fficial capacity.

165.    Secretary of Defense Leon Panetta is named in his o    fficial capacity.

166.    Director of the FBI Robert Mueller, III is named in    his official capacity.

167.    John Doe #1 is identified in the Senate Report as t    he Army officer who commanded Hasan at Walter Reed Army Hospital and th    en assigned Hasan to Fort Hood notwithstanding both Hasan's dangerous Islamist ide    ology and manifest professional failings. He knowingly and intentionally exempted Hasan from    generally applicable rules and military discipline, recommended Hasan for promotion and ass    igned him to treat U.S. combat soldiers at Fort Hood, in whole or in part, because of Hasan's    ethnicity and religion, and all with deliberate indifference to and reckless disregard for plaintif    fs' lives and legal rights. He is named in his individual capacity.

168.    John Doe #2 is identified as Witness 3 in the Senat    e Report. He ignored Hasan's Islamist ranting and professional inadequacies, Arm    y rules and military discipline, and treated Hasan preferentially because of his ethnicity and r    eligion, all with deliberate indifference to and reckless disregard for plaintiffs' lives and legal    rights. John Doe #2 did this because he was concerned that truth-telling about Hasan could ruin    his career. He is named in his individual capacity.

169.    John Doe #3 signed Hasan's sanitized and falsified    OERs. He did this because of Hasan's ethnicity and religion, knowing that the OE    Rs were false and misleading in all material respects and with deliberate indifference to and re    ckless disregard for plaintiffs' lives and legal

rights. John Doe #3 signed Hasan's false OERs because of command pressure that caused him to be concerned that truth-telling about Hasan could ruin his (John Doe #3's) military career. He is named in his individual capacity.

170.    John Doe #4 was the senior DOD official responsible for approving and/or formulating DOD's policies of political correctness, DOD's response to the Fort Hood terror attack and the determination that it was "workplace violence" and not "terrorism" contrary to applicable DOD policies, terms and definitions, all with deliberate indifference to and reckless disregard for plaintiffs' lives and legal rights. He is named in his individual capacity.

171.    John Doe #5 is identified in the Webster Report as "WFO-TFO." Among other things, he terminated his investigation of Hasan because of "political sensitivities" arising from Hasan's ethnicity and religion, all with deliberate indifference to and reckless disregard for plaintiffs' lives and legal rights. He is named in his personal capacity.

172.    John Doe #6 supervised Hasan at Fort Hood. He ignored Hasan's patient abuse, his support for the jihadi murder of Americans and his violations of Army regulations, all with deliberate indifference to and reckless disregard for plaintiffs' lives and legal rights. He did this because of Hasan's ethnicity and religion. He is named in his personal capacity.

## CLAIMS FOR RELIEF

### A. Claims Against the Terrorist Defendants

*First Claim for Relief: The Survival Act/D.C. Code §16-2701 et seq.*

173.    Plaintiffs repeat the allegations set forth above as if fully restated herein.

174.    This claim for relief against the terrorist defendants is by the personal representatives of those killed in the Fort Hood terror attack.

175.   All of the decedents' rights of action under this C       omplaint survive in favor of their personal representatives.

176.   As a direct, proximate and foreseeable result of th       e terrorist defendants' conduct, all as set forth in this Complaint, the decedents w       ere shot and killed by Hasan during his jihadi terror attack at Fort Hood.

177.   Each decedent suffered and experienced severe pain,       mental anguish and emotional distress prior to his or her death. For       example, Private Francheska Velez, who was shot by Hasan, was found by other soldiers curled i       n a fetal position crying "my baby, my baby" before she died. At all times relevant, she knew t       hat she and Baby Velez were both dying from their wounds.

178.   Therefore, these plaintiffs are entitled to any and       all damages recoverable under law.

179.   The terrorist defendants are individually, jointly       and severally liable to plaintiffs for all their damages.

*Second Claim for Relief: For Wrongful Death/D.C.C       ode §12-101 et seq.*

180.   Plaintiffs repeat the allegations set forth above a       s if fully restated herein.

181.   This claim for relief against the terrorist defenda       nts is by the personal representatives of those killed in the Fort Hood te       rror attack.

182.   As a direct, proximate and foreseeable result of th       e terrorist defendants' misconduct, all as set forth in this Complaint, dec       edents' next of kin have incurred burial expenses, and lost their share of the decedents' an       ticipated future earnings and the pecuniary value of the decedents' respective services, among       other things.

183.    Additionally, the decedents' estates lost probable     future earnings and other economic and noneconomic damages, including damages     for violation of their constitutional rights.

184.    Therefore, they are entitled to all damages recover     able under law.

185.    The terrorist defendants are individually, jointly     and severally liable to plaintiffs for all their damages.

*Third Claim for Relief: For Civil Conspiracy*

186.    Plaintiffs repeat the allegations set forth above     si fully restated herein.

187.    This claim for relief is by all plaintiffs.

188.    As set forth in this Complaint, Hasan and Aulaqi co     nspired to kill, wound, injure and damage plaintiffs as part of a Muslim jihad aga     inst Americans.

