## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SHAWN NELSON MANNING,                         :
7505 39th Avenue, SE                          :
Lacey, WA  98503                              :
                                              :
And                                           :
                                              :   Case No. 1:12-cv-01802-CKK
AUTUMN MANNING                                :
7505 39th Avenue, SE                          :
Lacey, WA  98503                              :
                                              :
And                                           :
                                              :
AMANDA ASTORGA,                               :
566 Hargrave Street                           :
Inglewood, CA  90302,                         :
                                              :
And                                           :
                                              :
EDUARDO CARAVEO,                              :
5366 S. Chiswick Lane                         :
Tucson, AZ  85706,                            :
                                              :
And                                           :
                                              :
FERNANDO CARAVEO,                             :
3219 E. Missouri                              :
El Paso, TX  79903,                           :
                                              :
And                                           :
                                              :
ANGELA G. RIVERA-CARAVEO, as the              :
widow and personal representative of the      :
estate of Major Libardo Eduardo Caraveo,      :
and as guardian for J.P.C., M.R., and T.R.,   :
7261 Tinsley Way                              :
Manassas, VA  20111,                          :
                                              :
And                                           :
                                              :
JOSE A. CARAVEO,                              :
625 W. Madison Street                         :
Chicago, IL  60661,                           :

And                                              :
                                                 :
RAFAEL CARAVEO,                                  :
241 Arisano Drive                                :
El Paso, TX  79932,                              :
                                                 :
And                                              :
                                                 :
MARIA ELENA GARCIA,                              :
1037 Miss Bev. Avenue                            :
El Paso, TX  79932,                              :
                                                 :
And                                              :
                                                 :
CARMEN RUIZ,                                      :
3919 Midland Street                              :
Los Angeles, CA  90031,                          :
                                                 :
And                                              :
                                                 :
ISABEL ZUNIGA,                                    :
3030 Richmond                                    :
El Paso, TX  79930,                              :
                                                 :
And                                              :
                                                 :
DANIEL DeCROW as the father and co-               :
personal representative of the estate of Staff    :
Sergeant Justin Michael DeCrow,                  :
6770 S. 250 West                                 :
Rochester, IN  46975,                            :
                                                 :
And                                              :
                                                 :
RHONDA  THOMPSON, as the mother and               :
co-personal representative of the estate of       :
Staff Sergeant Justin Michael DeCrow,            :
15179 West 9th Road                              :
Plymouth, IN  46563,                             :
                                                 :
And                                              :
                                                 :
CRISTIE M. GREENE as the widow and                :
personal representative of the estate of          :
Specialist Frederick Z. Greene, and as            :

guardian for A.J.G. and H.B.G.,                    :
1502 Sylvan Park Ct.                               :
Mt. Juliet, TN  37122,                             :
                                                   :
And                                                :
                                                   :
KAREN E. NOURSE,                                   :
115 Harber Lane                                    :
Johnson City, TN  37601,                           :
                                                   :
And                                                :
                                                   :
ROBERT H. NOURSE,                                  :
115 Harber Lane                                    :
Johnson City, TN  37601,                           :
                                                   :
And                                                :
                                                   :
JENNIFER N. HUNT, as the widow and                 :
personal representative of the estate of           :
Specialist Jason Dean Hunt,                        :
760 Lakeside Drive                                 :
Noble, OK  73068,                                  :
                                                   :
And                                                :
                                                   :
GALE HUNT,                                         :
300 N. Broadway                                    :
Wausa, NE  68786,                                  :
                                                   :
And                                                :
                                                   :
GARY DEAN HUNT,                                    :
1117 W. Comanche                                   :
Norman, OK  73019,                                 :
                                                   :
And                                                :
                                                   :
ANGELA L. SMITH,                                   :
101 Black Powder Cir.                              :
Noble, OK  73068,                                  :
                                                   :
And                                                :
                                                   :
JERILYN M. KRUEGER as mother and                   :
personal representative of the estate of           :

Sergeant Amy S. Krueger,          :
14902 S. Cedar Lake Road          :
Kiel, WI  53042,                  :
                                  :
And                               :
                                  :
CASEY J. KRUEGER,                 :
14902 S. Cedar Lake Road          :
Kiel, WI  53042,                  :
                                  :
And                               :
                                  :
JESSICA KRUEGER BRYANT,           :
1020 7th Street                   :
Kiel, WI  53042,                  :
                                  :
And                               :
                                  :
CYNTHIA SEAGER, as the widow and  :
personal representative of the estate of  :
Captain Russell G. Seager,        :
1714 Redcoat Drive                :
Racine, WI  53401,                :
                                  :
And                               :
                                  :
JOSEPH SEAGER                     :
1714 Redcoat Drive                :
Racine, WI  53401,                :
                                  :
And                               :
                                  :
VERNON SEAGER                     :
N. 4892 State Road 80             :
Elroy, WI  53929,                 :
                                  :
And                               :
                                  :
BARBARA B. PRUDHOMME,             :
9706 Riverview Lane               :
Caledonia, WI  53108,             :
                                  :
And                               :
                                  :
JUAN G. VELEZ,                    :
P.O. Box 832109                   :

Miami, FL  33283,                                    :
                                                     :
And                                                  :
                                                     :
EILLEN RODRIGUEZ, as the mother and                  :
grandmother of and representative of the             :
estates of Private Francheska Velez and Baby         :
Velez                                                :
1041 N. Ridgeway Avenue,                             :
Chicago, IL  60651,                                  :
                                                     :
 And                                                 :
                                                     :
JUAN G. VELEZ,                                        :
1041 N. Ridgeway Avenue,                             :
Chicago, IL  60651,                                  :
                                                     :
And                                                  :
                                                     :
EVA M. WADDLE, as mother and acting as               :
personal representative as the estate of             :
Lieutenant Colonel Juanita Warman,                   :
1215 Foster Avenue                                   :
Pittsburgh, PA  15205,                               :
                                                     :
And                                                  :
                                                     :
MELISSA CZEMERDA,                                    :
161 Marion Drive                                     :
McMurray, PA  15317,                                 :
                                                     :
And                                                  :
                                                     :
RENEE A. GAMBONI,                                    :
183 Delaware Drive                                   :
Damascus, PA  18415,                                 :
                                                     :
And                                                  :
                                                     :
TAWNYA PATTILLO,                                     :
5439 Lemon Tree Lane                                 :
Gulf Shores, AL  36542,                              :
                                                     :
And                                                  :
                                                     :
KRISTINA RIGHTWEISER,                                :

4732 N. 103rd Lane                              :
Phoenix, AZ  85037,                             :
                                                :
And                                             :
                                                :
PRISCILLA J. SHEADER,                           :
1328 Sandstone Drive                            :
McDonald, PA  15057,                            :
                                                :
And                                             :
                                                :
DONNA WADDLE,                                   :
3334 Duquesne Avenue                            :
West Mifflin, PA  15122,                        :
                                                :
And                                             :
                                                :
MARGARET YAGGIE,                                :
39 Hilltop Lane                                 :
Roaring Branch, PA  17765,                      :
                                                :
And                                             :
                                                :
SHOUA HER, as the widow and personal            :
representative of the estate of Private Kham    :
See Xiong, and as guardian of D.X., J.X. and    :
K.X.,                                           :
2183 7th Street N.                              :
North St. Paul, MN  55109,                      :
                                                :
And                                             :
                                                :
CHOR XIONG,                                     :
245 E. Congress Street, Apt. D,                 :
St. Paul, MN  55107,                            :
                                                :
And                                             :
                                                :
DAN BEE XIONG,                                  :
764 Hoyt Avenue East                            :
St. Paul, MN  55106,                            :
                                                :
And                                             :
                                                :
JENNIE XIONG,                                   :
6613 4th Street North,                          :

Oakdale, MN  55128,                                  :
                                                     :
And                                                  :
                                                     :
Ke.X.,                                               :
245 E. Congress Street, Apt. D                       :
St. Paul, MN  55107,                                 :
                                                     :
And                                                  :
                                                     :
M.X.,                                                :
245 E. Congress Street, Apt. D                       :
St. Paul, MN  55107,                                 :
                                                     :
And                                                  :
                                                     :
MEE XIONG,                                           :
844 Galtier Street                                   :
St. Paul, MN  55117,                                 :
                                                     :
And                                                  :
                                                     :
NELSON XIONG,                                        :
245 E. Congress Street, Apt. D                       :
St. Paul, MN  55107,                                 :
                                                     :
And                                                  :
                                                     :
PA NOU XIONG,                                        :
245 E. Congress Street, Apt. D                       :
St. Paul, MN  55107,                                 :
                                                     :
And                                                  :
                                                     :
P.X.,                                                :
245 E. Congress Street, Apt. D                       :
St. Paul, MN  55107,                                 :
                                                     :
And                                                  :
                                                     :
R.X.,                                                :
245 E. Congress Street, Apt. D                       :
St. Paul, MN  55107,                                 :
                                                     :
And                                                  :
                                                     :

ROBERT XIONG,                                  :
245 E. Congress Street, Apt. D                 :
St. Paul, MN  55107,                           :
                                               :
And                                            :
                                               :
TIFFANY XIONG,                                 :
3310 Davey Street                              :
Eau Claire, WI  54703,                         :
                                               :
And                                            :
                                               :
JAMES ARMSTRONG,                               :
1597 Augusta Road                              :
Bowdoin, ME  04287,                            :
                                               :
And                                            :
                                               :
KEARA BONO TORKELSON,                          :
14876 92nd Cir.                           :
Otsego, MN  55330,                             :
                                               :
And                                            :
                                               :
JOSEPH TORKELSON                               :
14876 92nd Cir.                           :
Otsego, MN  55330                              :
                                               :
And                                            :
                                               :
STEVEN MICHAEL BONO, personally and            :
as guardian for K.M.J.B., K.B.P.B.,            :
3610 Kings Highway                             :
Kansas City, MO  64137                         :
                                               :
And                                            :
                                               :
DUSTIN M. BONO                                 :
2829B Tepee Avenue                             :
Independence, MO  64057                        :
                                               :
And                                            :
                                               :
MICHAEL J. MCCARTY                             :
20113 E. 13th Street S.                   :
Independence, MO  64057                        :

And                                              :
                                                 :
MARGARET A. MCCARTY, personally                  :
and as guardian for L.D.M.,                       :
20113 E. 13th Street S.                          :
Independence, MO  64057                          :
                                                 :
And                                              :
                                                 :
MICHAEL J. MCCARTY, as guardian for              :
G.L.M. and E.J.M.,                               :
20113 E. 13th Street S.                          :
Independence, MO  64057                          :
                                                 :
And                                              :
                                                 :
LOGAN M. BURNETT                                 :
6053-1 Ruffer Spur                               :
Fort Hood, TX  76544                             :
                                                 :
And                                              :
                                                 :
VICTORIA ELIZABETH BURNETT                       :
6053-1 Ruffer Spur                               :
Fort Hood, TX  76544                             :
                                                 :
And                                              :
                                                 :
LOVICKIE DENISE BYRD personally and              :
as guardian for DOMINIQUE LAMAR                  :
BYRD,                                            :
5202 Deerwood Trail                              :
Killeen, TX 76542                                :
                                                 :
And                                              :
                                                 :
JOE LEWIS BYRD                                   :
5202 Deerwood Trail                              :
Killeen, TX  76542                               :
                                                 :
And                                              :
                                                 :
JOE LEWIS BYRD II                                :
5202 Deerwood Trail                              :
Killeen, TX  76542                               :

9

:

And                                            :

                                               :

DOROTHY CARSKADON                              :

3815 Monona Drive #8                           :

Madison, WI  53714                             :

                                               :

And                                            :

                                               :

JULIE CARSKADON                                :

3815 Monona Drive #8                           :

Madison, WI  53714                             :

                                               :

And                                            :

                                               :

MATTHEW DENNISON COOKE                         :

HQ, 1st Bn WTB                               :

Fort Hood, TX  76544                           :

                                               :

And                                            :

                                               :

CHRISTINA DANIELLE COOKE                       :

5022 Rolling Oaks Lane                         :

Charlotte, NC  28227                           :

                                               :

And                                            :

                                               :

MATTHEW DENNISON COOKE,                        :

as guardian for G.T.C. and Z.A.C.,             :

301 N. 21st                                  :

Duncan, OK  73533                              :

                                               :

And                                            :

                                               :

CARL COOKE,                                    :

31 ½ Pleasant Street                           :

Sidney, NY  13838                              :

                                               :

And                                            :

                                               :

JENNIFER LYNN FRAPPIER                         :

372 Eastover Avenue                            :

Norwood, NC  28128                             :

                                               :

And                                            :

                                               :

DIANE MARIE FRAPPIER                    :
372 Eastover Avenue                     :
Norwood, NC  28128                      :
                                        :
And                                     :
                                        :
GERARD LEO FRAPPIER                     :
372 Eastover Avenue                     :
Norwood, NC  28128                      :
                                        :
And                                     :
                                        :
KIMBERLY EV MILLER                      :
120 River Street                        :
Apt. 1E                                 :
Oneonta, NY  13820                      :
                                        :
And                                     :
                                        :
ANNA E. ELLIS                           :
1512 McCarthy Avenue                    :
Killeen, TX  76549                      :
                                        :
And                                     :
                                        :
MICK ENGNEHL                            :
1908 Twilight Drive                     :
Killeen, TX  76543                      :
                                        :
And                                     :
                                        :
AUTUMN ENGNEHL, personally and as       :
guardian for B.G.,                      :
1908 Twilight Drive                     :
Killeen, TX  76543                      :
                                        :
And                                     :
                                        :
JOSEPH T. FOSTER                        :
5502-2 Cutler Street                    :
Ft. Hood, TX  76544                     :
                                        :
And                                     :
                                        :
MANDY M. FOSTER                         :
5502-2 Cutler Street                    :

Ft. Hood, TX  76544                                 :
                                                    :
And                                                 :
                                                    :
AMBER MARIE GADLIN                                   :
1703 Mulford Street                                 :
Killeen, TX 76541,                                  :
                                                    :
And                                                 :
                                                    :
CHELSEA GARRETT                                      :
2707 Windmill Dr.                                   :
Killeen, TX  76549                                  :
                                                    :
And                                                 :
                                                    :
MICHELLE R. HARPER, personally and as               :
guardian for T.H. and A.M.,                         :
2802 Hydrangea Avenue                               :
Killeen, TX  76549                                  :
                                                    :
And                                                 :
                                                    :
GEORGE HARPER                                        :
2802 Hydrangea Avenue                               :
Killeen, TX  76549                                  :
                                                    :
And                                                 :
                                                    :
ALYSSA MAGEE                                         :
1615 Parker Lane                                    :
Harker Heights, TX  76548                           :
                                                    :
And                                                 :
                                                    :
NATHAN HEWITT                                        :
8121 Walnut Ridge Road                              :
Lafayette, IN  47909                                :
                                                    :
And                                                 :
                                                    :
CLIFFORD ALAN HOPEWELL                               :
6025 Wonder                                         :
Fort Worth, TX 76133                                :
                                                    :
And                                                 :

TRENA HOPEWELL                                    :
6025 Wonder                                       :
Fort Worth, TX 76133                              :
                                                  :
And                                               :
                                                  :
NAJEE MONELL HULL                                 :
1000 Holbrook Road, Apartment T                   :
Homewood, IL  60430                               :
                                                  :
And                                               :
                                                  :
NANETTE MONIQUE HULL                              :
1000 Holbrook Road, Apartment T                   :
Homewood, IL  60430                               :
                                                  :
And                                               :
                                                  :
NATHANIEL HULL                                    :
41 N. Willow Lane                                 :
Glenwood, IL  60425                               :
                                                  :
And                                               :
                                                  :
YVONNE HULL-PEARSON, personally                   :
and as guardian for N.M.P.,                       :
1000 Holbrook Road, Apartment T                   :
Homewood, IL  60430                               :
                                                  :
And                                               :
                                                  :
JUSTIN TIMOTHY JOHNSON                            :
25945 Aysend Dr.                                  :
Punta Gorda, FL  33983                            :
                                                  :
And                                               :
                                                  :
ROXANNE SIMONS-JOHNSON                            :
25945 Aysend Dr.                                  :
Punta Gorda, FL  33983                            :
                                                  :
And                                               :
                                                  :
LINDA LONDRIE                                     :
1104 Searcy Drive                                 :

Killeen, TX  76543                          :
                                            :
And                                         :
                                            :
ALONZO M. LUNSFORD, JR., personally         :
and as guardian for CANDICE J. WESTON,      :
A.D.L., A.M.L., III, AND H.W.,              :
6458 Easthampton Road                       :
Fayetteville, NC  28314                     :
                                            :
And                                         :
                                            :
JOHNSYE A. LUNSFORD-BLOOMFIELD,             :
3204 Johnson Court                          :
Glenarden, MD  20706                        :
                                            :
And                                         :
                                            :
KIMBERLY D. MUNLEY, personally and          :
as guardian for J.A.M. AND M.H.B.,          :
P.O. Box 73                                 :
Kure Beach, NC  28449,                      :
                                            :
And                                         :
                                            :
HOWARD EDWARD RAY                           :
5308 Lions Gate Lane                        :
Killeen, TX  67549                          :
                                            :
And                                         :
                                            :
RACHAEL SALONE RAY, personally and          :
as guardian for J.C.R., L.C.R., and M.P.R., :
5308 Lions Gate Lane                        :
Killeen, TX  76549                          :
                                            :
And                                         :
                                            :
DAYNA F. ROSCOE                             :
104 Cooney St.                              :
Ft. Huachuca, AZ  85613                     :
                                            :
And                                         :
                                            :
LEVA L. FERGUSON                            :
18806 Remington Springs Dr.                 :

Houston, TX  77073                                  :
                                                    :
And                                                 :
                                                    :
JAMES R. FERGUSON                                   :
18806 Remington Springs Dr.                         :
Houston, TX  77073                                  :
                                                    :
And                                                 :
                                                    :
CHRISTOPHER H. ROYAL, personally and                :
as guardian for C.S.R., II                          :
6300 Suellen Lane                                   :
Killeen, TX  76542,                                 :
                                                    :
And                                                 :
                                                    :
STEPHANIE J. ROYAL,                                 :
6300 Suellen Lane                                   :
Killeen, TX  76542,                                 :
                                                    :
And                                                 :
                                                    :
JONATHAN SIMS                                       :
231 Bridal Drive                                    :
Copperas Cove, TX  76522                            :
                                                    :
And                                                 :
                                                    :
MICHELLE SIMS                                       :
6620 Lyndale Dr.                                    :
Watauga, TX  76148                                  :
                                                    :
And                                                 :
                                                    :
JERRY LEE SIMS                                      :
6620 Lyndale Dr.                                    :
Watauga, TX  76148                                  :
                                                    :
And                                                 :
                                                    :
REX A. STALNAKER                                    :
333 Peterson Road                                   :
Knoxville, TN  37934                                :
                                                    :
And                                                 :

KATHRYNE A. STALNAKER                    :
333 Peterson Road                         :
Knoxville, TN  37934                      :
                                          :
And                                       :
                                          :
CLIFTON MIKEAL STONE                      :
886 Beverly Circle                        :
Lenoir, NC  28645                         :
                                          :
And                                       :
                                          :
DIANE BROOKE STONE, personally and        :
as guardian for                           :
O.M.S. AND A.K.S.,                        :
886 Beverly Circle                        :
Lenoir, NC  28645                         :
                                          :
And                                       :
                                          :
KAREN DENISE MIKEAL                       :
886 Beverly Circle                        :
Lenoir, NC  28645                         :
                                          :
And                                       :
                                          :
GEORGE O. STRATTON III                    :
122 S. Scott Street                       :
Post Falls, ID  83854                     :
                                          :
And                                       :
                                          :
GEORGE STRATTON JR.                       :
122 S. Scott Street                       :
Post Falls, ID  83854                     :
                                          :
And                                       :
                                          :
LYNNE R. STRATTON                         :
122 S. Scott Street                       :
Post Falls, ID  83854                     :
                                          :
And                                       :
                                          :
LAWRENCE STRATTON                         :