189.    Acting pursuant to this conspiracy, Hasan killed, w     ounded, injured and damaged plaintiffs.

190.    As a proximate and foreseeable result of the terror     ist defendants' civil conspiracy, plaintiffs have suffered physical injury, including     but not limited to terror, wrongful death, disfigurement, permanent and temporary disability,     neurological damage, pain and suffering; emotional distress, including but not limited to di     sabling post-traumatic stress disorder, anger, depression, sleeplessness and nightmares, crippling     anxiety, feelings of constant fear and helplessness, an inability to work, psychiatric dis     orders, adverse personality changes and a host of physical ailments and disorders that are manifes     tations thereof, including high blood pressure, headaches and other physical disorders; a loss of t     he ability to enjoy a normal life, including but not limited to loss of consortium, marital problems     , and lost affection, aid, attention and familial

support; social disorders; and economic losses, inc      luding but not limited to lost wages, lost benefits and medical expenses.

191.    As a further direct and proximate result of the ter      rorist defendants' conspiracy, the decedents suffered severe physical pain and sufferi      ng, severe mental anguish and other damages during the last moments of their life, after they w      ere shot by Hasan.

192.    The terrorist defendants are individually, jointly      and severally liable to plaintiffs for all their damages.

*Fourth Claim for Relief: For Violation of §1985(3)*

193.    Plaintiffs repeat the allegations set forth above a      s if fully restated herein.

194.    This claim for relief is by all plaintiffs.

195.    Hasan and Aulaqi conspired to deprive plaintiffs of      equal protection, privileges and immunities under the laws of the United States      because they were not Muslims, by means of religious murder and violent jihad.

196.    Pursuant to and in furtherance of this conspiracy,      Hasan killed, wounded and injured plaintiffs, thereby "injuring them in their      persons or property" and depriving them of their right to exercise their rights and privileges      as citizens of the United States, including their right to life.

197.    As a proximate and foreseeable result of the terror      ist defendants' violation of 42 U.S.C. § 1985(3), plaintiffs have suffered physical      injury, including but not limited to terror, wrongful death, disfigurement, permanent and tempor      ary disability, neurological damage, pain and suffering; emotional distress, including but no      t limited to disabling post-traumatic stress disorder, anger, depression, sleeplessness and nigh      tmares, crippling anxiety, feelings of constant fear and helplessness, an inability to work, psychi      atric disorders, adverse personality changes

and a host of physical ailments and disorders that     are manifestations thereof, including high blood pressure, headaches and other physical disord     ers; a loss of the ability to enjoy a normal life, including but not limited to loss of consorti     um, marital problems, and lost affection, aid, attention and familial support; social disorders; a     nd economic losses, including but not limited to lost wages, lost benefits and medical expenses.

198.   As a further direct and proximate result of the ter     rorist defendants' violations of plaintiffs' civil rights, the decedents suffered se     vere physical pain and suffering, severe mental anguish and other damages during the last moments o     f their life, after they were shot by Hasan.

199.   The terrorist defendants are individually, jointly     and severally liable to plaintiffs for all their damages.

*Fifth Claim for Relief: Negligence*

200.   Plaintiffs repeat the allegations set forth above     si fully restated herein.

201.   This claim for relief is against Aulaqi's estate by     all plaintiffs.

202.   Aulaqi knew that Hasan had requested religious sanc     tion from him to murder innocent Americans.

203.   Aulaqi knew that Hasan was preparing to attack plai     ntiffs in the name of Muslim jihad, and that Hasan was relying on Aulaqi for rel     igious sanction to do so.

204.   Aulaqi had a duty to refrain from incitement to mur     der, and, knowing Hasan's intentions and reliance on him, to affirmatively di     rect Hasan to forego violence, murder and terrorism.

205.   He breached these duties. Instead, he incited and     provided Hasan with religious and operational inspiration, support and justificat     ion for violent jihad against plaintiffs, aiding and abetting Hasan's assault.

206.    As a proximate and foreseeable result of Aulaqi's n      egligence, plaintiffs have suffered physical injury, including but not limited    to terror, wrongful death, disfigurement, permanent and temporary disability, neurological da      mage, pain and suffering; emotional distress, including but not limited to disabling post-traumat    ic stress disorder, anger, depression, sleeplessness and nightmares, crippling anxiety, fe      elings of constant fear and helplessness, an inability to work, psychiatric disorders, adverse p      ersonality changes and a host of physical ailments and disorders that are manifestations ther      eof, including high blood pressure, headaches and other physical disorders; a loss of the ability       to enjoy a normal life, including but not limited to loss of consortium, marital problems, and lost a      ffection, aid, attention and familial support; social disorders; and economic losses, including bu      t not limited to lost wages, lost benefits and medical expenses.

207.    As a further direct and proximate result of Aulaqi'      s negligence, the decedents suffered severe physical pain and suffering, severe      mental anguish and other damages during the last moments of their life, after they were shot by      Hasan.

208.    Aulaqi, through his estate, is therefore liable to      plaintiffs for all their damages.

*Sixth Claim for Relief: Gross Negligence*

209.    Plaintiffs repeat the allegations set forth above a      s if fully restated herein.

210.    This claim for relief is against the terrorist defe      ndants by all plaintiffs.

211.    The terrorist defendants' conduct, as set forth in      this Complaint, reflects such an extreme deviation from the ordinary standard of car      e as to support a finding of wanton, willful and reckless disregard or conscious indifference fo      r plaintiffs' rights and safety.