122 S. Scott Street                              :
Post Falls, ID  83854                            :
                                                 :
And                                              :
                                                 :
DAVID CLUNE                                       :
122 S. Scott Street                              :
Post Falls, ID  83854                            :
                                                 :
And                                              :
                                                 :
MATTHEW CLUNE                                     :
1769 N. Cecil Road                               :
Post Falls, ID  83854                            :
                                                 :
And                                              :
                                                 :
MIGUEL A. VALDIVIA                                :
36 N. Edison Avenue                              :
Elgin, IL  60123-5234                            :
                                                 :
And                                              :
                                                 :
MARK ANTHONEY WARREN                              :
11313 Frontage Drive                             :
Blair, NE 68008                                  :
                                                 :
                                                 :
And                                              :
                                                 :
CARLA SUE WARREN                                  :
11313 Frontage Drive                             :
Blair, NE 68008                                  :
                                                 :
And                                              :
                                                 :
DIANA J. WHITE                                    :
1901 N. WS Young Dr. #C                           :
Killeen, TX  76543                               :
                                                 :
And                                              :
                                                 :
JULIA WILSON (ADEE)                               :
6909 Shannon Circle                              :
Killeen, TX  76542                               :
                                                 :

17

And                                              :
                                                 :
ELIZABETH WILSON                                 :
6909 Shannon Circle                              :
Killeen, TX  76542                               :
                                                 :
And                                              :
                                                 :
JULIA WILSON (ADEE), as guardian for             :
W.W.,                                            :
6909 Shannon Circle                              :
Killeen, TX  76542                               :
And                                              :
                                                 :
PATRICK ZEIGLER                                  :
1203 Northway Lane, N.E.                         :
Rochester, Minnesota  55906                      :
                                                 :
And                                              :
                                                 :
JESSICA ZEIGLER                                  :
1203 Northway Lane, N.E.                         :
Rochester, Minnesota  55906                      :
                                                 :
And                                              :
                                                 :
JESSICA ZEIGLER, as guardian for                 :
P.Z.,                                            :
1203 Northway Lane, N.E.                         :
Rochester, Minnesota  55906                      :
          Plaintiffs,                            :
                                                 :
v.                                               :
                                                 :
                                                 :
JOHN McHUGH, in his official capacity as         :
Secretary of the Army                            :
101 Army Pentagon                                :
Washington, DC 20310                             :
                                                 :
And                                              :
                                                 :
Charles T. Hagel, in his official capacity as    :
Secretary of Defense                             :
1000 Defense Pentagon                            :
Washington, DC 20301                             :

|  | : |
| --- | --- |
| And | : |
|  | : |
| ROBERT MUELLER III, in his official | : |
| capacity as Director of the Federal Bureau of | : |
| Investigation, | : |
| FBI Headquarters | : |
| 935 Pennsylvania Avenue, N.W. | : |
| Washington, D.C. 20535 | : |
|  | : |
| And | : |
|  | : |
| JOHN DOE # 1, in his individual capacity, | : |
| c/o the United States Army | : |
| 101 Army Pentagon | : |
| Washington, DC 20310, | : |
|  | : |
| And | : |
|  | : |
| JOHN DOE #2, in his individual capacity, | : |
| c/o the United States Army | : |
| 101 Army Pentagon | : |
| Washington, DC 20310, | : |
|  | : |
| And | : |
|  | : |
| JOHN DOE #3, in his individual capacity, | : |
| c/o the United States Army | : |
| 101 Army Pentagon | : |
| Washington, DC 20310, | : |
|  | : |
| And | : |
|  | : |
| JOHN DOE #4, in his individual capacity, | : |
| c/o the United States Army | : |
| 101 Army Pentagon | : |
| Washington, DC 20310, | : |
|  | : |
| And | : |
|  | : |
| JOHN DOE #5, in his individual capacity, | : |
| c/o the Federal Bureau of Investigation | : |
| FBI Headquarters | : |
| 935 Pennsylvania Avenue, N.W. | : |
| Washington, D.C. 20535, | : |
|  | : |

And                                                         :
                                                            :
JOHN DOE #6, in his individual capacity,                    :
c/o the United States Army                                  :
101 Army Pentagon                                           :
Washington, DC 20310,                                       :
                                                            :
And                                                         :
                                                            :
NIDAL HASAN, in his individual capacity,                    :
c/o the Bell County Jail                                    :
113 West Central Ave                                        :
Belton, Texas 76513                                         :
,                                                           :
                                                            :
And                                                         :
                                                            :
NASSER al-AULAQI in his capacity as the
personal representative of the estate of
ANWAR al-AULAQI,
c/o American Civil Liberties Union of the                   :
Nation's Capital                                            :
4301 Connecticut Avenue N.W., Suite 434                     :
Washington, DC 20008                                        :
                                                            :
Individually, jointly and severally,                        :
                                                            :
                      Defendants.                           :
                                                            :
                                                            :
                                                            :
                                                            :
                                                            :

## FIRST AMENDED COMPLAINT

(FOR WRONGFUL DEATH, SURVIVORSHIP, ASSAULT AND BATTERY, DUE PROCESS
VIOLATIONS, LOSS OF CONSORTIUM, CIVIL CONSPIRACY, VIOLATION OF 42 U.S.C. §1985(3),
NEGLIGENCE, GROSS NEGLIGENCE, NEGLIGENT AND INTENTIONAL MISREPRESENTATIONS)

## SUMMARY

1.      Plaintiffs are victims of the Fort Hood terrorist attack of November 5, 2009.

2.      Defendants are John McHugh, Secretary of the Army ("Army");Charles T. Hagel,

Secretary of the Department of Defense ("DOD"); Robert Mueller III, Director of the Federal

Bureau of Investigation ("FBI"); John Does ##1-6, whose actions as individuals and as Army, DOD and/or FBI employees are known to plaintiffs, but whose names are not; Army psychiatrist Major Nidal Malik Hasan ("Hasan"); and Nasser al-Aulaqi as the personal representative of the estate of Anwar al-Aulaqi ("Aulaqi").

3.      The Army, DOD, FBI and John Does are jointly and severally called the "government defendants" in this Complaint. Hasan and Aulaqi are jointly and severally called the "terrorist defendants" in this Complaint.

4.      Hasan, an open and notorious Islamic extremist, carried out the Fort Hood terrorist attack with cold-blooded premeditation and the critical support, approval and religious sanction of Aulaqi and the Al-Qaeda terrorist organization.

5.      Aulaqi was a prominent Islamic and al-Qaeda propagandist and terrorist leader killed in a September, 2011 U.S. drone strike in Yemen. At all times relevant, Al-Qaeda - established by Osama bin Laden - was a designated Foreign Terrorist Organization operating through a global network of terror cells, members, associates and supporters (like Hasan) dedicated to the establishment of a pan-Islamic caliphate worldwide. In February, 1998, Al-Qaeda issued a religious pronouncement titled "the World Islamic Front for Jihad against Jews and Crusaders" saying it was the duty of Muslims to kill Americans – civilians and military – and their allies everywhere. This is what Aulaqi and Hasan believed and this is what Hasan did at Fort Hood.

6.      On or before December, 2008, the government defendants knew that Al-Qaeda and its Pakistani, Somali, and Yemeni allies had established a terrorist recruitment, radicalization, and operational infrastructure in the United States with effects both at home and abroad. Put simply, at all times relevant, the government defendants knew that Aulaqi and al-

Qaeda were seeking out and using Muslim extremists such as Hasan to attack and kill Americans inside the United States.

7.      The Special Report by Joseph I. Lieberman, Chairman, and Susan M. Collins, Ranking Member, United States Senate Committee on Homeland Security and Governmental Affairs dated February 3, 2011 ("Senate Report") (attached and incorporated by reference as Exhibit 1), and the Final Report of the William H. Webster Commission on the Events at Fort Hood, Texas on November 5, 2009 (the "Webster Report") (attached and incorporated by reference as Exhibit 2), demonstrate that the government defendants did not "miss" Hasan, and lay to rest any claims or assertions that Hasan somehow "slipped through the cracks" of their security.

8.      Instead, these Reports prove the government defendants knew to a moral certainty that Hasan was a radical extremist who supported violent jihad against the United States and who considered himself a devoted fellow-traveler and "soldier" of al-Qaeda and Aulaqi.  They also prove that the government defendants knew to a moral certainty both that Hasan's conduct and beliefs rendered him unfit to serve as an officer in the U.S. Army, and that he was a "ticking time bomb" who posed an unreasonable risk of harm to plaintiffs.

9.      At multiple points in time and on many different occasions, beginning as early as 2005 and continuing up until the very day of the attack, non-discretionary Army rules, FBI tradecraft and constitutional duties required the government defendants to act against Hasan, to discipline him, to investigate him, to interview him, to inform his superiors about his communications with Aulaqi, to prosecute him, to discharge him from the service, and/or to imprison him.

10.     Yet, contrary to law, to their own rules and to plain common sense, the government defendants elevated illegal ethnic and religious preferences and "political correctness" over national security and their own non-discretionary legal and moral duties to protect plaintiffs' lives and legal rights.  As a direct, proximate and foreseeable result of the government defendants' negligence, gross negligence, political correctness and deliberate indifference to and reckless disregard for plaintiffs' lives and legal rights, Hasan was able to kill 14 Americans, wound by gunshot 32 others, and injure many more.

11.     In the immediate aftermath of the attack, the President of the United States, the Chairman of the Joint Chiefs of Staff and other high-ranking political officials traveled to Fort Hood to visit the victims and hold media "photo opportunities."  The President spoke with a number of the military and victims and their family members, in the hospital and elsewhere.  He specifically promised them that they would be "well taken care of" and that the government would "make them whole."  The Chairman of the Joint Chiefs of Staff made similar promises to injured soldiers.

12.     These promises were empty and untrue.

13.     Even as the President and others were visiting the victims,  the government defendants, for political reasons and to protect both the policies of political correctness and the high ranking officials who advocated and enforced same, had developed and implemented "damage control" policies designed to obscure Hasan's religious motives; to obfuscate the fact that the government defendants' ethnic and religious preferences proximately caused the plaintiffs' injuries; and to convince plaintiffs and the public that the Fort Hood attack was merely "workplace violence" and not Al-Qaeda-inspired terrorism.

14.     Ironically, the very same government defendants who gave Hasan preferential treatment because of his ethnicity and religion have given his victims - the soldiers and civilians who were casualties in the Fort Hood terror attack - inferior and degrading treatment relative to the soldiers and civilians injured in other terrorist attacks.

15.     Upon information and belief, at all times relevant, these "damage control" policies were known to and approved by elected and/or appointed officials at the highest levels of the U.S. government.

16.     To this day, more than three years after the Fort Hood terror attack, the Army, DOD and FBI have never apologized, taken responsibility for their mistakes, or expressed any regret to plaintiffs.   In fact, no high ranking civilian or military command official has been disciplined or lost his or her job because of the acts, errors and omissions that proximately caused the attack and led to the plaintiffs' deaths, wounds and injuries.

17.     The promises made by the President and the others have not been kept.

## BACKGROUND

18.     The Senate Report and the Webster Report prove the government defendants' deliberate indifference to and reckless disregard for plaintiffs' physical safety and legal rights.

19.     By May 17, 2007, the Army, DOD and John Does ##1-4 knew to a moral certainty that Hasan was a shockingly substandard doctor who demonstrated a lack of professionalism, poor judgment, a poor work ethic and a studied disregard for professional standards of care for his patients and Army rules and discipline.  *See* Memorandum from Major Scott Moran to National Capital Consortium Psychiatry Residency Program dated May 17, 2007 (attached as Exhibit 3).

20.     By 2005, these defendants knew to a moral certainty that Hasan was a fanatic Islamist extremist who openly and notoriously supported jihad, suicide attacks and violence against the United States.  According to the Senate Report, at least one of Hasan's supervisors was so alarmed by Hasan's Islamic radicalism that he tried on at least two occasions to convince Hasan to resign from the service.

21.     By December, 2008, the Army, DOD and FBI and John Does ##4 and 5 knew to a moral certainty that Aulaqi and Al-Qaeda terrorist groups had actively recruited individuals in the U.S., deliberately motivated others to carry out terrorist attacks on U.S. soil, and/or directed trained operatives in the execution of coordinated strikes against American targets within our borders. They also knew to a moral certainty that Al-Qaeda and its Pakistani, Somali, and Yemeni allies had established a terrorist recruitment, radicalization, and operational infrastructure in the United States that was attracting Muslims who were American citizens to be operatives in Al-Qaeda's broader global battlefield, with effects at home and abroad.

22.     By January 7, 2009, the FBI and Doe #5 knew to a moral certainty that Hasan was an active security threat, as the result of his intercepted communications with Al-Qaeda's Aulaqi. In the emails reviewed by these defendants, Hasan - who was at all times an active duty U.S. military officer - sought religious sanction for fratricide, supported the government of Iran, justified suicide attacks against innocents and offered material support for terrorism, among other things.  Hasan also made clear his deep devotion to the terrorist leader, writing in rhapsodic terms of meeting Aulaqi in the Muslim "after-life."

23.     By June 30, 2009, the government defendants knew or should have known that Hasan supported the jihadi murder of Americans at the Little Rock, Arkansas Army recruiting

office and that he believed Muslims needed to "strap bombs on themselves and go into Times Square" to kill Americans.

24.    By August, 2009, the Army, DOD and John Doe #6 knew or should have known that Hasan was abusing his patients, who were American soldiers returning from the battlefields of Iraq and Afghanistan, by calling them "war criminals" in the course of psychiatric treatment sessions, and promising criminal prosecution against them because these soldiers had killed Taliban and other terrorists in Afghanistan and Iraq.

25.    At all times relevant, the government defendants knew that Hasan's conduct violated Army regulations and U.S. law; that the FBI had a non-discretionary and constitutional duty to interview Hasan, to notify his superiors of the communications with Aulaqi, and to monitor his weapons purchases, among other things; and that the Army had a non-discretionary and constitutional duty to discipline, discharge, prosecute and/or imprison Hasan.  In short, the government defendants had a non-discretionary and constitutional duty to protect plaintiffs.

26.    At all times relevant, the government defendants knew or should have known that their failure to meet their obligations and do these things unreasonably threatened plaintiffs' lives and violated their legal rights.

27.    Yet, bowing to political correctness because of Hasan's ethnicity and religion (Arab Muslim), and with unreasonable and deliberate indifference to, and reckless and willful disregard for, plaintiffs' lives and legal rights, the government defendants afforded Hasan preferential treatment, thereby proximately causing the Fort Hood terrorist attack.

28.    For example, they awarded Hasan a fellowship that he did not earn; sanitized and falsified his Officer Evaluation Reports ("OERs") to hide both his Islamist jihadi ideology and his professional incompetence; intentionally ignored his constant violations of Army regulations

and professional standards; wrongfully and intentionally disregarded, or "spiked," the multiple reports from his peers calling him a security risk and a "ticking time bomb;" promoted him to Major; chose not to discipline, prosecute, discharge and/or imprison him; and terminated the security investigation into his ties to Aulaqi and Al-Qaeda without a personal interview, an appropriate database review or the disclosure of the fact and content of his communications with this international terrorist chieftain to his commanding officers.

29.     On November 5, 2009, after extensive planning, practice and preparation, Hasan carried out the Fort Hood terror attack.

30.     At approximately 1:00 pm local time, he took up a pre-planned firing position designed to maximize the carnage, yelled "Allah Akbar" (meaning "God is Great" in Arabic), just as Aulaqi had recommended, and began shooting.  He killed 14 Americans, wounded 32 with gunshots and injured many others, before he was shot and paralyzed.  "Allah Akbar" was the rallying cry for the 9/11 terrorists and for the terrorists who beheaded the American journalist Daniel Pearl, and it is used by other jihadists worldwide when attacking non-Muslims.

31.     The government defendants' unreasonable and deliberate indifference to, and reckless disregard for, plaintiffs' lives and legal rights, proximately and foreseeably caused the Fort Hood terror attack and plaintiffs' injuries. This attack was predictable and preventable - but for the government's own intentional acts and deliberate omissions in violation of Army rules, regulations and discipline, and their patently illegal ethnic and religious preferences and sensitivities, Hasan could not have killed, wounded and maimed plaintiffs and the other Americans at Fort Hood.

32.     Within minutes after shooting had stopped the government defendants knew that Hasan's rampage was religiously motivated; that he acted on behalf of Al-Qaeda, and in support

of its objectives, with religious and operational inspiration and support from Aulaqi; that the attack was "terrorism" as defined by U.S. Army Field Manual No. FM 3-0, Chapter 9, 37 and the DOD Joint Publication 1-02, the "DOD Dictionary of Military and Associated Terms" (the "DOD Dictionary"); and that the government defendants' political correctness, which manifested itself in the unreasonable, knowing and deliberate indifference to and reckless disregard for plaintiffs' lives and legal rights, had proximately caused the most lethal terror attack on U.S. soil since 9/11.

33.     At all times relevant, the government defendants knew that Hasan was a dedicated Islamist and jihadist who openly and notoriously declared himself a "Soldier of Allah;" supported suicide attacks, fratricide and the murder of innocents; was a devoted follower of al-Qaeda's Aulaqi; and who yelled "Allah Akbar" as instructed by Aulaqi, when he shot down unarmed Americans, among other things.

34.     At all times relevant, the government defendants knew or should have known that Hasan considered himself and conducted himself as an enemy of the United States, and that he had carried out a "hostile act" against it, as defined by the DOD Dictionary.

35.     Yet, to avoid culpability, to protect the very policies of preference that proximately caused the Fort Hood terror attack, and to mitigate political embarrassment, the government defendants, led by John Doe #4, undertook "damage control" that included covering up and/or obscuring Hasan's employment history; his communications with Aulaqi; his religious motivations and purposes in carrying out the attack; and the Army's reasons for failing to discipline or otherwise act against Hasan the way it would have against any other non-Muslim soldier.

36.     It also included calling the Fort Hood terror attack "workplace violence."

37.     This damage control and cover up was conducted with unreasonable and deliberate indifference to and reckless disregard for the truth; good military morale, discipline and order; and for plaintiffs' legal rights.   At all times relevant, the government defendants knew that their slavish devotion to political correctness, and their unreasonable deliberate indifference to and reckless disregard for plaintiffs' lives and legal rights caused plaintiffs actionable mental distress.

38.     Ironically, the very same government defendants who gave Hasan preferential treatment because of his ethnicity and religion have given his victims, the soldiers and civilians who were casualties in the Fort Hood terror attack, inferior and degrading treatment relative to soldiers and civilians injured in other terrorist attacks.

39.     In the immediate aftermath of the attack, high ranking political and military officials, including the President and the Chairman of the Joint Chiefs of Staff, visited with some of the wounded soldiers, civilians and their family members, promising them the best care, support and assistance from the Army and DOD.   The President himself specifically told injured victims and their families that they would be "well taken care of" and that "the government would make them whole."