212.    As a proximate and foreseeable result of the terror      ist defendants' gross negligence, plaintiffs have suffered physical injur      y, including but not limited to terror, wrongful

81

death, disfigurement, permanent and temporary disab     ility, neurological damage, pain and

suffering; emotional distress, including but not li     mited to disabling post-traumatic stress

disorder, anger, depression, sleeplessness and nigh     tmares, crippling anxiety, feelings of constant

fear and helplessness, an inability to work, psychi     atric disorders, adverse personality changes

and a host of physical ailments and disorders that     are manifestations thereof, including high

blood pressure, headaches and other physical disord     ers; a loss of the ability to enjoy a normal

life, including but not limited to loss of consorti     um, marital problems, and lost affection, aid,

attention and familial support; social disorders; a     nd economic losses, including but not limited to

lost wages, lost benefits and medical expenses.

213.   As a further direct and proximate result of the ter     rorist defendants' gross

negligence, the decedents suffered severe physical     pain and suffering, severe mental anguish and

other damages during the last moments of their life     , after they were shot by Hasan.

214.   The terrorist defendants are individually, jointly     and severally liable to plaintiffs

for all their damages.

*Seventh Claim for Relief: Assault and Battery*

215.   Plaintiffs repeat the allegations set forth above a     s if fully restated herein.

216.   This claim for relief is against the terrorist defe     ndants by all plaintiffs.

217.   The terrorist defendants engaged in an intentional     and unlawful attempt or threat,

either by words or by acts, to do physical harm to     plaintiffs, and as a proximate result thereof,

Hasan engaged in an intentional act of terror that     caused plaintiffs grievously harmful or

offensive bodily contact and injury.

218.   The terrorist defendants are therefore liable to pl     aintiffs for civil assault and

battery.

219. As a proximate and foreseeable result of the terror      ist defendants' assault and battery, plaintiffs have suffered physical injury,      including but not limited to terror, wrongful death, disfigurement, permanent and temporary disab      ility, neurological damage, pain and suffering; emotional distress, including but not li      mited to disabling post-traumatic stress disorder, anger, depression, sleeplessness and nigh      tmares, crippling anxiety, feelings of constant fear and helplessness, an inability to work, psychi      atric disorders, adverse personality changes and a host of physical ailments and disorders that      are manifestations thereof, including high blood pressure, headaches and other physical disord      ers; a loss of the ability to enjoy a normal life, including but not limited to loss of consorti      um, marital problems, and lost affection, aid, attention and familial support; social disorders; a      nd economic losses, including but not limited to lost wages, lost benefits and medical expenses.

220. As a further direct and proximate result of the ter      rorist defendants' assault and battery, the decedents suffered severe physical pai      n and suffering, severe mental anguish and other damages during the last moments of their life      , after they were shot by Hasan.

221. The terrorist defendants are individually, jointly      and severally liable to plaintiffs for all their damages.

*Eighth Claim for Relief: For Intentional Inflictio      n of Emotional Distress*

222. Plaintiffs repeat the allegations set forth above a      s if fully set forth herein.

223. This claim for relief is against the terrorist defe      ndants by all plaintiffs.

224. The terrorist defendants' conduct, as set forth in      this Complaint, was extreme or outrageous, which intentionally or recklessly cause      d plaintiffs severe emotional distress.

225.    This conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and must be regarded as atrocious and utterly intolerable in a civilized community.

226.    Therefore, the terrorist defendants are liable for intentional infliction of emotional distress against plaintiffs.

227.    As a proximate and foreseeable result of the terrorist defendants' intentional infliction of emotional distress, plaintiffs have suffered emotional distress, including but not limited to disabling post-traumatic stress disorder, anger, depression, sleeplessness and nightmares, crippling anxiety, feelings of constant fear and helplessness, an inability to work, psychiatric disorders, adverse personality changes and a host of physical ailments and disorders that are manifestations thereof, including high blood pressure, headaches and other physical disorders; a loss of the ability to enjoy a normal life, including but not limited to loss of consortium, marital problems, lost affection, aid, attention and familial support; social disorders; and economic losses, including but not limited to lost wages, lost benefits and medical expenses.

*Ninth Claim for Relief: Loss of Consortium*

228.    Plaintiffs repeat the allegations set forth above as if fully restated herein.

229.    This claim for relief is by all spouses, partners and family members of those killed, wounded or injured in the Fort Hood terror attack against the terrorist defendants.

230.    The terrorist defendants' conduct, as set forth in this Complaint, has caused these plaintiffs to suffer a substantial and painful loss of affection, aid, comfort, marital relations, normal family life and assistance from their family members who were killed, wounded and injured by these defendants.