40.     However, these promises disappeared into the ether when the television cameras left Fort Hood.

41.     Many of the seriously wounded and injured plaintiffs were left abandoned to their own means and devices to obtain decent medical care.   One injured soldier was able to obtain proper treatment for a traumatic brain injury caused by a bullet to the head only because the treatment was paid for by a private benefactor.

42.     In multiple cases, the Army has refused to admit the seriousness the Fort Hood victims' injuries.  For example, one soldier, who was diagnosed with crippling post traumatic stress syndrome, was denied treatment and a medical discharge by a Captain who specifically refused to sign the appropriate certifications because his injuries were sustained at Fort Hood.  In another case, a soldier was kept on active duty despite doctors' recommendations that he be transferred to a wounded warrior unit if not discharged from the Army on disability entirely. After the last of several major surgeries, he had to enlist the help of his brigade surgeon in begging his brigade commander to approve surgery to remove a bullet that was moving into the nerve wrap around an artery that could have caused internal bleeding from the axilla artery leading to death.  His medical care has been so inadequate that he has been forced to get civilian care off base.

43.     Another soldier who was shot by Hasan five times and almost died due to medical neglect of his head and belly wounds at Darnell Army Hospital and has been in a Wounded Warrior unit for over two years.  Although he is unable to lift anything heavy, or walk more than a short distance, or even ride a bicycle, he has been denied a medical discharge and been taunted by his commanders.  He has been told that if he had been wounded in Iraq, he would have been retired and deemed disabled long ago.  However, because the DOD views his injuries as a workplace violence matter, he remains in limbo.

44.     Another soldier, whom the Veterans' Administration has since diagnosed with post traumatic stress disorder so severe that he cannot work, drive a car, or even bathe himself was sent to Iraq immediately after the Fort Hood attack without any treatment whatsoever. Upon returning from Iraq, he had a breakdown and requested treatment. The Army refused and instead put him on a punitive duty that involved 24-48 hour shifts.  He was not allowed off base,

and was forced to sleep in a hallway on a cot for 3 weeks.  When he was allowed to return home he received discharge papers and was told that he was lucky to have an honorable discharge because he was such an embarrassment to his company.  Since he was not medically discharged as he should have been, his family went without any income for two years, until in August 2012 the VA classified him 100% disabled.  But for assistance from his mother and mother-in-law, this soldier and his family would have been homeless.

46. Others were denied retirement benefits on specious grounds through administrative appeal proceedings fatally tainted by undue command influence.  Still others were subjected to insults, taunts, abuse and neglect from their command because they sought treatment for Fort Hood-related injuries, exacerbating their psychiatric injuries.  One plaintiff, who was harassed by his commander simply because of his connection to the Fort Hood terror attack, was even subjected to an Article 15 disciplinary proceeding which resulted in a demotion, forfeiting of pay and extra duty.

46. In yet another case, the Armed Forces Chief of Staff had given a wounded soldier his card with instructions to call if he (the soldier) needed anything.  Severely injured and disabled, unable to even drive himself to his doctor appointments, and on the verge of economic disaster because his wife had to quit her job and provide him with full time care, he called for help.  No one answered.  No help was provided.

47. Contrary to its own regulations, the Army has refused to deem the soldiers killed and wounded in the attack eligible for a Purple Heart decoration, with its attendant recognition and medical and retirement benefits.

48. As for the civilians injured by Hasan, the government defendants have done nothing of substance at all in the way of decent medical care, assistance or support.

49.     Upon information and belief, this deliberate indifference and reckless disregard for plaintiffs was the result of a determination by John Doe #4 and other political and command officials to obfuscate Hasan's religious motivations and Al-Qaeda ties, to cover up the government defendants' culpability for plaintiffs' injuries and protect the policies of ethnic and religious preference that proximately caused the Fort Hood terror attack, and to push plaintiffs down a memory hole to spare the Army, DOD and others from critical scrutiny and liability.

50.     The Army, DOD and FBI have never apologized or expressed any regret to plaintiffs for their mistakes.  In fact, no high ranking civilian or military command official has been disciplined or lost his or her job because of the acts, errors and omissions that proximately caused the attack.  Instead, the Army has "disciplined" junior officers in hopes of deflecting blame for its failings from the responsible officials in the bureaucracy, DOD and elsewhere in the Executive Branch.

51.     The government defendants' tortious, reckless and willful post-attack cover up to protect the patently illegal policies of preference and political correctness has angered, bewildered and injured the plaintiffs, compounding the damage done by the terror attack itself and inflicting separate and unique injuries.

52.     Defendants' tortious misconduct and gross negligence, misguided obedience to political correctness, and unreasonable, deliberate indifference to and reckless disregard for plaintiffs' lives, emotional well-being and constitutional rights, have proximately and foreseeably caused plaintiffs physical injury, including but not limited to terror, wrongful death, disfigurement, permanent and temporary disability, neurological damage, pain and suffering; emotional distress, including but not limited to disabling post-traumatic stress disorder, anger, depression, sleeplessness and nightmares, crippling anxiety, feelings of constant fear and

helplessness, an inability to work, psychiatric disorders, adverse personality changes and a host of physical ailments and disorders that are manifestations thereof, including high blood pressure, headaches and other physical disorders; a loss of the ability to enjoy a normal life, including but not limited to loss of consortium, marital problems, and social disorders; and economic losses, including but not limited to lost wages, lost benefits and medical expenses.

FACTS

**Pre-Attack Misconduct of the Army and DOD**

53.     From 2003 to 2007, Hasan was a resident in the psychiatric program at Walter Reed Army Medical Center in Washington, D.C.

54.     From 2007 to 2009, Hasan was a fellow in a post-residency graduate program at the Uniformed Services University for the Health Sciences, also in Washington, D.C.

55.     At all times relevant, Hasan was employed by and subject to the supervision of the Army and DOD.

56.     As set forth in the Senate Report, the Army and DOD knew that Hasan was an unfit officer and an incompetent and dangerous employee who posed an unreasonable risk of harm to his patients and to plaintiffs.  For example:

a.   Hasan refused to make presentations on patients and medical subjects, as required of all others similarly situated, but instead was allowed to make off-topic and irrelevant presentations of Islamist propaganda.

b.   Hasan, openly and notoriously, justified suicide bombing, "jihad," killing non-Muslims and the attacks on the World Trade Center by Osama bin Laden.

c.   Hasan said, openly and notoriously, that Muslims in the U.S. military should commit fratricide to protect their religion.

33

d.   Hasan said, openly and notoriously, that suicide bombers were "rewarded with 72 virgins."

e.   Hasan, openly and notoriously, identified himself as a "Soldier of Allah" and told his peers and superiors that the U.S. was at war with Islam.

f.   Hasan openly and notoriously told his superiors that he could not engage in combat against Muslims and that Islam "sharia law" took precedence over the U.S. Constitution.

g.   Hasan's presentation for his medical residency graduation "Grand Rounds" consisted almost entirely of Koranic verses supporting the killing of non-Muslims.

h.   Hasan was viewed as a security threat and as a "ticking time bomb" by his fellow officers who reported him for discipline and appropriate action by defendants.

i.   Hasan said, openly and notoriously, that he was "happy" when a U.S. soldier was killed in a June 1, 2009 jihadi attack on an Army recruiting office in Little Rock, Arkansas.

j.   Hasan said, openly and notoriously, that Muslims should "strap bombs on themselves in Times Square."

k.   Hasan said, openly and notoriously, that Muslims needed to "stand up against the aggressor" – i.e., the United States.

l.   Hasan considered himself, and conducted himself, as an enemy of the United States.

m.   Hasan was known by the Psychiatric Residency Program Director to be "lazy" and a "religious fanatic."

n.  Hasan was a chronic poor performer during his residency and fellowship, placed on probation and remediation for failing to meet basic job expectations such as showing up for work and being available when he was the physician on call, and for improperly proselytizing Islamic beliefs to his patients.

o.  Hasan displayed "a pattern of poor judgment and a lack of professionalism" as a doctor, failing to appropriately handle an emergency room encounter with a homicidal patient "who subsequently eloped from the ER [emergency room]," among other things.

p.  Hasan was placed on administrative probation for failing medical skills certification exams.

q.  Hasan was "counseled" for "having a poor record of attendance at didactics" and being consistently late for National Naval Medical Center morning report.

r.  Hasan had unsatisfactory Psychiatry Resident-In-Training Examination test scores and, in one year, he failed to show up for the examination at all.

s.  Hasan intentionally avoided and refused to provide medical services to military and other patients.  During his fourth post-graduate year his superiors discovered that he failed to carry out his duties and saw only 30 outpatients in 38 weeks of outpatient continuity clinic.

t.  Hasan, openly and notoriously, abused his patients in the course of their psychiatric treatment by calling them "war criminals" for killing terrorists in Iraq and Afghanistan.  Hasan then went to his superiors, contrary to all standards of medical practice, breached his patients' confidences and demanded that they be criminally prosecuted.

57.     Under Army rules, the Army, DOD and John Does ##1-4 and 6 all had non-discretionary duties to protect plaintiffs and to act against Hasan, to discipline him, to prosecute him, to imprison him and/or to dishonorably discharge him from military service.

58.     As stated in the Senate Report, the Army, DOD and John Does ##1-3 and 6 knew that Hasan was unfit to serve as a U.S. Army officer.  Yet, they promoted Hasan to Major from Captain, sent him to Fort Hood, and gave him the privilege of providing psychiatric treatment to American combat soldiers.

59.     They did these things, in whole or material part, because of Hasan's ethnicity and religion (Arab Muslim), and with unreasonable and deliberate indifference to, and reckless and willful disregard for, both Army regulations and the plaintiffs' lives and legal rights.

60.     At all times relevant, the Army, DOD and John Does ##1-4 and 6 unreasonably, knowingly, contrary to law, and with deliberate indifference to and reckless disregard both for Army regulations and for plaintiffs' lives and legal rights, operated a scheme of politically correct ethnic and religious preferences that benefitted Hasan.

61.     Pursuant thereto, Hasan was given financial and professional benefits, promotions, exemptions from generally applicable standards of practice and discipline, and other preferences that were not available or given to similarly situated non-Muslims.  For example, the Army, DOD and John Does ##1-4 and 6:

      a.  Exempted Hasan from generally applicable Army and professional rules, standards and discipline.

      b.  Affirmatively declined to discipline Hasan for his multiple and consistent violations of Army regulations and discipline.

c.  Awarded Hasan a highly valuable and competitive fellowship and gave him other preferences and benefits that were not available to similarly situated non-Muslims, with the knowledge that Hasan had not earned and was not qualified for same.

d.  Affirmatively declined to discipline Hasan, to treat him as a security risk and/or to refer him for investigation or criminal prosecution and discharge from the service although at all relevant times Hasan publicly supported and promoted jihad and suicide attacks against "enemies of Muslims" including the United States, among other things.

e.  Sanitized and falsified Hasan's OERs to cover up his dangerous Islamic extremism, his professional incompetence and his reckless disregard for the health and safety of his patients.

f.  Intimidated Hasan's immediate superior officers through political correctness directives that led them to fear for their military careers if they treated Hasan like any similarly situated soldier, causing these officers to ignore and show deliberate indifference to and recklessly disregard both Army regulations and plaintiffs' lives and legal rights by covering up Hasan's dangerous Islamist radicalism, manifest professional failings and gross disregard for the health and safety of his patients.

g.  Disregarded generally applicable Army rules and regulations in order to avoid disciplining Hasan in response to his claims that "Islamic law" justified or even mandated fratricide.

h.  Disregarded reports by other soldiers that Hasan was a dangerous religious fanatic who repeatedly affirmed the primacy of "Islamic law" over the U.S. Constitution, contrary to his oath as an officer and who posed a risk of harm to others.

i.   Promoted Hasan from Captain to Major notwithstanding his failure to meet basic job expectations such as showing up for work and being available as the physician on call, his disregard for basic good medical practices or his Islamist ideology.

j.   Assigned Hasan to treat combat soldiers at Fort Hood who had killed Islamic terrorists even though Hasan was a self-described "Soldier of Allah" who openly and notoriously praised the jihadi killing of American soldiers and who was described as a "ticking time bomb" by those in the military who knew him.

k.   Allowed Hasan to keep his rank and freedom notwithstanding his patient abuse.

l.   Classified Hasan's attack at Fort Hood as "workplace violence," and not "terrorism," contrary to all of their applicable definitions of the term.

m.   Failed to comply with applicable Army policies and regulations solely because of Hasan's ethnicity and religion, all as set forth in a classified report in the Army's and DOD's sole possession and control.

62.   At all times relevant, the Army, DOD and John Does ##1-4 and 6 knew that they each had a non-discretionary duty of care to properly train and supervise Hasan; to hold Hasan to the same standards of professional performance and military discipline as any other soldier; to ensure Hasan's OERs were true and accurate in all material respects; to protect plaintiffs from their dangerous and unfit employee Hasan; and to protect, guard and respect plaintiffs' lives and legal rights.

63.   Each of them negligently, knowingly, with deliberate indifference to and reckless disregard for Army regulations and plaintiffs' lives and legal rights, breached and disregarded these duties of care, all as set forth in this Complaint.

38

64.     As a proximate and foreseeable result of their negligence, gross negligence, deliberate indifference to and reckless disregard for Army regulations and for plaintiffs' lives and legal rights, Hasan killed, wounded, injured and damaged plaintiffs, all as set forth in this Complaint.

65.     But for these defendants' political correctness and scheme of ethnic and religious preferences, the Fort Hood terror attack and plaintiffs' grievous injuries could not have occurred.

### Pre-Attack Misconduct of the FBI

66.     As set forth in the Webster Report, the FBI's San Diego Field Office's ("SDFO") investigation of Aulaqi uncovered Hasan's communications with him in late 2008.

67.     SDFO read Hasan's emails to mean that an U.S. Army officer sympathetic to the Iranian government was communicating with an al-Qaeda leader about violence against fellow soldiers and therefore, the SDFO referred the lead to the FBI's Washington Field Office ("WFO") for action.

68.     However, SDFO negligently failed to send an Intelligence Information Report ("IIR") to the Army and/or DOD, even though dissemination of such information in this fashion was provided for by FBI guidelines.  The Webster Report states that this mistake "had serious consequences, because IIRs are a primary means by which the FBI shares information.  An IIR could have provided notice to senior DOD officials of Hasan's communications [with Aulaqi]." *See* Webster Report at 74.

69.     For its part, WFO was grossly negligent in its handling of the Hasan lead, acting with deliberate indifference to and reckless disregard for both FBI tradecraft and its non-discretionary duty to protect plaintiffs' lives and legal rights, in whole or in part because of political correctness due to Hasan's ethnicity and religion.  For example:

a.  WFO did not read and assign the Hasan lead until February 25, 2009, nearly fifty days after it had been sent by SDFO.

b.  John Doe #5, aka "WFO-TFO," was required to act on the Hasan lead within ninety days.  On the ninetieth day, he read it for the first time, gave it four hours of review, and then negligently, and with deliberate indifference to and reckless and willful disregard for plaintiffs' lives and legal rights, and for his non-discretionary duty to protect them from Hasan, unreasonably closed the investigation.

c.  John Doe #5 unreasonably decided not to interview Hasan about his communications with Aulaqi, contrary to the FBI's tradecraft, and then rejected SDFO's specific request that he do so, because of political sensitivities in WFO due to Hasan's ethnicity and religion.

d.  John Doe #5 unreasonably relied on the falsified OERs to terminate the Hasan investigation.

e.  WFO unreasonably failed to fully respond to requests for information and additional investigation from the SDFO.

f.  WFO unreasonably failed to search appropriate computer databases, which would have revealed critical information about Hasan, contrary to FBI requirements.

70.  SDFO was dissatisfied with WFO's careless approach.  Therefore, the San Diego agent in charge took the extraordinary step of conducting "follow up" with WFO.  He asked an employee identified in the Webster Report as Task Officer 3 ("SD-TFO3") to call John Doe #5 and tell him that WFO had mishandled the investigation.  SD-TFO3 and John Doe #5 were both Defense Criminal Investigation Service employees.

71.     After multiple communications requesting more diligent investigation were ignored by WFO, SD-TFO3 called WFO-TFO and said that, upon receiving a lead like this one, San Diego would have conducted, at the least, an interview of the subject.   According to SD-TFO3, John Doe #5 replied, in effect (paraphrased, not a quotation): "This is not SD, it's DC and WFO doesn't go out and interview every Muslim guy who visits extremist websites.  Besides, this guy has a legitimate work related reasons [sic] to be going to these sites and engaging these extremists in dialogue.  WFO did not assess this guy as a terrorism threat."

72.     Most significantly, SD-TFO3 also recalls that John Doe #5 indicated that *this subject is "politically sensitive for WFO"* (emphasis added).  *See* Webster Report at 60.

73.     John Doe #5 denies this call occurred.  The Webster Report says that the FBI does not have the relevant phone records and so the author does not opine whether it is SD-TFO3 or John Doe #5 who is lying.

74.     At all times relevant, the FBI knew or should have known that:

a.   Aulaqi was a highly influential voice, perhaps the most influential voice, of Islamist radicalism among English-speaking extremists such as Hasan.

b.   Aulaqi had first been identified as a potential terrorist by the FBI in June, 1999.

c.   Aulaqi was an al-Qaida operative who believed in, supported and worked to implement the religious pronouncements in al-Qaida's call for a "World Islamic Front for Jihad against Jews and Crusaders" including the command that Muslims kill Christian and Jewish Americans – civilians and military – and their allies everywhere.

d.   During the 1990s, Aulaqi had served as vice president of a "charity" that was an al-Qaeda front group raising money in the United States to fund terrorism.

e.   In 2000, Aulaqi was in communication with a close associate of the terrorist "Blind Sheik" Abdul Rahman, the mastermind of the first World Trade Center attack.

f.   Aulaqi was closely connected, personally and financially, with   the 9/11 hijackers Nasaf al- al-Hazmi and Khalid al-Midhar.   When Aulaqi moved to Falls Church, Virginia in 2001, these 9/11 terrorists also moved there.

g.   Police searching al-Qaida operative Ramzi Binalshibh's residence in Germany, police found Aulaqi's phone number.

h.   Aulaqi's bank records contained "a number of transactions of interest" reflecting money laundering and other potential support for terrorist organizations.

i.   Aulaqi made multiple calls to terror suspects in Yemen and the United Arab Emirates.

j.   Aulaqi engaged in a suspicious series of commercial transactions related to the 9/11 attacks, including transactions in which Aulaqi feigned a poor command of English, lied about an association with San Diego State University and gave a false address.

k.   Aulaqi submitted fraudulent documents to the U.S. government.

l.   Aulaqi lied during his post-9/11 FBI interviews.

m.   Aulaqi was a key player in al-Qaeda's U.S. network with foreknowledge of the date and targets of the 9-11 attacks.

n.   Aulaqi, in the aftermath of 9/11, made inquiries in Northern Virginia about recruiting young Muslims for "violent jihad".

o.   Aulaqi repeatedly and effectively encouraged Muslims in America to engage in terrorism after 9/11, including unsuccessful attacks against American Soldiers at Fort

Dix, New Jersey, in 2007 and American Marines at Quantico, Virginia, in 2008, and the successful attack on an Army Recruiting station in Little Rock, Arkansas on June 1, 2009, among other things.

p.  Aulaqi had, for a period of years, provided material support to designated terrorist organizations and had personally provided or arranged to provide housing; transportation; communications resources; financial assistance; organizational support; and material and spiritual resources to help terrorists in the United States (including Hasan) and elsewhere murder innocent Christians and Jews as part of a religious holy war against non-Muslims.

q.  Hasan's December 17, 2008 email to Aulaqi asked whether a Muslim U.S. Army member called Hasan Akbar was a "shaheed" or religious martyr for committing fratricidal murder of non-Muslim American Soldiers in Kuwait during 2003.

r.  Hasan identified himself as a "SOA," or "Soldier of Allah," to Aulaqi.

s.  Hasan offered Aulaqi material financial support.

t.  Hasan said he looked forward to joining Aulaqi in the "afterlife."

u.  Hasan supported suicide attacks, stating in one email intercepted by the FBI "[In] the Qur'an it states to fight your enemies as they fight you but don't transgress. So, I would assume that suicide bomber whose aim is to kill enemy soldiers or their helpers but also kill innocents in the process is acceptable."

v.  Hasan considered himself a clandestine agent and extension of Aulaqi and al-Qaeda in the Islamic fight against the United States.