231.    As a proximate and foreseeable result of the terror        ist defendants' misconduct, as set forth in this Complaint, plaintiffs have suffer        ed physical injury, including but not limited to terror, neurological damage, pain and suffering; em        otional distress, including but not limited to disabling post-traumatic stress disorder, anger, de        pression, sleeplessness and nightmares, crippling anxiety, feelings of constant fear and he        lplessness, an inability to work, psychiatric disorders, adverse personality changes and a host o        f physical ailments and disorders that are manifestations thereof, including high blood pressu        re, headaches and other physical disorders; a loss of the ability to enjoy a normal life, includi        ng but not limited to marital problems, lost affection, aid, attention and familial support; soc        ial disorders; and economic losses, including but not limited to lost wages, lost benefits and medica        l expenses.

## B. Claims Against the Government Defendants

*First Claim for Relief: The Survival Act/D.C. Code        §16-2701 et seq.*

232.    Plaintiffs repeat the allegations set forth above a        s if fully restated herein.

233.    This claim for relief against the government defend        ants is by the personal representatives of those killed in the Fort Hood te        rror attack.

234.    All of the decedents' rights of action under this C        omplaint survive in favor of their personal representatives.

235.    As a direct, proximate and foreseeable result of th        e terrorist defendants' conduct, all as set forth in this Complaint, the decedents w        ere shot and killed by Hasan during his jihadi terror attack at Fort Hood.

236.    Each decedent suffered and experienced severe pain,        mental anguish and emotional distress prior to his or her death. For        example, Private Francheska Velez, who was shot by Hasan, was found by other soldiers curled i        n a fetal position crying "my baby, my baby"

before she died. At all times relevant, she knew that she and Baby Velez were both dying from their wounds.

237.     Additionally, the decedents' estates lost probable    future earnings and other economic and noneconomic damages, including damages    for violation of their constitutional rights.

238.     Therefore, these plaintiffs are entitled to any and    all damages recoverable under law.

239.     The government defendants are individually, jointly    and severally liable to plaintiffs for all their damages.

*Second Claim: For Wrongful Death/ D.C. Code § 12-10    1 et seq.*

240.     Plaintiffs repeat the allegations set forth above a    s if fully restated herein.

241.     This claim for relief against the government defend    ants is by the next of kin of those killed in the Fort Hood terror attack.

242.     As a direct, proximate and foreseeable result of th    e terrorist defendants' misconduct, all as set forth in this Complaint, dec    edents' next of kin have incurred burial expenses, and lost their share of the decedents' an    ticipated future earnings and the pecuniary value of the decedents' respective services, among    other things.

243.     Therefore, they are entitled to all damages recover    able under law.

244.     Defendants are individually, jointly and severally    liable to plaintiffs for all their damages.

*Third Claim for Relief: Negligence (Hiring, Retent    ion and Supervision)*

245.     Plaintiffs repeat the allegations set forth above a    s if fully restated herein.

246.   This claim for relief against the Army, the DOD, and John Does ## 1-4 and 6 is by all plaintiffs.

247.   As set forth in this Complaint, these defendants knew that Hasan was an incompetent doctor and a dangerous Islamic radical who considered and conducted himself as an enemy of the United States.

248.   Unreasonably, with conscious and deliberate indifference to, and with reckless disregard for, Army rules and plaintiffs' lives and legal rights and, knowing to a moral certainty, of the risk posed by Hasan to plaintiffs, these defendants chose not to comply with or enforce Army regulations with respect to or against Hasan, or to discipline him or to protect and safeguard plaintiffs, his foreseeable victims.

249.   These defendants owed plaintiffs non-discretionary duties to, *inter alia*, use reasonable care in the hiring, training, supervision and retention of Hasan; to treat him as they would have treated any other person in his position without regard for his ethnicity, religion or other considerations of "political correctness"; to follow their own rules, discipline and procedures; to select and retain employees competent and fit for the work assigned to them; and to protect, refrain from retaining, and avoid exposing plaintiffs to harm from an unfit and dangerous employee.

250.   As set forth in this Complaint, these defendants unreasonably, with conscious and deliberate indifference to, and reckless and willful disregard for, plaintiffs' lives and legal rights, breached these duties.

251.   These defendants knew, to a moral certainty, that they had failed to reasonably hire, train and supervise Hasan and that by retaining him, promoting him and assigning him to

Fort Hood they had created an unreasonable risk of        harm to plaintiffs and others similarly situated.

252.    As set forth in this Complaint, these defendants' n        egligently and with deliberate indifference to and reckless and willful disregard        for plaintiffs' lives and legal rights violated their non-discretionary duties, which amounted to g        ross negligence, proximately and foreseeably causing plaintiffs' injuries.

253.    As a proximate and foreseeable result of these defe        ndants' negligence, conscious and deliberate indifference, and reckless disregard        for plaintiffs' lives and legal rights, all as set forth in this Complaint, plaintiffs have suffered p        hysical injury, including but not limited to terror, wrongful death, disfigurement, permanent an        d temporary disability, neurological damage, pain and suffering; emotional distress, including b        ut not limited to disabling post-traumatic stress disorder, anger, depression, sleeplessness and nigh        tmares, crippling anxiety, feelings of constant fear and helplessness, an inability to work, psychi        atric disorders, adverse personality changes and a host of physical ailments and disorders that        are manifestations thereof, including high blood pressure, headaches and other physical disord        ers; a loss of the ability to enjoy a normal life, including but not limited to loss of consorti        um, marital problems, lost affection, aid, attention and familial support; social disorders; a        nd economic losses, including but not limited to lost wages, lost benefits and medical expenses.