75.    Nevertheless, to protect Hasan's military career because of the "political sensitivities" associated with Hasan's ethnicity and religion (Arab Muslim), and with deliberate

indifference to and reckless and willful disregard for plaintiffs' lives and legal rights, the FBI failed to investigate Hasan in a manner and fashion consist with its own requirements and tradecraft or to notify either the DOD or the Army about Hasan's communications with Aulaqi and paid no more attention to him until November 5, 2009, when Hasan carried out the Fort Hood terror attack.

76.     The FBI's preferential treatment of Hasan, and its deliberate indifference to and reckless disregard for plaintiffs' safety and legal rights, and for its non-discretionary duty to protect them from Hasan, continued even in the attack's bloody aftermath.

77.     Shortly after the media began reporting Hasan's attack on plaintiffs at Fort Hood, a San Diego FBI agent told a colleague "You know who that is? That's our boy!"

78.     At all times relevant, the FBI and John Doe #5 had actual knowledge of their unique relationship with plaintiffs and of their corresponding non-discretionary and unique duties of care to protect plaintiffs from Hasan; to use good FBI tradecraft and reasonably investigate Hasan with the same diligence it would have used with any similarly situated non-Muslim, including an in-person interview; to maintain a system wherein Hasan's activities were properly documented, assessed and evaluated; and to reasonably perform their duties and protect plaintiffs' lives and legal rights by notifying the Army of Hasan's communications with Aulaqi, monitoring Hasan's weapons purchases, and/or arresting him, among other things.

79.     Plaintiffs justifiably relied on these defendants to perform their duties.

80.     The FBI and John Doe #5, however, unreasonably, knowingly and with deliberate indifference to and reckless disregard both for good FBI tradecraft and for plaintiffs' lives and legal rights, breached these duties.

81.     As a proximate and entirely foreseeable result of their negligence, unreasonable deliberate indifference to, and reckless disregard for, good FBI tradecraft and plaintiffs' lives and legal rights, Hasan was able to carry out his planned attack, killing, wounding, injuring and damaging the plaintiffs.

82.     As the House Homeland House Homeland Security Subcommittee on Oversight, Investigations and Management has concluded, "the FBI's failure to rapidly share information and exhaust all intelligence sharing options led to the 2009 terrorist attack at Fort Hood."  *See* Letter from Rep. Michael McCaul, Chairman of the House Homeland Committee, Rep. Frank Wolf, Chairman of the House Appropriations Subcommittee for Commerce-Justice-Science, and Rep. John Carter to Attorney General Eric Holder dated March 15, 2013 (attached as Exhibit 4).

83.     But for the FBI and John Doe #5's political correctness and violations of its own guidelines, procedures and tradecraft the Fort Hood terror attack and plaintiffs' injuries would not and could not have occurred.

**The Post-Attack Spin and Cover Up**

84.     At all times relevant, the government defendants knew that the Fort Hood attack was "terrorism" as they defined the term.  For example:

a.   The Fort Hood attack was defined as a "high fatality terrorist attack" by the National Counterterrorism Center ("NCTC") which, pursuant to 22 U.S.C. § 2656f(d)(2), defined "terrorism" as the "premeditated, politically motivated violence perpetrated against noncombatant targets by subnational groups or clandestine agents."  By law, NCTC is the primary U.S. government organization for integrating and analyzing all intelligence pertaining to counterterrorism, except for information pertaining exclusively to domestic terrorism.

45

b.   The U.S. Department of State ("State Department") classified the Fort Hood attack as "terrorism" in its "Country Report on Terrorism 2009", citing it as an example of "al-Qaida and violent Sunni radicals [continuing] to succeed…in persuading people to adopt their cause, even in the United States."   The State Department also said that "we have also seen U.S. citizens rise in prominence as proponents of violent extremism. The most notable is…[Aulaqi], who has become an influential voice of Islamist radicalism among English-speaking extremists….Ft. Hood attacker Nidal Hasan sought him out for guidance..."

c.   On December 10, 2010, Eric Holder, Attorney General of the United States, likened the Fort Hood attack to 9/11 and to Islamic terrorism in Mumbai, India, Uganda and Yemen, stating: "Each of these attacks was a reprehensible act of cowardice, inspired by a radical and corrupt ideology…"

d.   On April 14, 2011, Mark F. Giuliano, Assistant Director of the FBI's Counterterrorism Division, called Hasan's attack terrorism in a Washington, D.C. speech.

e.   On June 29, 2011, John O. Brennan, Assistant to the President for Homeland Security and Counterterrorism, called Hasan's attack terrorism in a speech titled "Ensuring al-Qa'ida's Demise."

85.   At all times relevant, the government defendants knew that Hasan had a strongly-held jihadi ideology and religious motives for the Fort Hood terror attack; that Hasan had sought and received religious and operational inspiration from Aulaqi; that Hasan self-identified as a "soldier of Allah;" that Hasan had openly and notoriously supported suicide attacks against innocent non-Muslims and called for more attacks against the "aggressor" United States, including suicide bombings in Times Square; and that Hasan had yelled "Allah Akbar" ("God is

46

great" in Arabic) as he shot down unarmed Americans, just as instructed by Aulaqi, among other things.

86.     At all times relevant, they knew that although Hasan wore the uniform of an American Army Major, he considered and conducted himself as an enemy of the United States and in fact carried out a "hostile act" against the U.S., as defined in the DOD Dictionary.

87.     At all times relevant, they knew that DOD offered soldiers one set of benefits for injuries sustained in terrorist attacks, and another, lesser set for "non-combat" injuries and that classification of Fort Hood as "work place violence" could have significant, life-long economic consequences for the soldiers.

88.     At all times relevant, they knew that a "work place violence" classification would deprive the soldiers killed and wounded in the Fort Hood terror attack of appropriate military honors and recognition, including the Purple Heart.

89.     At all times relevant, they knew that they had a unique relationship with the plaintiffs and that they owed them a heightened duty of care.

90.     Nevertheless, beginning within hours of the attack and continuing to this day, the government defendants used a cynical program of "damage control" to cover up their culpability, to prevent plaintiffs from learning the truth and exercising their legal rights, and to preserve the very policies of political correctness and religious and ethnic preference that proximately caused the attack in the first instance.

91.     Senior political and national security officials knew, within minutes or at most hours after Hasan was identified as the attacker that he was a radical jihadist receiving operational and religious inspiration from Aulaqi.  These officials knew at that time, or learned shortly thereafter, that the Army, DOD and the FBI were fully aware of Hasan's activities, and

that he had been promoted and exempted from discipline, investigation, prosecution, imprisonment and/or discharge from the Army solely because of his ethnicity and religion. These officials also knew at that time, or learned shortly thereafter, that the Fort Hood attack occurred not because the government defendants had "missed" Hasan, but because they had elevated illegal ethnic and religious preferences and political correctness over both national security and their non-discretionary legal and moral duties to protect plaintiffs' lives and legal rights.

92. At all times relevant, the facts about causation with respect to the government defendants' culpability and causation with respect to plaintiffs' injuries were (and substantially remain) under the government defendants' sole and exclusive control.

93. However, at all times relevant the government defendants knew that these facts were less than optimal for them and for other senior U.S. political officials.

94. Therefore, the government defendants formulated and implemented - upon information and belief, at the direction and under the control of John Doe #4 and others in the Executive Branch - a "damage control" program to hide the truth.  This "damage control" was aimed at first deflecting attention from the illegal ethnic and religious preferences and political correctness that proximately caused the attack, and then distracting the public from Hasan's open and notorious religious fanaticism, extremism and his support for al-Qaeda and jihadi violence. The "damage control" included, among other things:

a.  In the immediate aftermath of the Fort Hood terror attack, making efforts to "turn the media narrative" and focus on a fabricated "risk" of anti-Muslim backlash.

b.  Having the Army tell reporters on the scene that the Fort Hood attack was not terrorism immediately after the attack had concluded.

c.   Having the President refuse and refrain from calling the attack "terrorism"; directing the public and plaintiffs on multiple occasions "not to jump to conclusions" about Hasan's jihadist motives; and praising "diversity."

d.   Having the Secretary of Homeland Security say on November 8, 2009 in a statement to Arab Persian Gulf officials that "U.S. Homeland Security officials are working with groups around United States to head off any possible anti-Muslim backlash following the shootings at Fort Hood in Texas" without referencing Hasan's Al-Qaeda ties or open and notorious jihadism.

e.   Having Army Chief of Staff Gen. George Casey and others deflect attention from Hasan's religious motivation and long-standing support for violent extremism to cover up the fact that the government defendants had elevated patently illegal political correctness policies, and Hasan's career, ethnicity and religion, over and above plaintiffs' lives and legal rights.   For example, Gen. Casey's media talking points on Sunday, November 8, 2009, a mere four days after the attack, were that it was important for the public not to "get caught up in speculation about Hasan's Muslim faith"; that he (Casey) had "instructed his commanders to be on the lookout for anti-Muslim reaction to the killings;" that "focusing on the Islamic roots of the suspected shooter could heighten the backlash" against all Muslims in the military; and that "what happened at Fort Hood was a tragedy, but I believe it would be an even greater tragedy if our diversity becomes a casualty here."

f.   Blaming junior Army officers for failing, contrary to applicable regulations, to take appropriate action against Hasan without mentioning, much less analyzing or

addressing, the corrosive impact of ethnic and religious preferences and political correctness on the command chain, military morale and discipline.

g.  Characterizing the attack a "tragic shooting of U.S. military personnel" and "workplace violence" but not religiously motivated, al-Qaida inspired terrorism in a memorandum from then DOD Secretary Robert Gates titled "Final Recommendations of the Fort Hood Follow-on Review" dated August 18, 2010 (attached as Exhibit 5).

h.  Intentionally concealing from plaintiffs and the public the fact that the Army, DOD and John Does ## 1-4 and 6 proximately caused plaintiffs' injuries through their patently illegal practices of political correctness and through their negligence, gross negligence, and deliberate indifference to and reckless disregard for plaintiffs' lives.  For example, after the statements by the President and others as set forth above, the Army, the Navy, the Marine Corps, the Air Force and the Fort Hood Army Internal Review team each issued "reports" about the Fort Hood terror attack.  Not one of these reports, which together total well over 1000 pages, even mentions Hasan's Islamic extremism or his Al-Qaeda connections, much less suggest, admit, explain, discuss or explore the government defendants' failings that proximately caused plaintiffs' injuries.  Plaintiffs and the public were reasonably entitled to rely on the statements of their President and their military commanders, and they in any event did not have actual notice of the truth, and of causation, until the independent Senate Report was released in February, 2011.

i.  Intentionally concealing from plaintiffs and the public the FBI's and John Doe # 5's negligence, gross negligence, and deliberate indifference to and reckless disregard of plaintiffs' lives and legal rights.  Plaintiffs and the public were reasonably entitled to rely on the statements of their President and their military commanders, and they in any

event did not have actual notice either of the truth and/or that FBI and John Doe # 5 proximately caused their injuries until the independent Webster Report was released in July, 2012.

j.   Wrongly denying some soldiers important medical treatment, disability and retirement benefits, and treating the Fort Hood casualties in a manner and fashion substantially inferior to the treatment given other terror casualties.

k.   Wrongly denying the dead and injured wounded soldiers Purple Hearts, notwithstanding the fact that Hasan considered and conducted himself as an "enemy of the United States," contrary to Army Regulation 600-8-22 (Sept. 15, 2011).

95.    All of these things were done with the knowledge and approval of elected and appointed political officials at the highest levels of the U.S. government.

96.    The government defendants' reckless and willful post-attack spin and cover up to protect the patently illegal policies of preference and political correctness, and to shield the responsible senior officials from accountability, has angered, bewildered and injured the plaintiffs, compounding the damage done by the terror attack itself.

97.    The government defendants did these things knowing that they had a unique relationship with plaintiffs, one that necessarily implicated their emotional well-being.   The government defendants also knew that there was an especially likely risk that their negligence, unreasonable deliberate indifference to, and reckless and willful disregard for plaintiffs' lives and legal rights would proximately and foreseeably cause plaintiffs actionable emotional distress, as it in fact did.

98.    As set forth in this Complaint, the government defendants have treated plaintiffs with a shocking, appalling and indefensible measure of disdain, indifference and disregard.   To

begin with, the Fort Hood terror attack occurred because the government defendants valued political correctness and Hasan's ethnicity, religion and career more than they valued plaintiffs' lives and legal rights.

99.   This disdain, indifference and disregard continued after the attack as well.   For example, upon information and belief, armed FBI agents, over the objections of an Army nurse, pulled Private Mick Engnehl from a medivac helicopter and ordered that the helicopter be given to Hasan for his medical care.   Private Engnehl had been shot by Hasan in the neck while he and a fellow soldier were attempting to aid the mortally wounded Private Francheska Velez and Baby Valez.   The FBI knew that Private Engnehl was unconscious and in imminent danger of death, yet it left Private Engnehl to die.   Notwithstanding the FBI's reckless and shocking disregard for Engnehl's life, heroic efforts by the Army nurse and other medical personnel saved his life.

100.   High ranking political and military officials, including the President and the Chairman of the Joint Chiefs of Staff, visited with some of the wounded soldiers, civilians and their family members.   They pledged, promised and guaranteed that plaintiffs would receive appropriate care, support and assistance from the Army and DOD.   The President himself specifically told multiple victims and/or victim family members that they would be "well taken care of" and that the government "would make them whole."

101.   However, these promises were empty and false and disappeared into the ether when the news cameras left Fort Hood.

102.   Many of the seriously wounded and injured plaintiffs were left abandoned to their own means and devices to obtain decent medical care.   One injured soldier was able to obtain proper treatment for a traumatic brain injury caused by a bullet to the head only because the treatment was paid for by a private benefactor.   In another case, the Army has refused to

admit the seriousness of one soldier's debilitating injuries and has kept him on active duty despite his medical doctors' recommendation that he be transferred to a wounded warrior unit, if not discharged from the Army on disability.  After the last of several major surgeries, he had to enlist the help of his brigade surgeon in begging his brigade commander to approve surgery to remove a bullet that was moving into the nerve wrap around an artery that could have caused internal bleeding from the axilla artery leading to death.  His medical care has been so inadequate that he has been forced to get civilian care off base.

103.    Many of the seriously wounded and injured plaintiffs were left abandoned to their own means and devices to obtain decent medical care.  One injured soldier was able to obtain proper treatment for a traumatic brain injury caused by a bullet to the head only because the treatment was paid for by a private benefactor.

104.    In multiple cases, the Army has refused to admit the seriousness the Fort Hood victims' injuries.  For example, one soldier, who was diagnosed with crippling post traumatic stress syndrome, was denied treatment and a medical discharge by a Captain who specifically refused to sign the appropriate certifications because his injuries were sustained at Fort Hood.

105.    In another case, a soldier was kept on active duty despite doctors' recommendations that he be transferred to a wounded warrior unit if not discharged from the Army on disability entirely.  After the last of several major surgeries, he had to enlist the help of his brigade surgeon in begging his brigade commander to approve surgery to remove a bullet that was moving into the nerve wrap around an artery that could have caused internal bleeding from the axilla artery leading to death.  His medical care has been so inadequate that he has been forced to get civilian care off base.

106.    In yet another case, a soldier who was shot by Hasan five times and almost died due to medical neglect of his head and belly wounds at Darnell Army Hospital, has been in a Wounded Warrior unit for over two years.  Although he is unable to lift anything heavy, or walk more than a short distance, or even ride a bicycle, he has been denied a medical discharge and taunted by his commanders.  He has been told that if he had been wounded in Iraq, he would have been retired and deemed disabled long ago.  However, because the Army and DOD view his injuries as a workplace matter, he remains in limbo.

107.    Other plaintiffs were denied retirement benefits on specious grounds through administrative appeal proceedings fatally tainted by undue command influence.  Still others were subjected to insults, taunts, abuse and neglect from their command because they sought treatment for Fort Hood-related injuries, exacerbating their psychiatric injuries.  One plaintiff, who was harassed by his commander simply because of his connection to the Fort Hood terror attack, was even subjected to an Article 15 disciplinary proceeding which resulted in a demotion, forfeiting of pay and extra duty.

108.    Another soldier, whom the Veterans' Administration has since diagnosed with post traumatic stress disorder so severe that he cannot work, drive a car, or even bathe himself was sent to Iraq immediately after the Fort Hood attack without any treatment whatsoever. Upon returning from Iraq, he had a breakdown and requested treatment. The Army refused and instead put him on a punitive duty that involved 24-48 hour shifts.  He was not allowed off base, and was forced to sleep in a hallway on a cot for 3 weeks.  When he was allowed to return home he received discharge papers and was told that he was lucky to have an honorable discharge because he was such an embarrassment to his company.  Since he was not medically discharged as he should have been, his family went without any income for two years, until in August 2012

the VA classified him 100% disabled.  But for assistance from his mother and mother-in-law, this soldier and his family would have been homeless.

109.    In yet another case, the Armed Forces Chief of Staff had given a wounded soldier his card with instructions to call if he (the soldier) needed anything.  Severely injured and disabled, unable to even drive himself to his doctor appointments, and on the verge of economic disaster because his wife had to quit her job and provide him with full time care, he called. There was no answer.

110.    Contrary to its own regulations, the Army has refused to deem the soldiers killed and wounded in the attack eligible for a Purple Heart decoration, with its attendant recognition and medical and retirement benefits.

111.    As for the civilians injured by Hasan, the government defendants have done nothing of substance at all in the way of decent medical care, assistance or support.

112.    Ironically, the very same government defendants who gave Hasan preferential treatment because of his ethnicity and religion has given his victims, the soldiers who were casualties in the Fort Hood terror attack, inferior treatment relative to soldiers and civilians who were injured in other terrorist and Al-Qaeda attacks.

113.    Upon information and belief, this inferior treatment, deliberate indifference and reckless disregard for plaintiffs was the result of a determination by John Doe #4 and other political and command officials to obfuscate Hasan's religious motivations and Al-Qaeda ties, to cover up the government defendants' culpability for plaintiffs' injuries and to protect the policies of ethnic and religious preference that proximately caused the Fort Hood terror attack.  At all times relevant, the government defendants have aimed to push plaintiffs down a memory hole to spare the Army, DOD and others from critical scrutiny and liability.

114.    The government defendants' ethnic and religious preferences, their post-attack spin and cover up, and their deliberate indifference to and reckless disregard for the lives and legal rights of American soldiers and civilians have damaged the public's trust in the U.S. government and its military commanders; harmed troop morale, discipline and order; and grievously betrayed plaintiffs, causing devastating physical and emotional injuries.