254.    As a further direct and proximate result of these d        efendants' negligence, the decedents suffered severe physical pain and sufferi        ng, severe mental anguish and other damages during the last moments of their life, after they w        ere shot by Hasan.

255.    These defendants are individually, jointly and seve        rally liable to plaintiffs for all their damages.

*Fourth Claim for Relief: Negligence (Investigation)*

256.  Plaintiffs repeat the allegations set forth above a sifully restated herein.

257.  This claim for relief against the FBI and John Doe #5 is by all plaintiffs.

258.  As set forth in this Complaint, at all times releva nt, these defendants had actual knowledge of their unique relationship with plainti ffs, and of their corresponding non-discretionary duty to protect them and to reasonabl y investigate Hasan, including an in-person interview; to maintain a system wherein Hasan's act ivities were properly documented, assessed and evaluated; and to reasonably perform their duti es by notifying the Army of Hasan's communications with Aulaqi, monitoring Hasan's weap ons purchases, and/or arresting him, among other things, all without respect to Hasan's ethnicity or religion or any other considerations of political correctness.

259.  Plaintiffs justifiably relied on these defendants t o perform their duties.

260.  These defendants knowingly and with conscious and d eliberate indifference to, and reckless disregard for, plaintiffs' lives and l egal rights, breached and disregarded their duties to plaintiffs.

261.  As a proximate and foreseeable result of these defe ndants' negligence, deliberate indifference to and reckless disregard for plaintif fs' lives and legal rights, all as set forth in thi s Complaint, plaintiffs have suffered physical injury , including but not limited to terror, wrongful death, disfigurement, permanent and temporary disab ility, neurological damage, pain and suffering; emotional distress, including but not li mited to disabling post-traumatic stress disorder, anger, depression, sleeplessness and nigh tmares, crippling anxiety, feelings of constant fear and helplessness, an inability to work, psychi atric disorders, adverse personality changes and a host of physical ailments and disorders that are manifestations thereof, including high

blood pressure, headaches and other physical disord      ers; a loss of the ability to enjoy a normal life, including but not limited to loss of consorti      um, marital problems, lost affection, aid, attention and familial support; social disorders;      and economic losses, including but not limited to lost wages, lost benefits and medical expenses.

262.    As a further direct and proximate result of these d      efendants' negligence, the decedents suffered severe physical pain and sufferi      ng, severe mental anguish and other damages during the last moments of their life, after they w      ere shot by Hasan.

263.    These defendants are individually, jointly and seve      rally liable to plaintiffs for all their damages.

*Fifth Claim for Relief: For Gross Negligence*

264.    Plaintiffs repeat the allegations set forth above a      s if fully restated herein.

265.    This claim for relief against all the government de      fendants is by all plaintiffs.

266.    The government defendants' conduct, as set forth in      this Complaint, reflects such an extreme deviation from the ordinary standard of      care as to support a finding of wanton, willful and reckless disregard or conscious indifference fo      r plaintiffs' rights and safety.

267.    As a proximate and foreseeable result of the govern      ment defendants' gross negligence, plaintiffs have suffered physical injur      y, including but not limited to terror, wrongful death, disfigurement, permanent and temporary disab      ility, neurological damage, pain and suffering; emotional distress, including but not li      mited to disabling post-traumatic stress disorder, anger, depression, sleeplessness and nigh      tmares, crippling anxiety, feelings of constant fear and helplessness, an inability to work, psychi      atric disorders, adverse personality changes and a host of physical ailments and disorders that      are manifestations thereof, including high blood pressure, headaches and other physical disord      ers; a loss of the ability to enjoy a normal

life, including but not limited to loss of consorti        um, marital problems, lost affection, aid, attentionandfamilialsupport;socialdisorders;a        ndeconomiclosses,includingbutnotlimitedto lostwages,lostbenefitsandmedicalexpenses.

268.    As a further direct and proximate result of the gov        ernment defendants' gross negligence,thedecedentssufferedseverephysical        painandsuffering,severementalanguishand otherdamagesduringthelastmomentsoftheirlife        ,aftertheywereshotbyHasan.

269.    The government defendants are individually, jointly        and severally liable to plaintiffsforalltheirdamages.

*SixthClaimforRelief:ForConstitutionalViolati        ons*

270.    Plaintiffsrepeattheallegationssetforthabovea        siffullyrestatedherein.

271.    ThisclaimforreliefagainstalltheJohnDoesis        byallplaintiffs.

272.    Thesedefendantswereobligatedtorespectandprot        ectplaintiffs'livesandtheir legalandconstitutionalrights,includingbutnot        limitedtotheirFifthAmendmentDueProcess rightstolifeandproperty.

273.    However, as set forth in this Complaint, these defe        ndants knowingly, with conscious and deliberate indifference and reckless        and willful disregard, violated plaintiffs' rights by providing Hasan with preferential treatme        nt, promotions, assignments, benefits and exemptions from generally-applicable Army rules, st        andards and discipline because of his ethnicity and religion.  These affirmative acts, as        set forth in this Complaint, created and/or increasedplaintiffs'riskofharmandinjuryatHa        san'shands.