115.    Defendants' conduct as set forth in this Complaint is so egregious and outrageous that it shocks the conscience.

116.    The government defendants' deliberate indifference to and reckless disregard for plaintiffs' lives and legal rights, as set forth in this Complaint, is an indefensible disgrace that must be counted among the most reprehensible abdications of command and civilian authority and responsibility in the long history of the U.S. military.

<u>JURISDICTION AND VENUE</u>

117.    This court has jurisdiction of plaintiffs' tort claims for relief under the Federal Tort Claims Act, 28 U.S.C. §2671 et seq. ("FTCA") and 28 U.S.C. §1346(b)(1).  Plaintiffs have fully complied with the applicable provisions of 28 U.S.C. § 2675 and are not subject to any FTCA exceptions, including 28 U.S.C. § 2680(j).  Also, unless otherwise noted, plaintiffs have served notice of their claims for relief on defendants within two years of their accrual as required by 28 U.S.C. § 2401 and more than six months have elapsed without defendants formally responding thereto.

118.    Plaintiffs' tort claims for relief against the Army, DOD and John Does ##1-4 and 6 accrued no earlier than the Senate Report's public release on or about February 3, 2011. Plaintiffs' tort claims for relief against the estate of Aulaqi, the FBI and John Doe #5 accrued no earlier than the Webster Report's public release on or about July 19, 2012.

119.    This Court has jurisdiction of plaintiffs' claim for relief regarding defendants' constitutional violations under 28 U.S.C. § 1328.

120.    This Court has jurisdiction of plaintiffs' claim for Administrative Procedure Act relief under 5 U.S.C. §§ 701 – 706 and 28 U.S.C. § 1331.

121.    To the extent relevant, this Court has jurisdiction of plaintiffs' claims for relief pursuant to 28 U.S.C. § 1332(a), diversity jurisdiction, as the parties to this matter are citizens of different states and the amount in controversy for each plaintiff exceeds $75,000.

122.    This Court has jurisdiction of each and every claim for relief brought by each and every plaintiff against the Army, DOD and FBI.

123.    The "Feres Doctrine," based on *Feres v. United States*, 340 U.S. 135, 146 (1950), might be asserted by the government to deprive the soldiers and their families of their right to sue the Army and DOD for redress.  However, this doctrine is inapplicable and no bar for many reasons including but not limited to:  *Feres* should be overruled for the reasons stated in *United States v. Johnson*,  481 U.S. 681, 692 - 673 (1987) (Scalia, J. dissenting); application of the *Feres* bar to injuries proximately caused by patently illegal ethnic and religious preferences is not rationally related to a legitimate government interest and is therefore unconstitutional; application of the *Feres* bar to injuries proximately caused by patently illegal ethnic and religious preferences will substantially erode military discipline and interfere with U.S. combat efficiency; *Feres* does not apply to the soldiers' constitutional claims; and certain plaintiffs' injuries were not sustained "incident to military service" as defined under *Feres*.

124.    Similarly, the Federal Employee Compensation Act ("FECA"), 5 U.S.C. §§ 8101-8193, which might be asserted by the government to deprive the civilian DOD employees of their right to sue the Army, DOD and FBI for redress, is inapplicable for many reasons

including but not limited to: the Secretary of Labor has not offered or awarded FECA

compensation to the plaintiffs for all (or in some cases any) of their injuries and so there is no

"substantial question of FECA coverage"; FECA does not apply to the civilians' constitutional

claims; application of a FECA bar to injuries proximately caused by patently illegal ethnic and

religious preferences is not rationally related to a legitimate government interest and is therefore

unconstitutional; FECA does not apply because of the "dual capacity" doctrine, especially with

respect to the injuries attributable to the government's "damage control" actions.

125.    Each person who is named in his or her capacity as a personal representative is in

the process of complying with applicable District of Columbia law, including D.C. Stat. Ann. §

20-343(a), in order to be formally qualified to carry out this role for purposes of Fed. R. Civ. P.

17.

126.    Venue is proper in that all or a substantial part of the acts and omissions forming

the basis of these claims occurred in the District of Columbia.

<u>PARTIES</u>

**A.    Plaintiffs**

<u>The Soldiers Killed in the Fort Hood Terror Attack and Their Families.</u>

127.    <u>Angela G. Rivera-Caraveo</u>, acting as the personal representative of <u>Major Libardo</u>

<u>Eduardo Caraveo</u>.   Major Caraveo was shot and killed by Hasan. He had reenlisted in January

2009, knowing that he was to be deployed to Afghanistan.  Major Caraveo was the pride of his

family and the first to graduate from college, earning a doctorate in psychology.  His death has

left an enormous void.

a.    <u>Angela G. Rivera-Caraveo</u> as Major Caraveo's widow.  His death has forced

Ms. Rivera-Caraveo to drop out of a Master's program at Liberty University and she now

works full time to make up for the loss of Major Caraveo's income, leaving even less time to care for her children, for whom she is the sole support.

  b. <u>J.P.C.</u> is a five-year old minor child of Major Caraveo.

  c. <u>M.R.</u> is a minor step-child of Major Caraveo.

  d. <u>T.R.</u> is a minor step-child of Major Caraveo. T.R. remains severely depressed, takes multiple antidepressants, and has developed a sleep disorder due to Major Caraveo's killing.

  e. <u>Eduardo Caraveo</u>, an adult child of Major Caraveo.

  f. <u>Jose A. Caraveo</u>, an adult child of Major Caraveo.

  g. <u>Rafael Caraveo</u> is a sibling of Major Caraveo.

  h. <u>Fernando Caraveo</u> is a sibling of Major Caraveo.

  i. <u>Carmen Ruiz</u> is a sibling of Major Caraveo.

  j. <u>Amanda Astorga</u> is a sibling of Major Caraveo.

  k. <u>Maria Elena Garcia</u> is a sibling of Major Caraveo.

  l. <u>Isabel Zuniga</u> is a sibling of Major Caraveo.

128. <u>Daniel DeCrow</u> and <u>Rachel Thompson</u>, acting as the personal representatives of <u>Staff Sergeant Justin Michael DeCrow</u> who was shot and killed by Hasan.  Staff Sergeant DeCrow was helping soldiers fill out paperwork for deployment to Afghanistan.  He had learned that same day that he would soon be deployed to Afghanistan as well, and was honored to serve his country.

  a. <u>Daniel DeCrow</u> is Staff Sergeant DeCrow's father.

  b. <u>Rachel Thompson</u> is Staff Sergeant DeCrow's mother.  After losing her son, Ms. Thompson has suffered severe emotional distress and dealt with suicidal thoughts.

This has disrupted her ability to live a normal life, and caused her to lose a promotion at her work, among other things.

129.   <u>Christie M. Greene</u>, acting as the personal representative of <u>Specialist Frederick Z. Greene</u>, who was shot and killed by Hasan.

      a.   <u>Cristie M. Greene</u> as Specialist Greene's widow.  She is now the sole support for, and single parent of, their two minor children.

      b.   <u>A.J.G.</u> is Specialist Greene's minor daughter.

      c.   <u>H.B.G.</u> is Specialist Greene's minor daughter.

      d.   <u>Karen E. Nourse</u> is Specialist Greene's mother.

      e.   <u>Robert H. Nourse</u> is Specialist Greene's stepfather.

130.   <u>Jennifer Hunt</u>, acting as personal representative of <u>Specialist Jason Dean Hunt</u>, who was shot and killed by Hasan.  Specialist Hunt had been in the military for three and a half years, and had served proudly in Iraq.

      a.   <u>Jennifer Hunt</u> as Specialist Hunt's widow.  Ms. Hunt had married Specialist Hunt just a few months before the November 5 attack.  Tragically, Ms. Hunt's husband was taken from her while she was still a newlywed.  Ms. Hunt now raises her three children by herself, and is the sole family provider.

      b.   <u>Gale Hunt</u> is Specialist Hunt's mother.

      c.   <u>Gary Dean Hunt</u> is Specialist Hunt's father.

      d.   <u>Angela Smith</u> is Specialist Hunt's sister.

131.   <u>Jerilyn Krueger</u> as personal representative for <u>Sergeant Amy S. Krueger,</u> who was shot and killed by Hasan.

      a.   <u>Jerilyn Krueger</u> as Sergeant Krueger's mother.

     b.  <u>Jessica Krueger Bryant</u> is Sergeant Krueger's sister.

     c.  <u>Casey Krueger</u> is Sergeant Krueger's brother.

132.  <u>Cynthia Seager</u> acting as personal representative of <u>Captain Russell G. Seager</u> who was shot and killed by Hasan.  Captain Seager was a reservist who had just been called up to serve in Afghanistan for the first time.  A nurse practitioner in private life, Captain Seager had joined the Army Reserve in 2005 at age 47 specifically to provide mental health treatment to soldiers.

     a.  <u>Cynthia Seager</u> as Captain Seager's widow.  Ms. Seager is now undergoing treatment for cancer, and must fight this terrible disease without her husband's love and assistance.

     b.  <u>Joseph Seager</u> is Captain Seager's son.

     c.  <u>Vernon Seager</u> is Captain Seager's father.  Captain Seager was his only son.  Mr. Seager has suffered tremendously since the death of Captain Seager, including emotional distress, nightmares, extreme anxiety, depression, insomnia, and feelings of dread.

     d.  <u>Barbara Prudhomme</u> is Captain Seager's only sister.  Ms. Prudhomme has lost her only sibling, mentor, and close friend.  She suffers from anxiety, depression, insomnia, panic attacks, and fatigue.

133.  <u>Eillen Rodriguez</u>, acting as personal representative for <u>Private Francheska Velez</u>, who was shot and killed by Hasan.  Having just returned from deployment to Iraq, Private Velez was filing paperwork to continue her education.  Private Velez was also pregnant with her first child.  After Hasan shot her, she lived for a short time in terrible pain and agony, knowing that she and her child were dying.

    a.  <u>Eillen Rodriguez</u> as Private Velez's mother.

    b.  <u>Juan G. Velez</u> is Private Velez's father.  Mr. Velez is left feeling an empty man after the loss of his only daughter.  He has trouble eating, sleeping, and working, and lost his marriage because of Private Velez's death.

    c.  <u>Juan Velez</u> is Private Velez's brother.  Mr. Velez is devastated by the loss of his baby sister of whom he was so protective.

134.    <u>Eva Mae Waddle</u>, acting as personal representative of <u>Lieutenant Colonel Juanita Warman</u> who was shot and killed by Hasan.  Lieutenant Colonel Warman was processing out for her final deployment to Kuwait before she retired from the military.  Lieutenant Colonel Warman had spent her military career treating soldiers with mental illness, especially post traumatic stress disorder ("PTSD").  She was shot while shielding another soldier from Hasan's gunfire.

    a.  <u>Eva Mae Waddle</u> as Lieutenant Colonel Warman's mother.  Ms. Waddle has been devastated not only by Lieutenant Colonel Warman's death, but by the manner in which this loss has torn apart the family.

    b.  <u>Melissa Czemerda</u> is Lieutenant Colonel Warman's daughter.

    c.  <u>Tawnya Pattillo</u> is Lieutenant Colonel Warman's daughter.

    d.  <u>Margaret Yaggie</u> is Lieutenant Colonel Warman's sister.

    e.  <u>Donna Waddle</u> is Lieutenant Colonel Warman's sister.

    f.  <u>Kristina Rightweiser</u> is Lieutenant Colonel Warman's sister.

    g.  <u>Priscilla Sheader</u> is Lieutenant Colonel Warman's sister.

    h.  <u>Renee W. Gamboni</u> is Lieutenant Colonel Warman's sister.

135.   <u>Shoua Her</u> acting as personal representative for <u>Private Kham See Xiong,</u> who was shot and killed by Hasan.   Private Xiong was being processed for his first deployment to Afghanistan, and he was proud to serve.   Private Xiong came from a very tight-knit Hmong family in Minnesota.   His parents had immigrated to the United States after providing assistance to the U.S. government during the Vietnam War.   Three generations of his family have served the U.S. military.   Private Xiong's impact on the lives of others is remembered to this day, and there are several memorials to him in his high school in Minnesota.   Private Xiong was the glue of their family, and a father figure to many of his siblings.   His death in the Fort Hood terror attack, which was caused by the defendants' political correctness, has filled the family with sadness and anger.   He is deeply missed.

     a.   <u>Shoua Her</u> as Private Xiong's widow.   Ms. Her has lost her soul mate and best friend, and still struggles to adapt to the void in her life.   She is the sole support for and single parent to three minor children.

     b.   <u>K.X.</u> is Private Xiong's minor child.

     c.   <u>D.X.</u> is Private Xiong's minor child.

     d.   <u>J.X.</u> is Private Xiong's minor child.

     e.   <u>Chor Xiong</u> is Private Xiong's father.

     f.   <u>Pa Nou Xiong</u> is Private Xiong's mother.

     g.   <u>Jennie Xiong</u> is Private Xiong's sister.

     h.   <u>Mee Xiong</u> is Private Xiong's sister.

     i.   <u>Robert Xiong</u> is Private Xiong's brother.

     j.   <u>Dan Bee Xiong</u> is Private Xiong's brother.

     k.   <u>Nelson Xiong</u> is Private Xiong's brother.

    l.   <u>R.X.</u> is Private Xiong's minor brother.

    m.  <u>Tiffany Cho Xiong</u> is Private Xiong's sister.

    n.  <u>P.X.</u> is Private Xiong's minor brother.

    o.  <u>Ke.X.</u> is Private Xiong's minor brother.

    p.  <u>M.X.</u> is Private Xiong's minor sister.

<u>Soldiers Wounded by Gunshots in the Fort Hood Terror Attack and their Families.</u>

136.   <u>Specialist James Armstrong</u> was shot three times by Hasan. One bullet wounded Specialist Armstrong just above the knee, which has caused permanent damage and loss of mobility. Another bullet remains lodged near his kidney. Specialist Armstrong's injuries have required significant attention from his wife, causing her to quit work for nearly three months to care for him. This has only led to further financial difficulties. Specialist Armstrong has also been diagnosed with PTSD, and remains traumatized by the shooting.

137.   <u>Specialist Keara Bono Torkelson</u> was shot multiple times by Hasan and hit in the head. She was preparing for her first deployment to Iraq and was 20 feet away from Hasan when he began his terror attack. Today she is 80% disabled, and suffers from mild traumatic brain injury, PTSD, depression, chronic headaches, back spasms, and severe emotional distress.

    a.  <u>Joseph Torkelson</u> is Specialist Torkelson's husband. He suffered severe emotional distress and pain at his wife's injuries.

    b.  <u>Steven M. Bono</u> is Specialist Torkelson's father.

    c.  <u>Margaret A. McCarty</u> is Specialist Torkelson's mother. She suffers from PTSD, anxiety, depression, and severe emotional trauma.

    d.  <u>Michael J. McCarty</u> is Specialist Torkelson's step-father.

    e.  <u>E.J.M.</u> is Specialist Torkelson's minor sister.

    f.   <u>L.D.M.</u> is Specialist Torkelson's minor half-brother.

    g.   <u>Dustin M. Bono</u> is Specialist Torkelson's brother.

    h.   <u>G.L.M.</u> is Specialist Torkelson's minor step-sister.

    i.   <u>K.M.J.B.</u> is Specialist Torkelson's minor sister.

    j.   <u>K.B.P.B.</u> is Specialist Torkelson's minor sister.

138.   <u>Specialist Logan M. Burnett</u> was shot multiple times by Hasan, one bullet penetrating through his left hip and into his intestines, colon, and kidney.  He has had two operations to address this, but still has hip displacement and spinal misalignment along with two bullets in his stomach.  He was also shot in his left elbow and left hand.  He has had nine surgeries on his left hand, including one to remove two knuckles.  He has neuropathy in his left knee and nerve damage in his left leg.  He cannot drive, struggles to sleep, and suffers from PTSD.

    a.   <u>Victoria Burnett</u> is Specialist Burnett's wife.  Ms. Burnett suffers from depression and PTSD.  She takes medication and undergoes counseling to deal with her mental distress.  She also cannot work because of the care she must provide to her husband.

139.   <u>Captain Dorothy Carskadon</u> was shot multiple times by Hasan, and is now permanently disabled.  Captain Carskadon rushed to assist Private Velez, who had been shot along with Baby Velez.  But while providing comfort to the mortally wounded Private Velez, Captain Carskadon was gravely wounded by gunshots to the leg, head, hip, and stomach.  She underwent 15 hours of surgery, during which time her heart stopped twice.  Although she has made some physical recovery, she still suffers from PTSD, sleep apnea, and constant pain from the bullet wounds.  She left the military in 2011.

a. <u>Julie Carskadon</u> is Captain Carskadon's domestic partner.  She has suffered severe emotional distress.

140.  <u>Specialist Matthew D. Cooke</u> was shot and wounded by Hasan. He had performed two tours of duty in Iraq and was due to be deployed again when he was shot by the terrorist Hasan.  He was giving blood on November 5, and was directly in front of Hasan when he began shooting.  Specialist Cooke was hit three times.  Specialist Cooke was dragged outside by Private Gadlin and taken to Darnell Hospital.  However, doctors failed to diagnose him with any serious injuries, leading to a lengthy delay in receiving treatment.  This delay cost Specialist Cooke massive quantities of blood and may result in blindness.  Eventually, he did receive treatment, enduring multiple surgeries, excruciating pain, and a two-month hospital stay.  Specialist Cooke now suffers from severe PTSD, which has been largely untreated by the Army.  He and his wife have divorced, and his life has been forever changed.

a. <u>Diane Marie Frappier</u> is Specialist Cooke's mother.

b. <u>Carl Cooke</u> is Specialist Cooke's father.

c. <u>Gerard Leo Frappier</u> is Specialist Cooke's stepfather.

d. <u>Christina Danielle Cooke</u> is Specialist Cooke's sister.

e. <u>Jennifer Lynn Frappier</u> is Specialist Cooke's step-sister.

f. <u>Kimberly E. Miller</u> is Specialist Cooke's sister.

g. <u>G.T.C.</u> is Specialist Cooke's minor child.

h. <u>Z.A.C.</u> is Specialist Cooke's minor child.

141.  <u>Private Mick Engnehl</u> was shot by Hasan in the neck and shoulder as he was attempting to aid Private Velez and her baby.  Seriously wounded, Private Engnehl was forcibly removed from a "medivac" helicopter by agents of the FBI and left to die.  Because of the heroic

work of an Army nurse, another helicopter was found for Private Engnehl, he was airlifted to a hospital and survived.  Private Engnehl spent the next several days in the intensive care unit of Scott and White Hospital, where he was in a room next door to Hasan.  Engnehl retired from the military in 2011 on 80% disability.  He still has partial paralysis in his right arm and severe PTSD.

a. <u>Autumn Engnehl</u> is Private Engnehl's wife.  Ms. Engnehl was planning to marry Private Engnehl just a week after the November 5, 2009 attack, but had to postpone those plans after her husband was shot.  She now cares for her disabled husband and suffers from PTSD.

b. <u>B.G.</u> is Private Engnehl's minor son.  He suffers from emotional and other maladies attributable to the attack's impact on his parents.

142. <u>Private Joseph T. Foster</u> was shot and wounded by Hasan.  He has suffered significant severe physical and emotional pain.

a. <u>Mandy M. Foster</u> is Private Foster's wife.  She has suffered severe emotional distress, interfering with her ability to live a normal life.

143. <u>Private Amber Marie Gadlin</u> was shot and wounded by Hasan.  She pulled Specialist Cooke to safety.  She has suffered significant physical and emotional pain.