274.    Thesedefendants,throughtheiraffirmativeacts,d        eliberateindifference,reckless andwillfuldisregard,andintentionalomissions,b        othcreatedtheopportunityforHasantocarry outtheterrorattackandrenderedplaintiffsmore        vulnerabletothedanger.

275.    These defendants violated plaintiffs' rights with actual knowledge that they had a special relationship with plaintiffs and held a position of trust and authority over them, and that their wrong-doing would place plaintiffs at a uniquely greater risk of harm than the general public.

276.    As set forth in this Complaint, these defendants knew or should have known that Hasan's attack was reasonably foreseeable and, in fact, was utterly predictable.  Instead, they elevated political correctness and Hasan's career above their duties to protect plaintiffs' physical safety and legal rights.

277.    But for these defendants' patently illegal religious and ethnic preferences; intentional affirmative acts and omissions; and deliberate indifference to, and reckless and willful disregard for plaintiffs' lives and legal rights, the Fort Hood terror attack could not have occurred.  By their slavish devotion to political correctness, and as set forth in this Complaint, defendants created the danger and proximately caused plaintiffs' injuries.

278.    These defendants' conduct, as set forth in this Complaint, is so egregious and so outrageous as to shock the conscience.

279.    As a proximate and foreseeable result of these defendants' violations of plaintiffs' constitutional rights, all as set forth in this Complaint, plaintiffs have suffered physical injury, including but not limited to terror, wrongful death, disfigurement, permanent and temporary disability, neurological damage, pain and suffering; emotional distress, including but not limited to disabling post-traumatic stress disorder, anger, depression, sleeplessness and nightmares, crippling anxiety, feelings of constant fear and helplessness, an inability to work, psychiatric disorders, adverse personality changes and a host of physical ailments and disorders that are manifestations thereof, including high blood pressure, headaches and other physical disorders; a

loss of the ability to enjoy a normal life, includi        ng but not limited to loss of consortium, marital

problems, lost affection, aid, attention and famili        al support; social disorders; and economic

losses, including but not limited to lost wages, lo        st benefits and medical expenses.

280.    As a further direct and proximate result of these d        efendants' wrongful conduct

and omissions, the decedents suffered severe physic        al pain and suffering, severe mental anguish

and other damages during the last moments of their        life, after they were shot by Hasan.

281.    These defendants are individually, jointly and seve        rally liable to plaintiffs for all

their damages.

*Seventh Claim for Relief: Negligent Infliction of E        motional Distress*

282.    Plaintiffs repeat the allegations set forth above a        s if fully restated herein.

283.    This claim of relief against the government defenda        nts is by all plaintiffs.

284.    The government defendants had a relationship with a        nd had undertaken

obligations to the plaintiffs of a kind and nature        that necessarily affected the plaintiffs' emotional

well-being. Therefore, they knew or should have kn        own that there was an especially likely and

foreseeable risk that their deliberate indifference        to and reckless and willful disregard for

plaintiffs' lives and legal rights would cause plai        ntiffs' actionable emotional distress.

285.    The government defendants' deliberate indifference        to and reckless and willful

disregard for and mistreatment of plaintiffs after        Hasan's attack and their abuse of their special

relationship with and responsibility to plaintiffs,        all as set forth in this Complaint, injured the

plaintiffs and caused them actionable mental distre        ss.

286.    As a proximate and foreseeable result of the govern        ment defendants' negligence,

deliberate indifference and reckless and willful di        sregard, all as set forth in this Complaint,

plaintiffs have suffered emotional distress, includ        ing but not limited to disabling post-traumatic

stress disorder, anger, depression, sleeplessness a      nd nightmares, crippling anxiety, feelings of

constant fear and helplessness, an inability to wor      k, psychiatric disorders, adverse personality

changes and a host of physical ailments and disorde      rs that are manifestations thereof, including

high blood pressure, headaches and other physical d      isorders; a loss of the ability to enjoy a

normal life, including but not limited to loss of c      onsortium, marital problems, lost affection, aid,

attention and familial support; social disorders; a      nd economic losses, including but not limited to

lost wages and medical expenses.

287.    These defendants are therefore jointly and severall      y liable to plaintiffs for all of

their damages.

*Eighth Claim for Relief: Loss of Consortium*

288.    Plaintiffs repeat the allegations set forth above a      s if fully restated herein.

289.    This claim for relief is by all spouses, partners,      children and family members of

those killed, wounded or injured in the Fort Hood t      error attack against the government

defendants.

290.    The government defendants' conduct, as set forth in      this Complaint, has caused

these plaintiffs to suffer a substantial and painfu      l loss of affection, aid, comfort, marital relation      s,

normal family life and assistance from their family      members whose wrongful death, wounds and

injuries were proximately caused by these defendant      s' negligence and other misconduct.