144. <u>Sergeant Nathan Hewitt</u> was shot and wounded by Hasan while he was processing for his second deployment to Afghanistan.  He sustained two gunshot wounds to his leg that required hospitalization and rehabilitation.  He still struggles with PTSD, anxiety, and insomnia.

145. <u>Private Najee M. Hull</u> was shot and wounded by Hasan in the chest, abdomen, and knee, and suffered a collapsed lung and ruptured spleen.  After lengthy hospitalization and

therapy, Private Hull remains in severe pain and still has a bullet fragment in his chest.  He also suffers from PTSD, depression, anxiety, panic attacks, loss of confidence and loss of trust.

    a.  <u>Nanette Monique Hull</u> is Private Hull's sister.

    b.  <u>Nathaniel Hull</u> is Private Hull's brother.

    c.  <u>N.M.P.</u> is Private Hull's minor sister.

    d.  <u>Yvonne Hull-Pearson</u> is Private Hull's mother.

146.  <u>Private Justin T. Johnson</u> was shot and wounded by Hasan in the back and foot, puncturing his lungs, fracturing his ribs, and breaking bones in his foot.  A bullet remains lodged in his chest, and he continues to suffer from PTSD, anxiety, and loss of trust.

    a.  <u>Roxanne Simons-Johnson</u> is Private Johnson's mother.  Ms. Simons-Johnson suffered extreme emotional distress as she was on the phone with her son when he was shot.

147.  <u>Staff Sergeant Alonzo M. Lunsford, Jr.</u> was shot and wounded by Hasan six times and nearly died.  He endured numerous surgeries, including one as recent as June 19, 2012.  He is assigned to a Wounded Warrior unit at Fort Bragg, but remains injured and unable to do his job.  Despite his serious injuries, he has not received the care and treatment he deserves and has been denied a promotion because of his criticism of the defendants' treatment of Hasan's victims and their refusal to acknowledge the Fort Hood terrorist attack.

    a.  <u>Johnsye A. Lunsford-Bloomfield</u> is Staff Sergeant Lunsford's mother.

    b.  <u>Candice J. Weston</u> is Staff Sergeant Lunsford's daughter.

    c.  <u>A.D.L.</u> is Staff Sergeant Lunsford's minor daughter.

    d.  <u>A.M.L., III</u> is Staff Sergeant Lunsford's minor son.

    e.  <u>H.W.</u> is Staff Sergeant Lunsford's minor step-son.

148.   <u>Staff Sergeant Shawn N. Manning</u> was shot six times by Hasan.  Once in the left upper chest, with the bullet traveling through his sternum, right lung and liver; once in the left mid back, where the bullet traveled parallel to his spine and remains lodged today behind his left kidney; once in the lower right thigh, where the bullet traveled into his pelvic region and later migrated back down right thigh where it remains today; once in the upper right thigh, where the bullet traveled into abdomen, lacerated his colon and was removed; once in the right foot; and once in the lower right side, a graze wound.   Sergeant Manning was taken to a civilian hospital for initial treatment, but then was taken to a Texas military hospital.  There, he had surgery that took out his intestines because a bullet traveled into his liver, but a surgical staple was left behind.  This became infected and was removed, leaving a hole in his belly.  After three months in the Texas hospital, he complained of pain in right leg.  He was told that the pain was from scar tissue. Subsequently, he went to a Seattle hospital that checked and found two bullets in his leg. Also, the government classified Sergeant Manning's injuries as being caused by "workplace violence."  At time of attack, Shawn was an activated reservist.  While in Army Reserves his pay was less than his compensation as a federal civilian, which would have been matched had his injuries been deemed the result of terrorism. However, because his injuries have been deemed workplace violence-related, he has lost approximately $40,000 in compensation, as well as significant retirement benefits.  He has bullet fragments in several places in his body and remains in severe and constant pain three years after the attack.  He suffers from PTSD, depression, and sleep apnea.

a.   <u>Autumn Manning</u> is Staff Sergeant Manning's wife.  Ms. Manning suffers from PTSD and emotional distress.

149.   Specialist Dayna Ferguson Roscoe was shot and wounded by Hasan in the arm, shoulder, and thigh at close range.  Her left arm was completely shattered, her left lung was collapsed, and her ovaries and fallopian tubes were damaged.  After a major surgery, she was eventually released from the hospital.  Her orthopedist cleared her to return to duty, but Specialist Roscoe could barely even dress herself.  She received a second opinion and was told she needed significant surgery on her arm.  Today, she is still in pain, and suffers from PTSD, anxiety, depression, flashbacks, and emotional distress.

a.   Leva L. Ferguson is Specialist Roscoe's mother.

b.   James R. Ferguson is Specialist Roscoe's father. The Fergusons endured six hours of horrible uncertainty as they attempted to learn whether their daughter was dead or alive.  Both suffer from PTSD and emotional distress.

150.   Chief Warrant Officer Christopher H. Royal was shot multiple times by Hasan on November 5, 2009.  In addition to the bullet wounds Chief Warrant Officer Royal suffered, he continues to deal with PTSD and severe emotional trauma.

a.   Stephanie J. Royal is Chief Warrant Officer Royal's wife.

b.   C.S.R., II is Chief Warrant Officer Royal's minor son.

151.   Specialist Jonathan Sims was shot and wounded by Hasan in the chest and back, where one bullet still remains.  Just months after being discharged from the hospital, Specialist Sims then deployed to Afghanistan.  Despite his wounds, he has again re-enlisted for five more years.  He has been diagnosed with PTSD in addition to his chronic pain.  He is proud to serve his country.

a.   Jerry Lee Sims is Specialist Sims's father.

b.   Michelle Sims is Specialist Sims's mother.

152.     Specialist George O. Stratton, III was shot and wounded by Hasan in the shoulder at close range, resulting in serious physical injuries.   Specialist Stratton has also suffered debilitating psychological wounds, including severe PTSD.    After mistreatment from his superiors, arising from their efforts to play down the terror attack, Specialist Stratton requested a transfer from Fort Hood.   His request was denied.   He requested counseling for his PTSD, but was refused.    In fact, he was even demoted in rank and released from the Army without disability.   The Army's mistreatment has only exacerbated the effects of his PTSD.

a.    George O. Stratton Jr. is Specialist Stratton's father.

b.    Lynne Stratton is Specialist Stratton's step-mother. Both parents have had to deal with Specialist Stratton's violent mood swings and severe PTSD.   Ms. Stratton now must take medication as a result.

c.    Lawrence Stratton is Specialist Stratton's brother.

d.    David Clune is Specialist Stratton's step-brother.

e.    Matthew Clune is Specialist Stratton's step-brother.   Each sibling has suffered severe emotional distress as a result of their brother's injuries.

153.     Sergeant Miguel A. Valdivia was shot and wounded by Hasan, suffering three gunshot wounds, including one bullet that shattered his right femur.   After one unsuccessful attempt to place a rod in his leg, he had to have another surgery to correct the error.   Sergeant Valdivia was discharged in February of 2011 and has been unemployed since.

154.     Staff Sergeant Patrick Zeigler was preparing to deploy overseas when he was attacked by Hasan.   Hasan shot Staff Sergeant Zeigler in the right side of his head, his left forearm, his left shoulder, and his left hip.   Staff Sergeant Zeigler now suffers from nightmares and uncontrollable outbursts of anger and crippling PTSD.   He has been in medical treatment

essentially continuously since the attack in 2009.  Prior to the attack, Staff Sergeant Zeigler had

been a candidate for the Army Officer Candidate School.  Now, he is 100% disabled because of

his head injuries, his physical wounds and his PTSD, and is currently under psychiatric care at

Walter Reed National Military Medical Center in Bethesda, Maryland.

   a.   Jessica Zeigler is Staff Sergeant Zeigler's wife.  She is living with her family

in Minnesota while Staff Sergeant Zeigler is undergoing treatment in Maryland, and

caring for their two and a half year-old child.  She suffers from severe emotional distress

and has had her life – including dreams of medical school – destroyed due the

defendants' acts and omissions.

   b.   P.Z.  is the Zeigler's minor child.  He will never enjoy a normal childhood due

to the defendants' acts and omissions.

The Soldiers Injured in the Fort Hood Terror Attack and their Families.

155.   Staff Sergeant Chelsea Garrett suffered severe psychological trauma on

November 5, 2009.  She was a medic who was preparing to attend her graduation ceremony on

the morning of November 5.   When news of Hasan's terrorist attack reached her, she rushed to

help her fallen comrades, still wearing her graduation gown and unsure of Hasan's whereabouts.

She and her colleagues performed heroically despite the danger they faced.   Today Staff

Sergeant Garrett suffers from PTSD, anxiety, and depression.  Not a day goes by when she is not

accosted by nightmarish thoughts of the massacre.  She is on disability and cannot work, and

experiences debilitating anxiety when in public.  The Army has not offered or provided her with

treatment.

156.   Major Dr. Clifford A. Hopewell suffered severe psychological trauma on

November 5, 2009.   Major Hopewell, a neuropsychologist, was Officer-in-Charge of the

Traumatic Brain Injury Clinic in charge of evaluating all Soldiers suspected of brain injuries processing through Ft. Hood.  When Hasan began shooting, Major Hopewell and his staff were trapped in their building.  Major Hopewell now suffers from chronic PTSD, for which he has undergone extensive therapy.  He also struggles with insomnia, high blood pressure, fatigue, and diminished cognitive functioning.  In addition, Major Hopewell's clinic was completely destroyed and impounded as a result of the terror attack.  He operated from a parking lot using a cell phone for close to a year, and was forced to retire from the military following the shooting, thus depriving the Army of the very professionals most needed to treat the victims of the Fort Hood massacre.

      a.  <u>Trena Hopewell</u> is Major Hopewell's wife.  She has suffered severe emotional distress.

157.  <u>Sergeant Howard E. Ray</u> suffered severe psychological trauma on November 5, 2009.  Sergeant Ray was involved in a counseling session at the Traumatic Brain Injury clinic for injuries received as a result of combat.  Sergeant Ray narrowly escaped several bullets as he helped colleagues escape from Hasan.  He was awarded the Army Commendation Medal for his conduct in saving the lives of six of his comrades.  Sergeant Ray now suffers from PTSD, which has exacerbated the emotional wounds he had already suffered in combat.  He has undergone extensive counseling, but remains emotionally scarred.  After nearly 13 years in the Army, Sergeant Ray retired on 70% disability in 2010.

      a.  <u>Rachael Salone Ray</u> is Sergeant Ray's wife.  Ms. Ray has dealt with her husband's emotional distance and psychological scars while trying to raise a family with little assistance.

      b.  <u>J.C.R.</u> is Sergeant Ray's minor child.

      c.  <u>L.C.R.</u> is Sergeant Ray's minor child.

      d.  <u>M.P.R.</u> is Sergeant Ray's minor child.  Each child has suffered emotional distress due to the attack.  They have seen their father suffer and become withdrawn and distant, a dramatic and terrible change from their previous family dynamic.

158.  <u>Sergeant Rex A. Stalnaker</u> suffered severe psychological trauma on November 5, 2009.  As he saw his comrades gunned down in front of him, Sergeant Stalnaker helped to get soldiers to safety.  He received a Meritorious Service Medal for his conduct.  Sergeant Stalnaker was then deployed to Afghanistan almost immediately.  But the Fort Hood terror attack has left lasting emotional damage.  Sergeant Stalnaker suffers from chronic PTSD, anxiety, panic attacks, hyper-vigilance, paranoia, violent rages, depression, sleep disorders, and various other psychological injuries, most of which the Army ignored.  He is 70% disabled and unemployable.

      a.  <u>Kathryne A. Stalnaker</u> is Sergeant Stalnaker's wife.  She has also been diagnosed with PTSD.  She and her husband's lives have been engulfed by PTSD, and extensive counseling provides little relief.  Ms. Stalnaker has been forced to give up her career and income so that she can provide constant care for her husband.

159.  <u>Specialist Clifton Mikeal Stone</u> suffered severe psychological trauma on November 5, 2009.  He was awaiting an anthrax vaccination in preparation for his first deployment to Iraq when Hasan began shooting.  Specialist Stone feared for his life but provided care for the wounded soldiers that surrounded him.  Soaked in blood, he eventually returned to his barracks, only to be deployed two weeks later.  Today, Specialist Stone suffers from severe PTSD, depression, and anxiety, which has consumed his life.  Despite his evident emotional trauma, the Army did nothing to care for Specialist Stone, minimizing his psychological injuries

at every turn.  Specialist Stone was honorably discharged in January 2011.  In August, 2012, he was classified by the Veterans' Administration as 100% disabled.

    a.  <u>Diane Brooke Stone</u> is Specialist Stone's wife.  Ms. Stone has been a primary caregiver for her husband, who cannot function without significant assistance.  She has seen her life turned upside down as her husband's dream of serving his country has instead become a nightmare of PTSD.

    b.  <u>O.M.S.</u> is Specialist Stone's minor daughter.

    c.  <u>A.K.S.</u> is Specialist Stone's minor daughter.

    d.  <u>Karen D. Mikeal</u> is Specialist Stone's mother.  She has suffered severe emotional distress.

160.  <u>Staff Sergeant Mark Anthoney Warren</u> suffered severe emotional distress on November 5, 2009.  Since that day his life has become a nightmare of PTSD.  He cannot be in crowds and even the sound of a door shutting is enough to trigger painful flashbacks.  Staff Sergeant Warren has temporarily retired on 100% disability.

    a.  <u>Carla Sue Warren</u> is Staff Sergeant Warren's wife.  Ms. Warren now deals with her husband's crippling PTSD and anxiety.  Her life was permanently changed on November 5, 2009.

<u>The Civilian Killed in the Fort Hood Terror Attack and her Family.</u>

161.  <u>Eileen Rodriguez</u>, acting as personal representative for <u>Baby Velez</u>, the unborn child shot and killed by Hasan.  Hasan also shot and killed Baby Velez's mother, Private Francheska Velez.

    a.  <u>Eileen Rodriguez</u>, as Baby Velez's grandmother.  She grieves for her loss.

b. <u>Juan G. Velez</u> is Baby Velez's grandfather.  He mourns every day for his granddaughter.

<u>The Civilians Injured in the Fort Hood Terror Attack and their Families.</u>

162.  <u>Lovickie D. Byrd</u> was a civilian federal employee who had just finished processing Lieutenant Colonel Warman when Hasan began shooting.  She injured her left knee and sustained serious psychological injuries in the attack. She suffers from PTSD, depression, panic attacks, insomnia, irritability, and incontinence.  Ms. Byrd's psychological traumas caused her work performance to decline and she is now disability retired.

a. <u>Joe L. Byrd</u> is Ms. Byrd's husband.  He has struggled to deal with Ms. Byrd's emotional distance, irritability, depression, and psychological damage.

b. <u>Joe L. Byrd, II</u> is Ms. Byrd's son.

c. <u>Dominique L. Byrd</u> is Ms. Byrd's son.  Both children have put their lives on hold to care for their mother, who has only grown more distant and irritable since the November 5 attack.

163.  <u>Anna E. Ellis</u> was a civilian federal human relations employee.  She suffered a spinal injury and nerve damage as a result of Hasan's attack, and had ten screws placed in her neck.  She still has injuries to her knees and hands, all of which has prevented her from returning to work.  After two surgeries, she is facing yet another operation to improve her mobility and pain level.  She also suffers from PTSD and sleep disorders.

164.  <u>Michelle R. Harper</u> was a civilian nurse who was injured in her neck, back, and knees during the attack. Ms. Harper has been diagnosed with PTSD and experiences severe panic attacks.

a. <u>George Harper</u> is Ms. Harper's husband.  He has suffered severe emotional distress.

b. <u>T.H.</u> is Ms. Harper's minor son.

c. <u>A.M.</u> is Ms. Harper's minor daughter.

d. <u>Alyssa Magee</u> is Ms. Harper's daughter.

165.   <u>Kimberly D. Munley</u> was the civilian DoD police officer who was the first person to return fire on Hasan.  She rushed to the scene of the shooting to confront Hasan and exchanged fire with Hasan from six feet away.  Ms. Munley acted bravely to stop Hasan's attack but suffered gravely as a result, suffering multiple life-threatening gunshot wounds, including a major arterial wound.  After a lengthy surgery and nearly a week in intensive care, Ms. Munley's life was saved.  But she remains injured and unable to perform the work she used to.  After receiving a knee replacement she can walk again, but she cannot run or train.  She has been out of work for 10 months, and cannot take a police job because of her physical limitations.  The defendants have washed their hands of Ms. Munley, who as part of the defendants' political cover up and damage control effort was even invited to attend a State of the Union speech and sit next to the First Lady of the United States, ignoring her recovery and suffering and even placing obstacles in the way of her attempts to return to work.  Ms. Munley suffers from severe PTSD and anxiety.

a. <u>J.A.M.</u> is Ms. Munley's minor daughter.

b. <u>M.H.B.</u> is Ms. Munley's minor daughter. Both children have suffered severe emotional distress, and their lives have been forever changed, because of their mother's tremendous physical pain and emotional strain.

166.    <u>Linda J. Londrie</u>, a civilian DoD employee, suffered severe psychological trauma due to the terrorist attack.  She consoled Sergeant Krueger in the last minutes of her life, and believed Sergeant Krueger was dead when she left her.  Ms. Londrie had no military training or experience, and learned that day what it was like in a combat situation.  Even as she consoled Sergeant Krueger, Ms. Londrie believed she was going to die too.  Ms. Londrie has been diagnosed with PTSD, and is haunted daily by the events of November 5.  She suffers from survivor's guilt, anger, isolation, insomnia, nightmares, anxiety, and panic attacks.  Ms. Londrie remains in counseling, but she is changed forever.

167.    <u>Diana J. White</u> suffered severe psychological trauma on November 5, 2009.  Ms. White was a civilian speech pathologist working with Sergeant Ray at the time Hasan began shooting.  As she fled the scene of the shooting with Sergeant Ray, she barely escaped Hasan's gunfire.  Sergeant Ray helped lead her to safety, but only after she quite literally dodged a bullet.  Ms. White has been diagnosed with PTSD, severe anxiety disorder, and severe depression.  Her life has changed irrevocably, and she still sleeps with a gun at her side nearly three years later.

168.    <u>Julia Wilson Adee</u> is a civilian DoD employee suffered severe psychological trauma on November 5, 2009.  Ms. Wilson was pregnant the day of Hasan's attack.  She had just parked near the SRP when Hasan began shooting.  Ms. Wilson was panicked and terrified as she tried to escape.  She continues to suffer from PTSD following Hasan's attack, but as a single mother must work grueling hours away from her home in order to provide for her son.

a.  <u>Elizabeth Wilson</u> is Ms. Wilson's mother.  She has suffered severe emotional distress, particularly since she was on the phone with her daughter during the attack.

b.  <u>W.W.</u> is Ms. Wilson's minor son.  He also has suffered severe emotional distress.

169.    <u>Chelsea Garrett</u>, <u>Jerry and Michelle Sims</u>, <u>Carl Cooke</u> and the <u>Royal family</u> have each filed FTCA claims within the past six months.

## B.    Defendants

<u>The Terrorist Defendants</u>

170.    Hasan is a radical Islamist and follower of Aulaqi and al-Qaeda who is also a Major in the United States Army.  He is named in his personal capacity.  He is incarcerated in, and a resident of, Texas.   Currently, he is housed in the Bell County Jail, 113 West Central Ave , Belton, Texas 76513.