291.    As a proximate and foreseeable result of the govern      ment defendants' negligence

and other misconduct, as set forth in this Complain      t, plaintiffs have suffered physical injury,

including but not limited to terror, neurological d      amage, pain and suffering; emotional distress,

including but not limited to disabling post-traumat      ic stress disorder, anger, depression,

sleeplessness and nightmares, crippling anxiety, fe      elings of constant fear and helplessness, an

inability to work, psychiatric disorders, adverse p        ersonality changes and a host of physical

ailments and disorders that are manifestations ther        eof, including high blood pressure, headaches

and other physical disorders; a loss of the ability        to enjoy a normal life, including but not limited

to marital problems, lost affection, aid, attention        and familial support; social disorders; and

economic losses, including but not limited to lost        wages, lost benefits and medical expenses.

292.    These defendants are therefore jointly and severall        y liable to plaintiffs for all of

their damages.

*Ninth Claim for Relief: For Negligent Misrepresent        ation*

293.    Plaintiffs repeat the allegations set forth above a        s if fully restated herein.

294.    This claim for relief is by all plaintiffs against        the Army, DOD and John Does ## 1

-3.

295.    As set forth in this Complaint, these defendants ma        de false statements on Hasan's

OERs and/or omitted facts that they had a duty to d        isclose with respect to Hasan's jihadist

ideology and professional competency. At all time        s, these defendants represented to plaintiffs

and/or their decedents, as appropriate, that Hasan        was a loyal and competent American Army

psychiatrist who would use his position and authori        ty for the benefit of American soldiers.

296.    These representations were both material and false.

297.    Plaintiffs reasonably relied upon these defendants'        false statements and/or

omissions to their detriment.

298.    As a proximate and foreseeable result of these defe        ndants' misrepresentations and

other misconduct, as set forth in this Complaint, p        laintiffs have suffered physical injury,

including but not limited to terror, neurological d        amage, pain and suffering; emotional distress,

including but not limited to disabling post-traumat        ic stress disorder, anger, depression,

sleeplessness and nightmares, crippling anxiety, fe     elings of constant fear and helplessness, an

inability to work, psychiatric disorders, adverse p     ersonality changes and a host of physical

ailments and disorders that are manifestations ther     eof, including high blood pressure, headaches

and other physical disorders; a loss of the ability     to enjoy a normal life, including but not limited

to marital problems, lost affection, aid, attention     and familial support; social disorders; and

economic losses, including but not limited to lost     wages, lost benefits and medical expenses.

299.    These defendants are therefore jointly and severall     y liable to plaintiffs for all of

their damages.

*Tenth Claim for Relief: For Intentional Misreprese     ntation*

300.    Plaintiffs repeat the allegations set forth above a     s if fully restated herein.

301.    This claim for relief is by all plaintiffs against     John Doe #3 who signed Hasan's

false and sanitized OERs.

302.    By signing Hasan's false and sanitized OERs, John D     oe # 3 knowingly and

intentionally made false representations and delibe     rate, deceptive omissions with respect to

Hasan's professional competence and loyalty to the     United States, to its Army and to its soldiers,

with actual knowledge of their falsity.

303.    These false representations and deliberate, decepti     ve omissions were made with

knowledge of their falsity and with the intent to d     eceive plaintiffs and others.

304.    The false representations and deception were succes     sful, causing plaintiffs and

others to act in reliance thereupon.

305.    Plaintiffs proximately and foreseeably suffered gri     evous injuries and damages as a

result.

306.    As a proximate and foreseeable result of this defen        dant's intentional misrepresentations and other misconduct, as set for         th in this Complaint, plaintiffs have suffered physical injury, including but not limited to terro        r, neurological damage, pain and suffering; emotional distress, including but not limited to di        sabling post-traumatic stress disorder, anger, depression, sleeplessness and nightmares, crippling         anxiety, feelings of constant fear and helplessness, an inability to work, psychiatric dis        orders, adverse personality changes and a host of physical ailments and disorders that are manifes        tations thereof, including high blood pressure, headaches and other physical disorders; a loss of t        he ability to enjoy a normal life, including but not limited to marital problems, lost affection, ai        d, attention and familial support; social disorders; and economic losses, including but not l        imited to lost wages, lost benefits and medical expenses.

*Eleventh Claim for Relief: For Administrative Proc        edure Act Declaratory Judgment*

307.    Plaintiffs repeat the allegations set forth above a        s if fully restated herein.

308.    This claim for relief against the Army is by the pe        rsonal representatives of all decedents except Baby Velez, and by the wounded sol        diers, Specialist James Armstrong, Specialist Keara Bono Torkelson, Specialist Logan M        . Burnett, Captain Dorothy Carskadon, Specialist Matthew D. Cooke, Private Mick Engnehl;        Private Joseph T. Foster, Private Amber Marie Gadlin, Sergeant Nathan Hewitt, Private Najee        M. Hull, Private Justin T. Johnson, Staff Sergeant Alonzo M. Lunsford, Staff Sergeant Shawn N        . Manning, Specialist Dayna Ferguson Roscoe, Chief Warrant Officer Christopher Royal, Sp        ecialist Jonathan Sims, Specialist George O. Stratton, and Sergeant Miguel A. Valdivia.

309.    This Court has authority to "hold unlawful and set        aside agency action, findings, and conclusions found to be arbitrary, capricious,        an abuse of discretion, or otherwise not in

accordance with law," 5 U.S.C. § 706(2)(A), and to set aside an agency decision "without observance of procedure required by law," 5 U.S.C. § 706(2)(D).