171.    Aulaqi (aka "Sheik Aulaqi") was the al-Qaeda terrorist leader and Islamic religious authority who provided material support to the 9/11 and other terrorists and conspired with Hasan.  He provided Hasan with operational and inspirational guidance for the Fort Hood terror attack.  Aulaqi is deceased due to a U.S. drone strike.  Therefore, this action is brought against Nasser al-Aulaqi as personal representative of Aulaqi's estate.  Nasser al-Aulaqi is, upon information and belief, a resident of Yemen, but he and the estate are in the process of designating his counsel, the American Civil Liberties Union in the District of Columbia, as his local agent for service of process.

<u>The Government Defendants</u>

172.    Secretary of the Army John McHugh is named in his official capacity.

173.    Secretary of Defense Charles T. Hagel is named in his official capacity.

174.    Director of the FBI Robert Mueller, III is named in his official capacity.

175.    John Doe #1 is identified in the Senate Report as the Army officer who commanded Hasan at Walter Reed Army Hospital and then assigned Hasan to Fort Hood notwithstanding both Hasan's dangerous Islamist ideology and manifest professional failings.

He knowingly and intentionally exempted Hasan from generally applicable rules and military discipline, recommended Hasan for promotion and assigned him to treat U.S. combat soldiers at Fort Hood, in whole or in part, because of Hasan's ethnicity and religion, and all with deliberate indifference to and reckless disregard for plaintiffs' lives and legal rights.  He is named in his individual capacity.

176.    John Doe #2 is identified as Witness 3 in the Senate Report.  He ignored Hasan's Islamist ranting and professional inadequacies, Army rules and military discipline, and treated Hasan preferentially because of his ethnicity and religion, all with deliberate indifference to and reckless disregard for plaintiffs' lives and legal rights.  John Doe #2 did this because he was concerned that truth-telling about Hasan could ruin his career.  He is named in his individual capacity.

177.    John Doe #3 signed Hasan's sanitized and falsified OERs.  He did this because of Hasan's ethnicity and religion, knowing that the OERs were false and misleading in all material respects and with deliberate indifference to and reckless disregard for plaintiffs' lives and legal rights.  John Doe #3 signed Hasan's false OERs because of command pressure that caused him to be concerned that truth-telling about Hasan could ruin his (John Doe #3's) military career.  He is named in his individual capacity.

178.    John Doe #4 was the senior DOD official responsible for approving and/or formulating DOD's policies of political correctness, DOD's response to the Fort Hood terror attack and the determination that it was "workplace violence" and not "terrorism" contrary to applicable DOD policies, terms and definitions, all with deliberate indifference to and reckless disregard for plaintiffs' lives and legal rights.  He is named in his individual capacity.

179.    John Doe #5 is identified in the Webster Report as "WFO-TFO."   Among other things, he terminated his investigation of Hasan because of "political sensitivities" arising from Hasan's ethnicity and religion, all with deliberate indifference to and reckless disregard for plaintiffs' lives and legal rights.  He is named in his personal capacity.

180.    John Doe #6 supervised Hasan at Fort Hood.  He ignored Hasan's patient abuse, his support for the jihadi murder of Americans and his violations of Army regulations, all with deliberate indifference to and reckless disregard for plaintiffs' lives and legal rights. He did this because of Hasan's ethnicity and religion. He is named in his personal capacity.

## CLAIMS FOR RELIEF

**A.    Claims Against the Terrorist Defendants**

*First Claim for Relief:  The Survival Act/D.C. Code § 16-2701 et seq.*

181.    Plaintiffs repeat the allegations set forth above as if fully restated herein.

182.    This claim for relief against the terrorist defendants is by the personal representatives of those killed in the Fort Hood terror attack.

183.    All of the decedents' rights of action under this Complaint survive in favor of their personal representatives.

184.    As a direct, proximate and foreseeable result of the terrorist defendants' conduct, all as set forth in this Complaint, the decedents were shot and killed by Hasan during his jihadi terror attack at Fort Hood.

185.    Each decedent suffered and experienced severe pain, mental anguish and emotional distress prior to his or her death.  For example, Private Francheska Velez, who was shot by Hasan, was found by other soldiers curled in a fetal position crying "my baby, my baby"

before she died.  At all times relevant, she knew that she and Baby Velez were both dying from their wounds.

186.     Therefore, these plaintiffs are entitled to any and all damages recoverable under law.

187.     The terrorist defendants are individually, jointly and severally liable to plaintiffs for all their damages.

*Second Claim for Relief:  For Wrongful Death/D.C. Code § 12-101 et seq.*

188.     Plaintiffs repeat the allegations set forth above as if fully restated herein.

189.     This claim for relief against the terrorist defendants is by the personal representatives of those killed in the Fort Hood terror attack.

190.     As a direct, proximate and foreseeable result of the terrorist defendants' misconduct, all as set forth in this Complaint, decedents' next of kin have incurred burial expenses, and lost their share of the decedents' anticipated future earnings and the pecuniary value of the decedents' respective services, among other things.

191.     Additionally, the decedents' estates lost probable future earnings and other economic and noneconomic damages, including damages for violation of their constitutional rights.

192.     Therefore, they are entitled to all damages recoverable under law.

193.     The terrorist defendants are individually, jointly and severally liable to plaintiffs for all their damages.

*Third Claim for Relief:  For Civil Conspiracy*

194.     Plaintiffs repeat the allegations set forth above as if fully restated herein.

195.     This claim for relief is by all plaintiffs.

196.    As set forth in this Complaint, Hasan and Aulaqi conspired to kill, wound, injure and damage plaintiffs as part of a Muslim jihad against Americans.

197.    Acting pursuant to this conspiracy, Hasan killed, wounded, injured and damaged plaintiffs.

198.    As a proximate and foreseeable result of the terrorist defendants' civil conspiracy, plaintiffs have suffered physical injury, including but not limited to terror, wrongful death, disfigurement, permanent and temporary disability, neurological damage, pain and suffering; emotional distress, including but not limited to disabling post-traumatic stress disorder, anger, depression, sleeplessness and nightmares, crippling anxiety, feelings of constant fear and helplessness, an inability to work, psychiatric disorders, adverse personality changes and a host of physical ailments and disorders that are manifestations thereof, including high blood pressure, headaches and other physical disorders; a loss of the ability to enjoy a normal life, including but not limited to loss of consortium, marital problems, and lost affection, aid, attention and familial support; social disorders; and economic losses, including but not limited to lost wages, lost benefits and medical expenses.

199.    As a further direct and proximate result of the terrorist defendants' conspiracy, the decedents suffered severe physical pain and suffering, severe mental anguish and other damages during the last moments of their life, after they were shot by Hasan.

200.    The terrorist defendants are individually, jointly and severally liable to plaintiffs for all their damages.

*Fourth Claim for Relief:  For Violation of §1985(3)*

201.    Plaintiffs repeat the allegations set forth above as if fully restated herein.

202.    This claim for relief is by all plaintiffs.

203.     Hasan and Aulaqi conspired to deprive plaintiffs of equal protection, privileges and immunities under the laws of the United States because they were not Muslims, by means of religious murder and violent jihad.

204.     Pursuant to and in furtherance of this conspiracy, Hasan killed, wounded and injured plaintiffs, thereby "injuring them in their persons or property" and depriving them of their right to exercise their rights and privileges as citizens of the United States, including their right to life.

205.     As a proximate and foreseeable result of the terrorist defendants' violation of 42 U.S.C. § 1985(3), plaintiffs have suffered physical injury, including but not limited to terror, wrongful death, disfigurement, permanent and temporary disability, neurological damage, pain and suffering; emotional distress, including but not limited to disabling post-traumatic stress disorder, anger, depression, sleeplessness and nightmares, crippling anxiety, feelings of constant fear and helplessness, an inability to work, psychiatric disorders, adverse personality changes and a host of physical ailments and disorders that are manifestations thereof, including high blood pressure, headaches and other physical disorders; a loss of the ability to enjoy a normal life, including but not limited to loss of consortium, marital problems, and lost affection, aid, attention and familial support; social disorders; and economic losses, including but not limited to lost wages, lost benefits and medical expenses.

206.     As a further direct and proximate result of the terrorist defendants' violations of plaintiffs' civil rights, the decedents suffered severe physical pain and suffering, severe mental anguish and other damages during the last moments of their life, after they were shot by Hasan.

207.     The terrorist defendants are individually, jointly and severally liable to plaintiffs for all their damages.

*Fifth Claim for Relief:  Negligence*

208.    Plaintiffs repeat the allegations set forth above as if fully restated herein.

209.    This claim for relief is against Aulaqi's estate by all plaintiffs.

210.    Aulaqi knew that Hasan had requested religious sanction from him to murder innocent Americans.

211.    Aulaqi knew that Hasan was preparing to attack plaintiffs in the name of Muslim jihad, and that Hasan was relying on Aulaqi for religious sanction to do so.

212.    Aulaqi had a duty to refrain from incitement to murder, and, knowing Hasan's intentions and reliance on him, to affirmatively direct Hasan to forego violence, murder and terrorism.

213.    He breached these duties.  Instead, he incited and provided Hasan with religious and operational inspiration, support and justification for violent jihad against plaintiffs, aiding and abetting Hasan's assault.

214.    As a proximate and foreseeable result of Aulaqi's negligence, plaintiffs have suffered physical injury, including but not limited to terror, wrongful death, disfigurement, permanent and temporary disability, neurological damage, pain and suffering; emotional distress, including but not limited to disabling post-traumatic stress disorder, anger, depression, sleeplessness and nightmares, crippling anxiety, feelings of constant fear and helplessness, an inability to work, psychiatric disorders, adverse personality changes and a host of physical ailments and disorders that are manifestations thereof, including high blood pressure, headaches and other physical disorders; a loss of the ability to enjoy a normal life, including but not limited to loss of consortium, marital problems, and lost affection, aid, attention and familial support;

social disorders; and economic losses, including but not limited to lost wages, lost benefits and medical expenses.

215.    As a further direct and proximate result of Aulaqi's negligence, the decedents suffered severe physical pain and suffering, severe mental anguish and other damages during the last moments of their life, after they were shot by Hasan.

216.    Aulaqi, through his estate, is therefore liable to plaintiffs for all their damages.

*Sixth Claim for Relief:  Gross Negligence*

217.    Plaintiffs repeat the allegations set forth above as if fully restated herein.

218.    This claim for relief is against the terrorist defendants by all plaintiffs.

219.    The terrorist defendants' conduct, as set forth in this Complaint, reflects such an extreme deviation from the ordinary standard of care as to support a finding of wanton, willful and reckless disregard or conscious indifference for plaintiffs' rights and safety.

220.    As a proximate and foreseeable result of the terrorist defendants' gross negligence, plaintiffs have suffered physical injury, including but not limited to terror, wrongful death, disfigurement, permanent and temporary disability, neurological damage, pain and suffering; emotional distress, including but not limited to disabling post-traumatic stress disorder, anger, depression, sleeplessness and nightmares, crippling anxiety, feelings of constant fear and helplessness, an inability to work, psychiatric disorders, adverse personality changes and a host of physical ailments and disorders that are manifestations thereof, including high blood pressure, headaches and other physical disorders; a loss of the ability to enjoy a normal life, including but not limited to loss of consortium, marital problems, and lost affection, aid, attention and familial support; social disorders; and economic losses, including but not limited to lost wages, lost benefits and medical expenses.

221. As a further direct and proximate result of the terrorist defendants' gross negligence, the decedents suffered severe physical pain and suffering, severe mental anguish and other damages during the last moments of their life, after they were shot by Hasan.

222. The terrorist defendants are individually, jointly and severally liable to plaintiffs for all their damages.

*Seventh Claim for Relief: Assault and Battery*

223. Plaintiffs repeat the allegations set forth above as if fully restated herein.

224. This claim for relief is against the terrorist defendants by all plaintiffs.

225. The terrorist defendants engaged in an intentional and unlawful attempt or threat, either by words or by acts, to do physical harm to plaintiffs, and as a proximate result thereof, Hasan engaged in an intentional act of terror that caused plaintiffs grievously harmful or offensive bodily contact and injury.

226. The terrorist defendants are therefore liable to plaintiffs for civil assault and battery.

227. As a proximate and foreseeable result of the terrorist defendants' assault and battery, plaintiffs have suffered physical injury, including but not limited to terror, wrongful death, disfigurement, permanent and temporary disability, neurological damage, pain and suffering; emotional distress, including but not limited to disabling post-traumatic stress disorder, anger, depression, sleeplessness and nightmares, crippling anxiety, feelings of constant fear and helplessness, an inability to work, psychiatric disorders, adverse personality changes and a host of physical ailments and disorders that are manifestations thereof, including high blood pressure, headaches and other physical disorders; a loss of the ability to enjoy a normal life, including but not limited to loss of consortium, marital problems, and lost affection, aid,

attention and familial support; social disorders; and economic losses, including but not limited to lost wages, lost benefits and medical expenses.

228.   As a further direct and proximate result of the terrorist defendants' assault and battery, the decedents suffered severe physical pain and suffering, severe mental anguish and other damages during the last moments of their life, after they were shot by Hasan.

229.   The terrorist defendants are individually, jointly and severally liable to plaintiffs for all their damages.

*Eighth Claim for Relief:  For Intentional Infliction of Emotional Distress*

230.   Plaintiffs repeat the allegations set forth above as if fully set forth herein.

231.   This claim for relief is against the terrorist defendants by all plaintiffs.

232.   The terrorist defendants' conduct, as set forth in this Complaint, was extreme or outrageous, which intentionally or recklessly caused plaintiffs severe emotional distress.

233.   This conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and must be regarded as atrocious and utterly intolerable in a civilized community.

234.   Therefore, the terrorist defendants are liable for intentional infliction of emotional distress against plaintiffs.

235.   As a proximate and foreseeable result of the terrorist defendants' intentional infliction of emotional distress, plaintiffs have suffered emotional distress, including but not limited to disabling post-traumatic stress disorder, anger, depression, sleeplessness and nightmares, crippling anxiety, feelings of constant fear and helplessness, an inability to work, psychiatric disorders, adverse personality changes and a host of physical ailments and disorders that are manifestations thereof, including high blood pressure, headaches and other physical

disorders; a loss of the ability to enjoy a normal life, including but not limited to loss of consortium, marital problems, lost affection, aid, attention and familial support; social disorders; and economic losses, including but not limited to lost wages, lost benefits and medical expenses.

*Ninth Claim for Relief:  Loss of Consortium*

236.    Plaintiffs repeat the allegations set forth above as if fully restated herein.

237.    This claim for relief is by all spouses, partners and family members of those killed, wounded or injured in the Fort Hood terror attack against the terrorist defendants.

238.    The terrorist defendants' conduct, as set forth in this Complaint, has caused these plaintiffs to suffer a substantial and painful loss of affection, aid, comfort, marital relations, normal family life and assistance from their family members who were killed, wounded and injured by these defendants.

239.    As a proximate and foreseeable result of the terrorist defendants' misconduct, as set forth in this Complaint, plaintiffs have suffered physical injury, including but not limited to terror, neurological damage, pain and suffering; emotional distress, including but not limited to disabling post-traumatic stress disorder, anger, depression, sleeplessness and nightmares, crippling anxiety, feelings of constant fear and helplessness, an inability to work, psychiatric disorders, adverse personality changes and a host of physical ailments and disorders that are manifestations thereof, including high blood pressure, headaches and other physical disorders; a loss of the ability to enjoy a normal life, including but not limited to marital problems, lost affection, aid, attention and familial support; social disorders; and economic losses, including but not limited to lost wages, lost benefits and medical expenses.

**B.     Claims Against the Government Defendants**

*First Claim for Relief: The Survival Act/D.C. Code § 16-2701 et seq.*

240.     Plaintiffs repeat the allegations set forth above as if fully restated herein.

241.     This claim for relief against the government defendants is by the personal representatives of those killed in the Fort Hood terror attack.

242.     All of the decedents' rights of action under this Complaint survive in favor of their personal representatives.

243.     As a direct, proximate and foreseeable result of the terrorist defendants' conduct, all as set forth in this Complaint, the decedents were shot and killed by Hasan during his jihadi terror attack at Fort Hood.

244.     Each decedent suffered and experienced severe pain, mental anguish and emotional distress prior to his or her death.  For example, Private Francheska Velez, who was shot by Hasan, was found by other soldiers curled in a fetal position crying "my baby, my baby" before she died.  At all times relevant, she knew that she and Baby Velez were both dying from their wounds.

245.     Additionally, the decedents' estates lost probable future earnings and other economic and noneconomic damages, including damages for violation of their constitutional rights.

246.     Therefore, these plaintiffs are entitled to any and all damages recoverable under law.

247.     The government defendants are individually, jointly and severally liable to plaintiffs for all their damages.

*Second Claim:  For Wrongful Death/D.C. Code § 12-101 et seq.*

248.     Plaintiffs repeat the allegations set forth above as if fully restated herein.

249.     This claim for relief against the government defendants is by the next of kin of those killed in the Fort Hood terror attack.

250.     As a direct, proximate and foreseeable result of the terrorist defendants' misconduct, all as set forth in this Complaint, decedents' next of kin have incurred burial expenses, and lost their share of the decedents' anticipated future earnings and the pecuniary value of the decedents' respective services, among other things.

251.     Therefore, they are entitled to all damages recoverable under law.

252.     Defendants are individually, jointly and severally liable to plaintiffs for all their damages.

*Third Claim for Relief:  Negligence (Hiring, Retention and Supervision)*

253.     Plaintiffs repeat the allegations set forth above as if fully restated herein.

254.     This claim for relief against the Army, the DOD, and John Does ##1-4 and 6 is by all plaintiffs.

255.     As set forth in this Complaint, these defendants knew that Hasan was an incompetent doctor and a dangerous Islamic radical who considered and conducted himself as an enemy of the United States.

256.     Unreasonably, with conscious and deliberate indifference to, and with reckless disregard for, Army rules and plaintiffs' lives and legal rights and, knowing to a moral certainty, of the risk posed by Hasan to plaintiffs, these defendants chose not to comply with or enforce Army regulations with respect to or against Hasan, or to discipline him or to protect and safeguard plaintiffs, his foreseeable victims.

257.    These defendants owed plaintiffs non-discretionary duties to, *inter alia*, use reasonable care in the hiring, training, supervision and retention of Hasan; to treat him as they would have treated any other person in his position without regard for his ethnicity, religion or other considerations of "political correctness"; to follow their own rules, discipline and procedures; to select and retain employees competent and fit for the work assigned to them; and to protect, refrain from retaining, and avoid exposing plaintiffs to harm from an unfit and dangerous employee.

258.    As set forth in this Complaint, these defendants unreasonably, with conscious and deliberate indifference to, and reckless and willful disregard for, plaintiffs' lives and legal rights, breached these duties.

259.    These defendants knew, to a moral certainty, that they had failed to reasonably hire, train and supervise Hasan and that by retaining him, promoting him and assigning him to Fort Hood they had created an unreasonable risk of harm to plaintiffs and others similarly situated.

260.    As set forth in this Complaint, these defendants' negligently and with deliberate indifference to and reckless and willful disregard for plaintiffs' lives and legal rights violated their non-discretionary duties, which amounted to gross negligence, proximately and foreseeably causing plaintiffs' injuries.