310.    As set forth in this Complaint, the Army has arbitrarily and capriciously denied the decedents and the wounded soldiers the Purple Heart decoration contrary to Army Regulation 600-8-22, § 2-8 (Sept. 2011) ("Reg. 600").

311.    Reg. 600 provides that "an individual is not 'recommended' for the decoration; rather he or she is entitled to it upon meeting specific criteria."

312.    Reg. 600 further provides that the Purple Heart shall be awarded to soldiers who suffer wounds, injury or death as the result of the act of an enemy of the United States or the act of any hostile foreign force, the wound or injury required medical treatment and the records of such treatment are a matter of official Army records.

313.    Reg. 600 further provides that "such a strict interpretation of the requirement for the wound or injury to be caused by direct result of hostile action not be taken that it would preclude the award being made to deserving personnel."

314.    Reg. 600 further provides that examples of enemy-related injuries which "clearly justify award of the Purple Heart" include "Injury caused by enemy bullet, shrapnel or other projectile created by enemy action."

315.    Hasan was an enemy of the United States who was acting in concert with or on behalf of a hostile foreign force when he carried out the Fort Hood terror attack.

316.    Therefore, the plaintiffs meet the specified regulatory criteria for the Purple Heart decoration in that (1) they suffered wounds, injury or death as a result of the act of an enemy of the United States and/or a hostile foreign force; (2) they suffered injury by enemy bullet,

shrapnel or other projectile created by enemy actio     n, and (3) their wounds and injuries required medical treatment and the record of such treatment     are officially part of the Army's records.

317.    Exhaustion of administrative remedies is futile. F     or example, the White House, in a memorandum from the Office of Management and Budg     et to Congress, threatened to veto the National Defense Appropriations Act because it cont     ained a provision awarding Purple Hearts to the soldiers killed or wounded in the Fort Hood att     ack.

318.    Additionally, in another case, one soldier – plaint     iff Sergeant Manning - was denied terrorism-related benefits in a benefits rev     iew process that was fatally tainted by command interference and bureaucratic abuse. The A     rmy Physical Disability Agency's Physical Evaluation Board ("PEB") first determined that Serg     eant Manning, whom Hasan shot six times, had sustained combat-related injuries and that he s     hould accordingly receive full disability benefits. This could have also qualified him for     a Purple Heart.

319.    There was a dissent to the PEB ruling, however, sta     ting that a superior officer called one of the judges to advise him that the Arm     y had already determined Sergeant Manning's injuries were not combat-related and that the PEB s     hould therefore deny his claim.

320.    The PEB rejected this improper command influence an     d abuse of authority. However, the Army appealed and over-turned the PEB     ruling, holding, in a fatally tainted process and with utter disregard for the record, th     at Sergeant Manning's disabilities were not combat-related because Hasan was not a terrorist an     d his weapon was not "an instrumentality of war," because it could be purchased by civilians.

321.    Sergeant Manning asked for reconsideration.  He rem     inded the Army that the prosecutors in Hasan's court martial had submitted     an expert opinion that Hasan was a terrorist and submitted a copy of the Webster Report demonstr     ating Hasan's al-Qaida connections.

Defendants denied Sergeant Manning the courtesy of reading his reconsideration request, denying it within approximately thirty minutes of its submission.

322. Also, on October 21, 2012, an Army spokesman said "the victims who were allegedly killed at Fort Hood in November 2009 did not meet the criteria of the award of the Purple Heart as outlined in the Department of Defense Manual of Military Decorations and Awards" (i.e., Reg. 600).

323. Therefore, these plaintiffs ask this Court to declare that the Army's refusal to award the deceased and wounded soldiers the Purple Heart arbitrary and capricious, an abuse of discretion, not in accordance with law; to remand this matter with an order requiring the Army to award the Purple Hearts in accordance with Reg. 600; to pay reasonable attorney fees; and to otherwise comply with law.

## RELIEF REQUESTED

WHEREFORE plaintiffs respectfully request the following relief.

A. Judgment for each plaintiff for compensatory, exemplary and/or punitive damages, as appropriate, and in the amounts to which each is found to be entitled to under law, but in no event less than $75,000.00.

B. Declaratory relief, costs, expenses and attorney fees as allowed by law.

C. Such other relief, legal or equitable, that this Court deems just.

Respectfully submitted,

/s/ Reed D. Rubinstein                      /s/ Neal M. Sher
Reed D. Rubinstein, Esq.                    Neal M. Sher, Esq.
D.C. Bar No. 400153                         D.C. Bar No. NY0124
DINSMORE & SHOHL LLLP                        LAW OFFICES OF NEAL M. SHER
801 Pennsylvania Avenue N.W., Suite 610      132 East 43rd Street, Suite 304
Washington, DC 20004                         New York, NY 10017
(202) 372-9100                               (646) 201-8841

OfCounsel
RobertM.Zimmerman,Esq.
DINSMORE&SHOHLLLP
255E.FifthStreet,Suite1900
Cincinnati,OH45202
(513)977-8200

2269398v7
11/5/201212:48pm