261.    As a proximate and foreseeable result of these defendants' negligence, conscious and deliberate indifference, and reckless disregard for plaintiffs' lives and legal rights, all as set forth in this Complaint, plaintiffs have suffered physical injury, including but not limited to terror, wrongful death, disfigurement, permanent and temporary disability, neurological damage, pain and suffering; emotional distress, including but not limited to disabling post-traumatic stress

disorder, anger, depression, sleeplessness and nightmares, crippling anxiety, feelings of constant fear and helplessness, an inability to work, psychiatric disorders, adverse personality changes and a host of physical ailments and disorders that are manifestations thereof, including high blood pressure, headaches and other physical disorders; a loss of the ability to enjoy a normal life, including but not limited to loss of consortium, marital problems, lost affection, aid, attention and familial support; social disorders; and economic losses, including but not limited to lost wages, lost benefits and medical expenses.

262.    As a further direct and proximate result of these defendants' negligence, the decedents suffered severe physical pain and suffering, severe mental anguish and other damages during the last moments of their life, after they were shot by Hasan.

263.    These defendants are individually, jointly and severally liable to plaintiffs for all their damages.

*Fourth Claim for Relief:  Negligence (Investigation)*

264.    Plaintiffs repeat the allegations set forth above as if fully restated herein.

265.    This claim for relief against the FBI and John Doe #5 is by all plaintiffs.

266.    As set forth in this Complaint, at all times relevant, these defendants had actual knowledge of their unique relationship with plaintiffs, and of their corresponding non-discretionary duty to protect them and to reasonably investigate Hasan, including an in-person interview; to maintain a system wherein Hasan's activities were properly documented, assessed and evaluated; and to reasonably perform their duties by notifying the Army of Hasan's communications with Aulaqi, monitoring Hasan's weapons purchases, and/or arresting him, among other things, all without respect to Hasan's ethnicity or religion or any other considerations of political correctness.

267.   Plaintiffs justifiably relied on these defendants to perform their duties.

268.   These defendants knowingly and with conscious and deliberate indifference to, and reckless disregard for, plaintiffs' lives and legal rights, breached and disregarded their duties to plaintiffs.

269.   As a proximate and foreseeable result of these defendants' negligence, deliberate indifference to and reckless disregard for plaintiffs' lives and legal rights, all as set forth in this Complaint, plaintiffs have suffered physical injury, including but not limited to terror, wrongful death, disfigurement, permanent and temporary disability, neurological damage, pain and suffering; emotional distress, including but not limited to disabling post-traumatic stress disorder, anger, depression, sleeplessness and nightmares, crippling anxiety, feelings of constant fear and helplessness, an inability to work, psychiatric disorders, adverse personality changes and a host of physical ailments and disorders that are manifestations thereof, including high blood pressure, headaches and other physical disorders; a loss of the ability to enjoy a normal life, including but not limited to loss of consortium, marital problems, lost affection, aid, attention and familial support; social disorders;  and economic losses, including but not limited to lost wages, lost benefits and medical expenses.

270.   As a further direct and proximate result of these defendants' negligence, the decedents suffered severe physical pain and suffering, severe mental anguish and other damages during the last moments of their life, after they were shot by Hasan.

271.   These defendants are individually, jointly and severally liable to plaintiffs for all their damages.

*Fifth Claim for Relief:  For Gross Negligence*

272.   Plaintiffs repeat the allegations set forth above as if fully restated herein.

273.   This claim for relief against all the government defendants is by all plaintiffs.

274.   The government defendants' conduct, as set forth in this Complaint, reflects such an extreme deviation from the ordinary standard of care as to support a finding of wanton, willful and reckless disregard or conscious indifference for plaintiffs' rights and safety.

275.   As a proximate and foreseeable result of the government defendants' gross negligence, plaintiffs have suffered physical injury, including but not limited to terror, wrongful death, disfigurement, permanent and temporary disability, neurological damage, pain and suffering; emotional distress, including but not limited to disabling post-traumatic stress disorder, anger, depression, sleeplessness and nightmares, crippling anxiety, feelings of constant fear and helplessness, an inability to work, psychiatric disorders, adverse personality changes and a host of physical ailments and disorders that are manifestations thereof, including high blood pressure, headaches and other physical disorders; a loss of the ability to enjoy a normal life, including but not limited to loss of consortium, marital problems, lost affection, aid, attention and familial support; social disorders; and economic losses, including but not limited to lost wages, lost benefits and medical expenses.

276.   As a further direct and proximate result of the government defendants' gross negligence, the decedents suffered severe physical pain and suffering, severe mental anguish and other damages during the last moments of their life, after they were shot by Hasan.

277.   The government defendants are individually, jointly and severally liable to plaintiffs for all their damages.

*Sixth Claim for Relief:  For Constitutional Violations*

278.   Plaintiffs repeat the allegations set forth above as if fully restated herein.

279.   This claim for relief against all the John Does is by all plaintiffs.

280.    These defendants were obligated to respect and protect plaintiffs' lives and their legal and constitutional rights, including but not limited to their Fifth Amendment Due Process rights to life and property.

281.    However, as set forth in this Complaint, these defendants knowingly, with conscious and deliberate indifference and reckless and willful disregard, violated plaintiffs' rights by providing Hasan with preferential treatment, promotions, assignments, benefits and exemptions from generally-applicable Army rules, standards and discipline because of his ethnicity and religion.   These affirmative acts, as set forth in this Complaint, created and/or increased plaintiffs' risk of harm and injury at Hasan's hands.

282.    These defendants, through their affirmative acts, deliberate indifference, reckless and willful disregard, and intentional omissions, both created the opportunity for Hasan to carry out the terror attack and rendered plaintiffs more vulnerable to the danger.

283.    These defendants violated plaintiffs' rights with actual knowledge that they had a special relationship with plaintiffs and held a position of trust and authority over them, and that their wrong-doing would place plaintiffs at a uniquely greater risk of harm than the general public.

284.    As set forth in this Complaint, these defendants knew or should have known that Hasan's attack was reasonably foreseeable and, in fact, was utterly predictable.   Instead, they elevated political correctness and Hasan's career above their duties to protect plaintiffs' physical safety and legal rights.

285.    But for these defendants' patently illegal religious and ethnic preferences; intentional affirmative acts and omissions; and deliberate indifference to, and reckless and willful disregard for plaintiffs' lives and legal rights, the Fort Hood terror attack could not have

occurred.   By their slavish devotion to political correctness, and as set forth in this Complaint, defendants created the danger and proximately caused plaintiffs' injuries.

286.   These defendants' conduct, as set forth in this Complaint, is so egregious and so outrageous as to shock the conscience.

287.   As a proximate and foreseeable result of these defendants' violations of plaintiffs' constitutional rights, all as set forth in this Complaint, plaintiffs have suffered physical injury, including but not limited to terror, wrongful death, disfigurement, permanent and temporary disability, neurological damage, pain and suffering; emotional distress, including but not limited to disabling post-traumatic stress disorder, anger, depression, sleeplessness and nightmares, crippling anxiety, feelings of constant fear and helplessness, an inability to work, psychiatric disorders, adverse personality changes and a host of physical ailments and disorders that are manifestations thereof, including high blood pressure, headaches and other physical disorders; a loss of the ability to enjoy a normal life, including but not limited to loss of consortium, marital problems, lost affection, aid, attention and familial support; social disorders; and economic losses, including but not limited to lost wages, lost benefits and medical expenses.

288.   As a further direct and proximate result of these defendants' wrongful conduct and omissions, the decedents suffered severe physical pain and suffering, severe mental anguish and other damages during the last moments of their life, after they were shot by Hasan.

289.   These defendants are individually, jointly and severally liable to plaintiffs for all their damages.

*Seventh Claim for Relief: Negligent Infliction of Emotional Distress*

290.   Plaintiffs repeat the allegations set forth above as if fully restated herein.

291.   This claim of relief against the government defendants is by all plaintiffs.

292.    The government defendants had a relationship with and had undertaken obligations to the plaintiffs of a kind and nature that necessarily affected the plaintiffs' emotional well-being.  Therefore, they knew or should have known that there was an especially likely and foreseeable risk that their deliberate indifference to and reckless and willful disregard for plaintiffs' lives and legal rights would cause plaintiffs' actionable emotional distress.

293.    The government defendants' deliberate indifference to and reckless and willful disregard for and mistreatment of plaintiffs after Hasan's attack and their abuse of their special relationship with and responsibility to plaintiffs, all as set forth in this Complaint, injured the plaintiffs and caused them actionable mental distress.

294.    As a proximate and foreseeable result of the government defendants' negligence, deliberate indifference and reckless and willful disregard, all as set forth in this Complaint, plaintiffs have suffered emotional distress, including but not limited to disabling post-traumatic stress disorder, anger, depression, sleeplessness and nightmares, crippling anxiety, feelings of constant fear and helplessness, an inability to work, psychiatric disorders, adverse personality changes and a host of physical ailments and disorders that are manifestations thereof, including high blood pressure, headaches and other physical disorders; a loss of the ability to enjoy a normal life, including but not limited to loss of consortium, marital problems, lost affection, aid, attention and familial support; social disorders; and economic losses, including but not limited to lost wages and medical expenses.

295.    These defendants are therefore jointly and severally liable to plaintiffs for all of their damages.

*Eighth Claim for Relief:  Loss of Consortium*

296.    Plaintiffs repeat the allegations set forth above as if fully restated herein.

98

297.   This claim for relief is by all spouses, partners, children and family members of those killed, wounded or injured in the Fort Hood terror attack against the government defendants.

298.   The government defendants' conduct, as set forth in this Complaint, has caused these plaintiffs to suffer a substantial and painful loss of affection, aid, comfort, marital relations, normal family life and assistance from their family members whose wrongful death, wounds and injuries were proximately caused by these defendants' negligence and other misconduct.

299.   As a proximate and foreseeable result of the government defendants' negligence and other misconduct, as set forth in this Complaint, plaintiffs have suffered physical injury, including but not limited to terror, neurological damage, pain and suffering; emotional distress, including but not limited to disabling post-traumatic stress disorder, anger, depression, sleeplessness and nightmares, crippling anxiety, feelings of constant fear and helplessness, an inability to work, psychiatric disorders, adverse personality changes and a host of physical ailments and disorders that are manifestations thereof, including high blood pressure, headaches and other physical disorders; a loss of the ability to enjoy a normal life, including but not limited to marital problems, lost affection, aid, attention and familial support; social disorders; and economic losses, including but not limited to lost wages, lost benefits and medical expenses.

300.   These defendants are therefore jointly and severally liable to plaintiffs for all of their damages.

*Ninth Claim for Relief:  For Negligent Misrepresentation*

301.   Plaintiffs repeat the allegations set forth above as if fully restated herein.

302.   This claim for relief is by all plaintiffs against the Army, DOD and John Does ##1 - 3.

303.    As set forth in this Complaint, these defendants made false statements on Hasan's OERs and/or omitted facts that they had a duty to disclose with respect to Hasan's jihadist ideology and professional competency.    At all times, these defendants represented to plaintiffs and/or their decedents, as appropriate, that Hasan was a loyal and competent American Army psychiatrist who would use his position and authority for the benefit of American soldiers.

304.    These representations were both material and false.

305.    Plaintiffs reasonably relied upon these defendants' false statements and/or omissions to their detriment.

306.    As a proximate and foreseeable result of these defendants' misrepresentations and other misconduct, as set forth in this Complaint, plaintiffs have suffered physical injury, including but not limited to terror, neurological damage, pain and suffering; emotional distress, including but not limited to disabling post-traumatic stress disorder, anger, depression, sleeplessness and nightmares, crippling anxiety, feelings of constant fear and helplessness, an inability to work, psychiatric disorders, adverse personality changes and a host of physical ailments and disorders that are manifestations thereof, including high blood pressure, headaches and other physical disorders; a loss of the ability to enjoy a normal life, including but not limited to marital problems, lost affection, aid, attention and familial support; social disorders; and economic losses, including but not limited to lost wages, lost benefits and medical expenses.

307.    These defendants are therefore jointly and severally liable to plaintiffs for all of their damages.

*Tenth Claim for Relief:  For Intentional Misrepresentation*

308.    Plaintiffs repeat the allegations set forth above as if fully restated herein.

309.    This claim for relief is by all plaintiffs against John Doe # 3 who signed Hasan's false and sanitized OERs.

310.    By signing Hasan's false and sanitized OERs, John Doe # 3 knowingly and intentionally made false representations and deliberate, deceptive omissions with respect to Hasan's professional competence and loyalty to the United States, to its Army and to its soldiers, with actual knowledge of their falsity.

311.    These false representations and deliberate, deceptive omissions were made with knowledge of their falsity and with the intent to deceive plaintiffs and others.

312.    The false representations and deception were successful, causing plaintiffs and others to act in reliance thereupon.

313.    Plaintiffs proximately and foreseeably suffered grievous injuries and damages as a result.

314.    As a proximate and foreseeable result of this defendant's intentional misrepresentations and other misconduct, as set forth in this Complaint, plaintiffs have suffered physical injury, including but not limited to terror, neurological damage, pain and suffering; emotional distress, including but not limited to disabling post-traumatic stress disorder, anger, depression, sleeplessness and nightmares, crippling anxiety, feelings of constant fear and helplessness, an inability to work, psychiatric disorders, adverse personality changes and a host of physical ailments and disorders that are manifestations thereof, including high blood pressure, headaches and other physical disorders; a loss of the ability to enjoy a normal life, including but not limited to marital problems, lost affection, aid, attention and familial support; social disorders; and economic losses, including but not limited to lost wages, lost benefits and medical expenses.

*Eleventh Claim for Relief:  For Administrative Procedure Act Declaratory Judgment*

315.    Plaintiffs repeat the allegations set forth above as if fully restated herein.

316.    This claim for relief against the Army is by the personal representatives of all decedents except Baby Velez, and by the wounded soldiers, Specialist James Armstrong, Specialist Keara Bono Torkelson, Specialist Logan M. Burnett, Captain Dorothy Carskadon, Specialist Matthew D. Cooke, Private Mick Engnehl; Private Joseph T. Foster, Private Amber Marie Gadlin, Sergeant Nathan Hewitt, Private Najee M. Hull, Private Justin T. Johnson, Staff Sergeant Alonzo M. Lunsford, Staff Sergeant Shawn N. Manning, Specialist Dayna Ferguson Roscoe, Chief Warrant Officer Christopher Royal, Specialist Jonathan Sims, Specialist George O. Stratton, Sergeant Miguel A. Valdivia, and Staff Sergeant Patrick Zeigler.

317.    This Court has authority to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), and to set aside an agency decision "without observance of procedure required by law," 5 U.S.C. § 706(2)(D).

318.    As set forth in this Complaint, the Army has arbitrarily and capriciously denied the decedents and the wounded soldiers the Purple Heart decoration contrary to Army Regulation 600-8-22, § 2-8 (Sept. 2011) ("Reg. 600").

319.    Reg. 600 provides that "an individual is not 'recommended' for the decoration; rather he or she is entitled to it upon meeting specific criteria."

320.    Reg. 600 further provides that the Purple Heart shall be awarded to soldiers who suffer wounds, injury or death as the result of the act of an enemy of the United States or the act of any hostile foreign force, the wound or injury required medical treatment and the records of such treatment are a matter of official Army records.

321.   Reg. 600 further provides that "such a strict interpretation of the requirement for the wound or injury to be caused by direct result of hostile action not be taken that it would preclude the award being made to deserving personnel."

322.   Reg. 600 further provides that examples of enemy-related injuries which "clearly justify award of the Purple Heart" include "Injury caused by enemy bullet, shrapnel or other projectile created by enemy action."

323.   Hasan was an enemy of the United States who was acting in concert with or on behalf of a hostile foreign force when he carried out the Fort Hood terror attack.

324.   Therefore, the plaintiffs meet the specified regulatory criteria for the Purple Heart decoration in that (1) they suffered wounds, injury or death as a result of the act of an enemy of the United States and/or a hostile foreign force; (2) they suffered injury by enemy bullet, shrapnel or other projectile created by enemy action, and (3) their wounds and injuries required medical treatment and the record of such treatment are officially part of the Army's records.

325.   Exhaustion of administrative remedies is futile.  For example, the White House, in a memorandum from the Office of Management and Budget to Congress, threatened to veto the National Defense Appropriations Act because it contained a provision awarding Purple Hearts to the soldiers killed or wounded in the Fort Hood attack.

326.   Additionally, in another case, one soldier – plaintiff Sergeant Manning - was denied terrorism-related benefits in a benefits review process that was fatally tainted by command interference and bureaucratic abuse.  The Army Physical Disability Agency's Physical Evaluation Board ("PEB") first determined that Sergeant Manning, whom Hasan shot six times, had sustained combat-related injuries and that he should accordingly receive full disability benefits.   This could have also qualified him for a Purple Heart.

327.    There was a dissent to the PEB ruling, however, stating that a superior officer called one of the judges to advise him that the Army had already determined Sergeant Manning's injuries were not combat-related and that the PEB should therefore deny his claim.

328.    The PEB rejected this improper command influence and abuse of authority. However, the Army appealed and over-turned the PEB ruling, holding, in a fatally tainted process and with utter disregard for the record, that Sergeant Manning's disabilities were not combat-related because Hasan was not a terrorist and his weapon was not "an instrumentality of war," because it could be purchased by civilians.

329.    Sergeant Manning asked for reconsideration.  He reminded the Army that the prosecutors in Hasan's court martial had submitted an expert opinion that Hasan was a terrorist and submitted a copy of the Webster Report demonstrating Hasan's al-Qaida connections. Defendants denied Sergeant Manning the courtesy of reading his reconsideration request, denying it within approximately thirty minutes of its submission.

330.    Also, on October 21, 2012, an Army spokesman said "the victims who were allegedly killed at Fort Hood in November 2009 did not meet the criteria of the award of the Purple Heart as outlined in the Department of Defense Manual of Military Decorations and Awards" (i.e., Reg. 600).

331.    Therefore, these plaintiffs ask this Court to declare that the Army's refusal to award the deceased and wounded soldiers the Purple Heart arbitrary and capricious, an abuse of discretion, not in accordance with law; to remand this matter with an order requiring the Army to award the Purple Hearts in accordance with Reg. 600; to pay reasonable attorney fees; and to otherwise comply with law.

<u>RELIEF REQUESTED</u>

WHEREFORE plaintiffs respectfully request the following relief.

A.      Judgment for each plaintiff for compensatory, exemplary and/or punitive

damages, as appropriate, and in the amounts to which each is found to be entitled to under law,

but in no event less than $75,000.00.

B.      Declaratory relief, costs, expenses and attorney fees as allowed by law.

C.      Such other relief, legal or equitable, that this Court deems just.

Respectfully submitted,

/s/  Reed D. Rubinstein                                 /s/  Neal M. Sher
Reed D. Rubinstein, Esq.                               Neal M. Sher, Esq.
D.C. Bar No. 400153                                    D.C. Bar No. NY0124
DINSMORE & SHOHL LLP                                   LAW OFFICES OF NEAL M. SHER
801 Pennsylvania Avenue N.W., Suite 610                132 East 43rd Street, Suite 304
Washington, DC  20004                                  New York, NY  10017
(202) 372-9100                                         (646) 201-8841

Of Counsel
Robert M. Zimmerman, Esq.
DINSMORE & SHOHL LLP
255 E. Fifth Street, Suite 1900
Cincinnati, OH  45202
(513) 977-8200

For Staff Sergeant Patrick Zeigler, Jessica Zeigler,
and Jessica Zeigler as guardian for P.Z., only:

John O. Roark, Esq.
CAPPOLINO DODD KREBS L.L.P.
3604 SW HK Dodgen Loop, Suite 104
Temple, TX 76504
(254) 778-4357