**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MICHELLE HARPER, *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>THE UNITED STATES OF AMERICA, *et al.*,[1]<br><br>        Defendants. | **Civil Action No. 12-1802 (CKK)** |

**MEMORANDUM OPINION**
(July 21, 2020)

Pending before the Court is Defendant United States of America's Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, ECF No. 104.  Defendant argues that the claims of the remaining Plaintiffs should be dismissed because they are barred by the discretionary function exception and the intentional tort exception to the Federal Tort Claims Act ("FTCA").  In the alternative, Defendant argues that certain of Plaintiffs' claims should be dismissed for failure to state a claim and further moves for summary judgment on statute of limitations grounds.  Upon consideration of the pleadings,[2] the relevant legal authorities, and the record as a whole, the Court

---

[1] The caption in this action has been updated to reflect the current parties remaining in this suit, as discussed in more depth in Part I of this Memorandum Opinion.

[2] The Court's consideration has focused on the following:

- Further Revised Second Am. Compl. ("Second Am. Compl."), ECF No. 96;
- Def. United States of America's Mem. of P. & A. in Supp. of Mot. to Dismiss, or in the Alternative, Mot. for Summ. J. ("Def.'s Mem."), ECF No. 104-2;
- Mem. in Opp'n to Mot. to Dismiss, or in the Alternative, Mot. for Summ. J. ("Pls.' Opp'n"), ECF No. 108; and
- Def. United States of America's Mem. of P. & A. in Further Supp. of Mot. to Dismiss, or in the Alternative, Mot. for Summ. J. ("Def.'s Reply"), ECF No. 109.

To the extent that Plaintiffs actively incorporated relevant portions of their earlier briefing, Pls.' Mem. of P. & A. in Opp'n to Mot. to Dismiss ("Pls.' Original Opp'n"), ECF No. 80, the Court has

**GRANTS** Defendant's Motion to Dismiss because it lacks subject-matter jurisdiction over Plaintiffs' claims.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The Court has previously described the facts underlying this case in its prior January 30, 2014 Order, ECF No. 50; *Manning v. McHugh* ("*Manning I*"), No. CV 12-1802 CKK, 2014 WL 12789614, at *1–2 (D.D.C. Jan. 30, 2014), and its January 22, 2019 Order, ECF No. 88, and Memorandum Opinion, ECF No. 89; *Manning v. Esper* ("*Manning II*"), No. CV 12-1802 CKK, 2019 WL 281278, at *1–2 (D.D.C. Jan. 22, 2019), *appeal dismissed*, No. 19-5078, 2019 WL 4745367 (D.C. Cir. June 25, 2019), all three of which it incorporates and makes a part of its opinion here.  In light of the lengthy history of this case, the Court will summarize the allegations, which are taken as true for purposes of this Motion, relevant to the pending Motion to Dismiss.

This case stems from the tragic shootings that occurred on November 5, 2009, at Fort Hood, Texas.  Second Am. Compl. ¶ 1.  On November 5, 2009, Major Nidal Hasan,[3] a then-practicing psychiatrist in the U.S. Army, opened fire at Fort Hood in Texas.  *Id.* ¶¶ 1–2, 28–29, 58–59. According to Plaintiffs, Major Hasan was motivated by "radical Islamist" ideology, and his shout of "Allah Akbar," which Plaintiffs translate as "God is Great," during the shooting invoked the same "rallying cry" used on 9/11 and in other jihadist attacks.  *Id.* ¶¶ 29, 157.  This carefully planned shooting spree claimed the lives of fourteen people, inflicted gunshot wounds on thirty-two more, and caused physical and nonphysical injuries on a host of others, including family members of those harmed at the scene. *Id.* ¶¶ 28–29, 115–56.

---

also considered that briefing.  *See* Pls.' Opp'n at 1.  In an exercise of its discretion, the Court finds that holding oral argument would not be of assistance in rendering a decision.  *See* LCvR 7(f).

[3] The Court adopts the military title that Nidal Hasan allegedly held as of the Further Revised Second Amended Complaint, without taking a position on whether that title has been or should be removed.

Plaintiffs further allege that Major Hasan had communicated about jihad with Anwar al-Aulaqi, a leading al-Qaeda operative whose activities included recruiting Americans to carry out domestic attacks.  *Id.* ¶¶ 3–5, 7–8 20–21, 171–72.  Through Major Hasan's comments during his military medical training, and through review of his emails by the Federal Bureau of Investigation ("FBI"), the Army and FBI were aware of his extremist views.  *See e.g., id.* ¶¶ 50, 67.  Plaintiffs allege that rather than taking precautions based on these views or discipling Major Hasan for his substandard medical performance, the Army continued to advance his military and medical careers and the FBI minimized its investigation of him.  *See e.g., id.* ¶¶ 56, 63, 68.  Each agency's actions were motivated by "political correctness and . . . ethnic and religious preferences" that overrode their responsibility for safety and security.  *Id.* ¶ 59 (Army); *see id.* ¶¶ 68–69, 83 (FBI).

The original Plaintiffs that filed suit on November 5, 2012, were the representatives and family members of nine of the thirteen individuals killed, nineteen of the thirty-two individuals wounded by gunfire and their family members, and other witnesses (and their family members) who contended that they were psychologically injured.  *Id.* ¶¶ 115–56.  The Defendants were various Government Defendants, including the FBI and Army, Major Nidal Hasan, and Nasser al-Aulaqi as the personal representative of the deceased Anwar al-Aulaqi.  *Id.*¶¶ 2, 157–59; *Manning I*, 2014 WL 12789614 at *1.

On August 23, 2013, Major Hasan was convicted in a military court of thirty-two specifications of attempted murder and thirteen specifications of premeditated murder. *Manning I*, 2014 WL 12789614, at *2; *see Manning II*, 2019 WL 281278 at *3.  On January 30, 2014, this Court granted Defendants' Motion to Stay, ECF No. 24, which sought a stay of proceedings in this action during Major Hasan's court martial and post-conviction proceedings, *see Manning I*, 2014 WL 12789614.  The Court maintained the stay in light of lengthy post-conviction

proceedings, to avoid any risk of unlawful command influence, and to spare the inefficiencies of piecemeal proceedings. *Manning II*, 2019 WL 281278 at *3. The Court lifted the stay on March 29, 2017, and the parties subsequently briefed the dispositive motion filed by the Secretary of the Army, the Secretary of Defense, and the Director of the FBI, collectively the "Federal Defendants." *Id.*

In its January 22, 2019 Order, the Court dismissed several of Plaintiffs' claims against the Federal Defendants.[4] In particular, it dismissed without prejudice all remaining claims by the following Plaintiffs and their family members: Baby Velez, Lovickie D. Byrd, Anna E. Ellis, Kimberly D. Munley, Linda J. Londrie, Julia Wilson Adee, Diana J. White, and Michelle R. Harper. *Id.* at *23. Moreover, it dismissed with prejudice on different grounds the same claims against the Federal Defendants by all Plaintiffs other than the preceding Plaintiffs. *Id.* Lastly, the Court dismissed without prejudice all claims against the Doe Defendants. *Id.* In doing so, the Court did not reach the Federal Defendants' arguments regarding the discretionary function and intentional torts exceptions to the FTCA, *id.* at *21, which are the focus of the pending motion.

Subsequently, on May 6, 2019, Defendant Nasser al-Aulaqi, in his capacity as the personal representative of the estate of Anwar al-Aulaqi, was dismissed without prejudice due to Plaintiffs' failure to file proof of service or to explain that failure. *See* May 6, 2019 Order, ECF No. 101. Then, on July 16, 2019, the Court further dismissed without prejudice Defendant Nidal Hasan for similar reasons. *See* July 16, 2019 Order, ECF No. 105 ("As of the date of this Order, Plaintiffs have neither filed proof of service of the Further Revised Second Amended Complaint, nor have they indicated to the Court that they secured a waiver of service from Nidal Hasan, nor have they

---

[4] Plaintiffs appealed this ruling, but that appeal was later dismissed for lack of prosecution. *See* August 13, 2019 Mandate of the United States Court of Appeals for the District of Columbia Circuit, ECF No. 108.

established good cause for the failure to do so. Plaintiffs have also not sought default against Nidal Hasan with the appropriate filing.").  As a result, Plaintiffs' first six claims for relief, which were solely brought against "the Terrorist Defendants," were effectively dismissed.  *See* Second Am. Compl. ¶¶ 160–95 (outlining claims for civil conspiracy, negligence, gross negligence, assault and battery, intentional infliction of emotional distress, and loss of consortium against Defendants al-Aulaqi and Hasan).

The primary remaining Defendant is therefore the United States of America, based on acts Plaintiffs allege were taken by the Department of the Army, the Department of Defense ("DOD"), and the FBI.  *Id.* ¶¶ 159, 196–221; *see also id.* at 80.  The only remaining Plaintiffs who have brought claims in the Further Revised Second Amended Complaint are Michelle Harper, George Harper, Alyssa Magee, T.H. and A.M. (collectively, the "Harper Plaintiffs" or "Plaintiffs").  *Id.* at 80.  Michelle Harper was a civilian nurse that was injured in her neck, back, and knees during the shootings at Fort Hood.  *Id.* ¶ 152.  She has subsequently been diagnosed with PTSD and experiences severe panic attacks.  *Id.*  George Harper is Michelle Harper's husband, who has also suffered severe emotional distress.  *Id.* ¶ 152(a).  T.H. and A.M. are Michelle Harper's minor children, while Alyssa Magee is her daughter.  *Id.* ¶ 152(b)–(d).  The Harper Plaintiffs bring three claims against Defendant the United States: (1) negligence (hiring, retention, and supervision with respect to Hasan), *id.* ¶¶ 196–203; (2) negligent infliction of emotional distress, *id.* ¶¶ 212–17; and (3) loss of consortium, *id.* ¶¶ 218–21.

## II. LEGAL STANDARD

Defendant moves to dismiss Plaintiffs' claims due to lack of subject-matter jurisdiction.[5] A court must dismiss a case pursuant to Federal Rule 12(b)(1) when it lacks subject matter jurisdiction.  In determining whether there is jurisdiction, the Court may "consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."  *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (internal quotation marks omitted) (quoting *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992)); *see also Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) ("[T]he district court may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction.").

In reviewing a motion to dismiss pursuant to Rule 12(b)(1), courts must accept as true all factual allegations in the complaint and construe the complaint liberally, granting plaintiff the benefit of all inferences that can be drawn from the facts alleged.  *See Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1106 (D.C. Cir. 2005) ("At the motion to dismiss stage, counseled complaints, as well as *pro se* complaints, are to be construed with sufficient liberality to afford all possible inferences favorable to the pleader on allegations of fact."); *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993) ("We review here a decision granting a motion to dismiss, and therefore must accept as true all the factual allegations in the complaint."); *Koutny v. Martin*, 530 F. Supp. 2d 84, 87 (D.D.C. 2007) ("[A] court accepts

---

[5] The Court does not consider Defendant's alternative Motion for Summary Judgment and neither does it consider Defendant's arguments that certain of Plaintiffs' claims should be dismissed for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), and so it does not include those standards here.

as true all of the factual allegations contained in the complaint and may also consider 'undisputed facts evidenced in the record.'" (internal citations omitted) (quoting *Mineta*, 333 F.3d at 198)).

Despite the favorable inferences that a plaintiff receives on a motion to dismiss, it remains the plaintiff's burden to prove subject-matter jurisdiction by a preponderance of the evidence. *Am. Farm Bureau v. United States Envtl. Prot. Agency*, 121 F. Supp. 2d 84, 90 (D.D.C. 2000). "Although a court must accept as true all the factual allegations contained in the complaint when reviewing a motion to dismiss pursuant to Rule 12(b)(1), [a] plaintiff['s] factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Wright v. Foreign Serv. Grievance Bd.*, 503 F. Supp. 2d 163, 170 (D.D.C. 2007) (internal citations and quotation marks omitted) (quoting *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13–14 (D.D.C. 2001)), *aff'd*, 2008 WL 4068606 (D.C. Cir. Mar. 17, 2008). A court need not accept as true "a legal conclusion couched as a factual allegation" or an inference "unsupported by the facts set out in the complaint." *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 193 (D.C. Cir. 2006) (internal quotation marks omitted) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

### III. DISCUSSION

Defendant argues that this Court lacks subject-matter jurisdiction over Plaintiffs' claims because those claims are barred by both the discretionary function and intentional tort exceptions to the FTCA. As the Court finds that Plaintiffs' claims are barred by the discretionary function, it does not consider Defendant's arguments regarding the intentional tort exception.

"Under 28 U.S.C. § 2680(a)—also known as the 'discretionary function exception' to the FTCA—the federal government is immune from liability for agents' decisions that 'involve an element of judgment or choice.'" *Smith v. United States*, 157 F. Supp. 3d 32, 42 (D.D.C. 2016)

(quoting *United States v. Gaubert*, 499 U.S. 315, 323 (1991)); *see also Martinez v. United States*, 587 F. Supp. 2d 245, 248 (D.D.C. 2008) (Kollar-Kotelly, J.) (explaining that there is no waiver of United States' sovereign immunity under FTCA for claims involving government employee's "exercise, performance or failure to exercise or perform a discretionary function or duty" regardless of whether the "discretion involved [is] abused").

In *Martinez*, this Court explained the two-step test established by the Supreme Court in *United States v. Gaubert*, 499 U.S. 315 (1991), to determine whether the discretionary function exception applies:

> The discretionary function exception covers only acts that are discretionary in nature, acts that involve an element of judgment or choice. If a binding federal statute, regulation, or policy specifically prescribes a course of action for the employee to follow, then the employee has no rightful option but to adhere to the directive. Otherwise, where the challenged conduct involves an element of judgment and is of the nature and quality that Congress intended to shield from tort liability, the United States is immune from an FTCA suit. The purpose of the exception is to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.

*Martinez*, 587 F. Supp. 2d at 248 (internal citations and quotation marks omitted). The exception "immunizes even government abuses of discretion." *Shuler v. United States*, 531 F.3d 930, 935 (D.C. Cir. 2008).

Here, Defendant argues that the decisions challenged by Plaintiffs fall under this exception and are thus barred. Def.'s Mem. at 13–21. The Court first considers Plaintiffs' claims based upon actions taken by the Army and DOD before turning to Plaintiffs' claims premised on actions of the FBI.

## A. Plaintiffs' Claims Based on Actions Taken by the Army and DOD

In short, Plaintiffs allege that the Army and DOD were negligent in supervising Hasan, including in their evaluations of his performance and their decision to retain, rather than discharge, him.[6]  *See* Second Am. Compl. ¶¶ 196–211 (negligence in hiring, retention and supervision claim); *id.* ¶¶ 212–17 (negligent infliction of emotional distress claim based on same facts); *id.* ¶¶ 218–21 (corresponding loss of consortium claim based on same facts).  Plaintiffs claim that the Army and DOD owed Plaintiffs "non-discretionary duties to, *inter alia*, use reasonable care in the hiring, training, supervision and retention of Hasan;" to treat him as they would any other employee; "to follow their own rules, discipline and procedures;" to select and retain competent employees; and to protect plaintiffs from "an unfit and dangerous employee."  *See id.* ¶ 199; *see also id.* ¶ 24 (claiming that Army had "non-discretionary and constitutional duty to discipline, discharge, prosecute and/or imprison Hasan" and to "protect plaintiffs"); ¶ 198 (alleging that Defendant "chose not to comply with or enforce Army regulations with respect to or against Hasan, or to discipline him").  Defendant argues that there is no such duty, that such personnel decisions are subject to discretion, and that they are the types of decisions that Congress intended to shield from liability.  Def.'s Mem. at 14–17.  The Court agrees with Defendant that the Army and DOD's actions fall within the discretionary function exemption.

Under *Gaubert*, the Court first considers whether the conduct "involve[s] an element of judgment or choice."  *Gaubert*, 499 U.S. at 322 (internal quotation marks and citation omitted).  The Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") has previously found

---

[6] Plaintiffs at times also include the FBI in their recitation of these claims.  *See, e.g.*, Second Am. Compl. ¶ 8.  Thus, to the extent Plaintiffs' claims against Defendant discussed in this subsection include any actions along similar lines taken by the FBI and not discussed separately in the below subsection, the Court's discussion and decision here also applies.

that "decisions concerning the hiring, training, and supervising of" government employees for the

Washington Metropolitan Area Transit Authority, or WMATA, "are discretionary in nature, and

thus immune from judicial review." *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d

1207, 1217 (D.C. Cir. 1997). As the D.C. Circuit explained, these decisions fell within the

exception because:

> The hiring, training, and supervision choices that WMATA faces are choices
> "susceptible to policy judgment." The hiring decisions of a public entity require
> consideration of numerous factors, including budgetary constraints, public
> perception, economic conditions, "individual backgrounds, office diversity,
> experience and employer intuition." *Tonelli v. United States*, 60 F.3d 492, 496 (8th
> Cir. 1995). Similarly, supervision decisions involve a complex balancing of
> budgetary considerations, employee privacy rights, and the need to ensure public
> safety. The extent of training with which to provide employees requires
> consideration of fiscal constraints, public safety, the complexity of the task
> involved, the degree of harm a wayward employee might cause, and the extent to
> which employees have deviated from accepted norms in the past. Such decisions
> are surely among those involving the exercise of political, social, or economic
> judgment.

*Id.*; *see also Smith*, 157 F. Supp. 3d at 42 ("In this circuit, federal government hiring and employee

supervision decisions are generally held to involve the exercise of political, social, or economic

judgment, and therefore, to fall with the scope of the United States' sovereign immunity." (internal

quotation marks and alterations omitted)); *Tabman v. F.B.I.*, 718 F. Supp. 2d 98, 104 (D.D.C.

2010) ("In general, personnel decisions by a government employer are considered discretionary

under the FTCA and therefore immune from judicial review. . . . So too are many decisions by

agency officials to investigate personnel—just as the decision to initiate a criminal prosecution has

long been considered a discretionary function, 'agency officials performing certain functions

analogous to those of a prosecutor' are not subject to suit under the discretionary function

exception to the FTCA." (quoting *Sloan v. United States Dep't of Hous. and Urban Dev.*, 236 F.3d

756, 760 (D.C. Cir. 2001))).

As Plaintiffs are at bottom questioning the Army and DOD's supervision and discipline decisions with respect to Hasan, *Burkhart* and its underlying reasoning show that such decisions involve judgment and discretion.  The decision whether to retain, discipline, or discharge Hasan involved discretion, as it involved consideration of "numerous factors," such as relevant internal policies and aims as well as other considerations, such as "budgetary constraints, public perception, economic conditions, 'individual backgrounds, office diversity, experience and employer intuition.'"  *Burkhart*, 112 F.3d at 1217.  So too did decisions regarding how to supervise him involve similarly complex factors.  *See id.*

That the relevant government actors here were the Army and DOD is relevant, as "[o]rderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters."  *Orloff v. Willoughby*, 345 U.S. 83, 94 (1953).  "The Constitution vests '[t]he complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force' exclusively in the legislative and executive branches."  *Kreis v. Sec'y of Air Force*, 866 F.2d 1508, 1511 (D.C. Cir. 1989) (citation omitted).  In light of these principles, this Circuit's decisions regarding military personnel decisions further suggest that such decisions involve discretion and judgment.  *See, e.g.*, *id.* (finding that challenge to personnel decision was nonjusticiable because it would require Court "to second-guess the Secretary's decision about how best to allocate military personnel in order to serve the security needs of the Nation"); *cf. Park v. Zatchuk*, 605 F. Supp. 207, 210 (D.D.C. 1985) (finding that "evaluation of federal employees" by military hospital was a discretionary administrative decision by federal officials and that those officials were "entitled to the privilege of unfettered decisionmaking").

Plaintiffs' arguments do not suggest otherwise. To begin with, Plaintiffs argue in their briefing, and allege in their Further Revised Second Amended Complaint, that the Army and DOD had to have been aware of Hasan's alleged tendencies, and thus they had no other choice but to remove him from military service. *See, e.g.*, Pls.' Opp'n at 3–4. To support this assertion, they rely in part on a subsequently prepared Special Report (the "Senate Report"). *See* Second Am. Compl. ¶ 6 (incorporating Senate Report); First Am. Compl. Ex. 1, ECF No. 22-1 (S. Comm. on Homeland Security and Governmental Affairs (Chairman Joseph I. Lieberman and Ranking Member Susan M. Collins) (Feb. 2011), "A Ticking Time Bomb: Counterterrorism Lessons from the U.S. Government's Failure to Prevent the Fort Hood Attack").[7]

But, even if taken as true, the portions of the relevant Senate Report relied upon by Plaintiffs do not demonstrate that this decision was "prescribe[d]" by any particular "federal statute, regulation, or policy." *Gaubert*, 499 U.S. at 322 (internal quotation marks and citation omitted). For example, Plaintiffs argue that the Senate Report found that Hasan's "radicalization toward violent extremism was so clear that he could and should have been removed from military service under policies then in force," that "there was more than enough for his superiors to have disciplined him and removed him from the Army," and that his views were "incompatible with military service." Pls.' Opp'n at 4 (internal quotation marks omitted). Even assuming that this is true, it only appears to suggest that the Senate Report concluded that Hasan *should* have been discharged, rather than that there were mandatory policies in place requiring his discharge. *See, e.g.*, Senate Report at 8 ("As noted, DoD possessed compelling evidence that Hasan embraced

---

[7] The Court focuses here on those portions specifically highlighted by Plaintiffs in their briefing. As Plaintiffs do not always cite the page numbers for their propositions from the Senate Report, but reference it in their briefing and incorporate it in their Further Revised Second Amended Complaint, *see, e.g.*, Second Am. Compl. ¶¶ 6, 17, 19, 50, 52, the Court has reviewed the Senate Report for the source of Plaintiffs' statements and quotations as necessary.

views so extreme that it *should have* disciplined him or discharged him from the military, but DoD failed to take action against him." (emphasis added)); *id.* at 45 ("As described earlier in this report, there was compelling evidence that Hasan embraced views so extreme that he did not belong in the military, and this evidence was more than enough for his superiors to have disciplined him and even to have removed him from service."); *id.* at 45–47 (describing how officers had authority to discipline or discharge Hasan under certain policies without stating that they were required to remove him, and acknowledging discretion inherent in decision).

In fact, at one point the Senate Report explicitly notes that "[t]he failure to respond to Hasan's radicalization toward violent Islamist extremism was a failure of officer *judgment*," as although there were no policies exactly on point that "address[ed] violent Islamist extremism specifically," they had "the authority to discipline or remove him from the military under general provisions of key policies governing authority and officership." *Id.* at 45 (emphasis added). Similarly, even if the actions taken by the Army and DOD did not adhere to "high priority policies designed to prevent a Ft. Hood attack," Pls.' Opp'n at 3, Plaintiffs fail to demonstrate how generally stated policies against domestic terrorist attacks required mandatory action from the Army and DOD with respect to Hasan, thus foreclosing the discretion usually involved in such personnel decisions, *see id.* at 4–5. At bottom, even assuming that Plaintiffs' allegations are true, the findings relied upon by Plaintiffs do not render any decisions regarding Hasan non-discretionary. They instead suggest that the decision whether to discipline or discharge Hasan was, in fact, a matter of judgment and choice.

Plaintiffs next present a series of what they term "non-discretionary instructions, policy memoranda and directives" that they claim prescribed a certain course of action regarding Hasan. *Id.* at 4. This includes a DOD instruction explaining that it is DOD policy to protect DOD

personnel and their families from terrorist attacks, a DOD instruction requiring that any circumstances that could pose security threat to United States personnel be reported, a DOD memorandum reiterating that it was DOD policy to attempt to identify and prevent terrorist threats and share information regarding such threats, and a DOD publication that required personnel to share indicators of potential terrorist threats to law enforcement or intelligence agencies. *See id.* at 5–6. Plaintiffs claim that in light of these policies and "Hasan's actions and behavior," and "to protect Plaintiffs from a known threat," the Army and DOD were required to take action. *Id.* at 7. But even assuming (without deciding) that these policies apply, they do not demonstrate that the Army and DOD were required to discipline Hasan, discharge him, or otherwise supervise or investigate him differently. In other words, they did not prescribe a mandatory course of conduct, and thus do not show that the challenged action or inaction did not "involve an element of judgment or choice." *Gaubert*, 499 U.S. at 322 (internal quotation marks and citation omitted).

Plaintiffs also emphasize Army Regulation 623-3, which in general required officials to prepare accurate and complete officer evaluation reports ("OERs"). Pls.' Opp'n at 9–11. The portion of the regulation relied upon by Plaintiffs is found in Chapter 3 ("Army Evaluation Principles"), Section 1 ("Evaluation Overview"), and subsection 3-2 ("Evaluation requirements"). Army Regulation 623-3 ("AR 623-3") (Aug. 10, 2007), available at https://www.militarylawyers.com/documents/ar_623-3_army_reporting_system.pdf. It reads:

> *f.* Rating officials will prepare reports that are accurate and as complete as possible within the space limitations of the form. This responsibility is vital to the long-range success of the Army's mission. With due regard for the rated individual's current grade, experience, and military schooling, evaluations will cover failures as well as achievements. Evaluations will normally not be based on a few isolated minor incidents.

*Id.*

Plaintiffs claim that Hasan's OERs were "glaringly incomplete, false and misleading," as they left out important information on his "radicalization to violent Islamic extremism and the threat he posed." Pls.' Opp'n at 10–11. The result was the tragic shooting at Fort Hood. *Id.* at 10–12. According to Plaintiffs, the Army and DOD "had no discretion to ignore" Hasan's views by leaving them out of his OERs and to take no action. *Id.* at 10. Even taking Plaintiffs' claims regarding Hasan and the failure to provide complete OERs as true, which this Court must on a motion to dismiss, that is insufficient to show that the Army and DOD lacked discretion specifically in how to supervise Hasan, including the drafting, review, and use of his OERs. In fact, the regulation itself seems to contemplate that discretion and judgment is involved in completing it, as it recognizes that reports must be "as complete *as possible*" and that they are "normally not be based on a few isolated minor incidents," which shows that the drafter must pick and choose what to include (or not to include). AR 623-3 at 20 (emphasis added). Other subsections in the same portion of the regulation relied upon by Plaintiffs further suggest that discretion and judgment are involved in the drafting, review, and use of OERs. *See, e.g.*, AR 623-3 at 21 ("*i.* Rating officials have a responsibility to balance their obligations to the rated individual with their obligations to the Army. Rating officials will make honest and fair evaluations of Soldiers under their supervision. On the one hand, this evaluation will give full credit to the rated individual for their achievements and potential. On the other hand, rating officials are obligated to the Army to be discriminating in their evaluations so that Army leaders, DA selection boards and career managers can make intelligent decisions."). Indeed, discretion and judgment on the part of the drafters is inherent in the drafting of an employee or officer evaluation more generally. *See Park*, 605 F. Supp. at 209 ("Evaluations of the [military hospital employee] plaintiff were clearly within the scope of defendants' authority, indeed were mandated, and nothing prescribed the

manner in which that authority was to be exercised."); *Tonelli v. United States*, 60 F.3d 492, 496 (8th Cir. 1995) ("Issues of employee supervision and retention generally involve the permissible exercise of policy judgment and fall within the discretionary function exception."). Plaintiffs have therefore failed to show that the Army and DOD's challenged actions do not "involve an element of judgment or choice." *Gaubert*, 499 U.S. at 322 (internal quotation marks and citation omitted).

The second consideration under *Gaubert* is "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Id.* at 322–23 (internal quotation marks and citation omitted). In this vein, the Supreme Court has stated that the exception "protects only governmental actions and decisions based on considerations of public policy." *Berkovitz v. United States*, 486 U.S. 531, 537 (1988). Decisions involving policy implementation generally have been found to fall within the exception while "routine, garden-variety maintenance decisions" generally have been found to fall outside of the exception. *Hsieh v. Consol. Eng'g Servs., Inc.*, 698 F. Supp. 2d 122, 136–37 (D.D.C. 2010) (discussing cases). The Court "cannot make categorical determinations" but rather must "examine the nature of the judgments at issue," which, in turn, requires an examination of "the alleged causes of [plaintiff's] injuries and the alleged remedies that [plaintiff] claim[s] should have been undertaken." *Id.* at 134; *see Cope v. Scott*, 45 F.3d 445, 448 (D.C. Cir. 1995) ("While we must review the complaint to determine what actions allegedly caused the injuries, we do so only to determine whether the district court has jurisdiction over those actions, not to prejudge the merits of the case.").

As explained above, the D.C. Circuit has found that personnel decisions such as the ones challenged by Plaintiffs here are "surely among those involving the exercise of political, social, or economic judgment." *Burkhart*, 112 F.3d at 1217. And, as discussed above, decisions regarding how to supervise employees, including whether to retain, discharge, or investigate them, certainly

involves balancing competing policies and considerations. This is no less true when the employer is the military. Accordingly, for much the same reasons as provided above for the first step of the *Gaubert* test, the Court agrees with Defendant that the decisions challenged here satisfy the second step of the *Gaubert* test. *See, e.g.*, *Macharia v. United States*, 334 F.3d 61, 67 (D.C. Cir. 2003) (affirming district court's finding that "[d]ecisions regarding how much safety equipment should be provided to a particular embassy, how much training should be given to guards and embassy employees, and the amount of security-related guidance that should be provided necessarily entails balancing competing demands for funds and resources" and satisfy the *Gaubert* test in case involving terrorist bombing attack on embassy (internal quotation marks omitted)); *Sloan*, 236 F.3d at 760 (finding that agency's decision to "suspend plaintiffs" fell "well within" discretionary function exception); *Tookes v. United States*, 811 F. Supp. 2d 322, 330 (D.D.C. 2011) ("With regard to the second *Gaubert* prong, the governing case law in this Circuit firmly supports a finding that the supervision and training of deputy marshals are discretionary governmental functions grounded in social, economic, and political policy."); *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 198 (D.D.C. 2002) ("In addition, this Court finds that a personnel decision regarding whether to promote an employee is also considered 'discretionary in nature, and thus immune from judicial review.'" (quoting *Beebe v. Washington Metro. Area Transit Auth.*, 129 F.3d 1283, 1287 (D.C. Cir. 1997)).

Plaintiffs contend that the challenged actions and decisions were not a "*permissible exercise* of policy judgment." Pls.' Opp'n at 8 (emphasis in original). But the discretionary function test under *Gaubert* does not contemplate whether the government made the right or wrong choice when exercising its discretion. Indeed, if the underlying conduct "involve[s] an element of judgment or choice," and if "that judgment is of the kind that the discretionary function exception

was designed to shield," *Gaubert*, 499 U.S. at 322–23 (internal quotation marks and citation omitted), the discretionary function exception "immunizes even government abuses of discretion," *Shuler*, 531 F.3d at 935.  The Court therefore makes no statement as to whether the Army and DOD properly exercised their discretion here.

Lastly, Plaintiffs appear to hinge their negligent infliction of emotional distress claim not only on the circumstances preceding and surrounding the attack, but also on Defendant's "indifference to and reckless and willful disregard for and mistreatment of [P]laintiffs after Hasan's attack."  Second Am. Compl. ¶ 215.  In their Further Revised Second Amended Complaint, they describe these actions as "the post-attack spin and cover up."  *Id.* at 41.  In brief, they allege that Defendant "used a cynical program of 'damage control' to cover up their culpability, to prevent plaintiffs from learning the truth and exercising their legal rights, and to preserve the very polices of political correctness and religious and ethnic preference that proximately caused the attack in the first instance."  *Id.* ¶ 83; *see id.* ¶¶ 82–109.  Plaintiffs do not contend in their briefing that the challenged decisions, which deal with various government actors' reaction to the attack, do not fall within the discretionary function exception.  *See, e.g.*, *id.* ¶ 87 (government "aimed at first deflecting attention from the illegal ethnic and religious preferences and political correctness that proximately caused the attack"); *id.* ¶ 87(b) (Army told on-scene reporters "that the Fort Hood attack was not terrorism immediately after the attack had concluded"); *id.* ¶ 87(c) (President "refuse[d] and refrain[ed] from calling the attack 'terrorism,'" told the "public and plaintiffs on multiple occasions 'not to jump to conclusions,'" and "prais[ed] 'diversity'");  *id.* ¶ 87(d)–(e) (government officials spoke about the incident and "possible anti-Muslim backlash" and deflecting attention from Hasan's motives "without referencing Hasan's Al-Qaeda ties or open and notorious jihadism").

Regardless, the Court agrees with Defendant that to the extent Plaintiffs challenge any of Defendant's post-attack actions, they fall within the discretionary function exception. The decision of how to investigate and respond to the attacks, including the drafting and delivery of speeches and talking points to the public and plaintiffs, involves the balancing of numerous factors, including (but not limited to) budgetary restrictions, public safety, protecting confidential information, and public perception. Such decisions involve the exercise of social, political, or economic judgment. *See Burkhart*, 112 F.3d at 1217.

Accordingly, Plaintiffs' claims against the United States based upon the Army and DOD's actions fall within the discretionary function exception to the FTCA. The Court therefore lacks subject-matter jurisdiction over them, and they must be dismissed.

### B. Plaintiffs' Claims Based on Actions Taken by the FBI

Defendant also argues that Plaintiffs' claims based on actions taken by the FBI fall within the discretionary function exception. Def.'s Mem. at 17–21. At bottom, Plaintiffs challenge the FBI's decisions made with respect to its investigation of Hasan. *See* Second Am. Compl. ¶¶ 60–76, 196–221. Plaintiffs allege that the FBI knew that Hasan was "an active security threat" as a "result of his intercepted communications with Al-Qaeda's Aulaqi." *Id.* ¶ 21. They further claim "that the FBI had a non-discretionary and constitutional duty to interview Hasan, to notify his superiors of the communications with Aulaqi, and to monitor his weapons purchases, among other things." *Id.* ¶ 24; *see also id.* at ¶ 63 (describing "non-discretionary duty to protect plaintiffs' lives and legal rights"); *id.* ¶ 63(b) (describing "non-discretionary duty to protect [plaintiffs] from Hasan"); *id.* ¶ 71 (alleging "non-discretionary and unique duties of care to protect plaintiffs from Hasan"). They challenge the FBI's alleged decision to "terminate[] the security investigation into [Hasan's] ties with Aulaqi and Al-Qaeda without a personal interview, an appropriate database

review or the disclosure of the fact and content of his communications with the international terrorist chieftain to his commanding officers." *Id.* ¶ 27. They further challenge numerous other decisions made by the FBI during the course of its investigation. *See id.* ¶¶ 60–76 (listing alleged "Pre-Attack Misconduct of the FBI").

The first consideration under *Gaubert* is whether the challenged conduct "involve[s] an element of judgment or choice." 499 U.S. at 322 (internal quotation marks and citation omitted). In general, courts in this Circuit have found that decisions regarding criminal or civil investigations, prosecutions, or arrests are discretionary in nature. *See, e.g.*, *Shuler*, 531 F.3d at 934 ("Decisions regarding the timing of arrests are the kind of discretionary government decisions, rife with considerations of public policy, that Congress did not want the judiciary 'second-guessing.'" (quoting *United States v. S.A. Empresa de Viacao Aerea Rio Grandense* (*Varig Airlines*), 467 U.S. 797, 814 (1984))); *Sloan*, 236 F.3d at 760 ("The decision to initiate a prosecution has long been regarded as a classic discretionary function."); *Leji v. Dep't of Homeland Sec.*, No. 1:15-CV-00387, 2015 WL 1299361, at *2 (D.D.C. Mar. 17, 2015) ("The United States Attorney General has absolute discretion in deciding whether to investigate claims for possible criminal or civil prosecution, and such decisions generally are not subject to judicial review."); *Wightman-Cervantes v. Mueller*, 750 F. Supp. 2d 76, 80 (D.D.C. 2010) (explaining that "an agency's decision whether to prosecute, investigate, or enforce has been recognized as purely discretionary and not subject to judicial review" in mandamus context); *Martinez*, 587 F. Supp. 2d at 248 ("The decision to allocate limited governmental resources to investigate a reported crime, like the decision to allocate limited resources to prosecute a crime, is a discretionary function.").

The FBI's alleged decisions challenged here are discretionary in nature. As the D.C. Circuit has explained, "the sifting of evidence, the weighing of its significance, and the myriad

other decisions made during investigations plainly involve elements of judgment and choice." *Sloan*, 236 F.3d at 762.  So too here.  To begin with, the FBI "*may* investigate any violation of Federal criminal law involving Government officers and employees," 28 U.S.C. § 535(a) (emphasis added), but is not required to do so.  Moreover, with respect to the investigation (or alleged lack thereof) into Hasan, the FBI had numerous factors to consider, including but not limited to the strength and types of evidence at issue, the allocation of limited governmental resources, the protection of other ongoing investigations, and various applicable policies and priorities.  In other words, the decisions made by the FBI during the course of their investigation into Hasan involved aspects of "judgment or choice."  *Gaubert*, 499 U.S. at 322 (internal quotation marks and citation omitted).  Moreover, in light of the factors considered, the judgment exercised during the course of an investigation "is of the kind that the discretionary function exception was designed to shield."  *Id.* at 322–23 (internal quotation marks and citation omitted); *cf. Cmty. for Creative Non-Violence v. Pierce*, 786 F.2d 1199, 1201 (D.C. Cir. 1986) ("The power to decide when to investigate, and when to prosecute, lies at the core of the Executive's duty to see to the faithful execution of the laws; when reviewing the exercise of that power, the judicial authority is, therefore, at its most limited.").

While Plaintiffs argue otherwise, they do not direct the Court to any specific mandatory duties.  In their Further Revised Second Amended Complaint, Plaintiffs claim in a conclusory manner that the FBI had non-discretionary duties "to use good FBI tradecraft and reasonably investigate Hasan with the same diligence it would have used with any similarly situated non-Muslim, including an in-person interview; to maintain a system wherein Hasan's activities were properly documented, assessed and evaluated; and to reasonably perform their duties and protect plaintiffs' lives and legal rights by notifying the Army of Hasan's communications with Aulaqi,

monitoring Hasan's weapons purchases, and/or arresting him, among other things." Second Am. Compl. ¶ 71. Plaintiffs reference and rely upon both the Senate Report and another report attached, the Final Report of the William H. Webster Commission on the Events at Fort Hood, Texas on November 5, 2009 (the "Webster Report"), First Am. Compl. Ex. 2, ECF No. 22-2, to establish such non-discretionary duties. *See, e.g.*, Pls.' Opp'n at 3–4, 7, 13; Second Am. Compl. ¶¶ 6, 60–76.

Even if their contents are taken as true, however, neither report demonstrates that there were any relevant mandatory duties as alleged. In their briefing, Plaintiffs focus on the specific portions of the Senate Report already addressed above with respect to the Army and DOD that did not indicate any particular prescribed actions. *See supra*. Discussion in the Senate Report about the investigation into Hasan at various stages in fact suggests that there were no guiding statutes, policies, or regulations that mandated a specific course of action. For example, the Senate Report's subsection on the FBI's investigation does discuss the original requested inquiry into Hasan, but it notes that it was "not a mandatory order" to investigate "but rather a 'discretionary lead,' which was a type of lead that did not specify what if any actions" should be taken. Senate Report at 36. While the Senate Report explains why the investigating agent did not interview Hasan or his superiors and colleagues, which includes the concern that any further investigation of Hasan may have revealed the investigation into suspected terrorist al-Aulaqi, it does not indicate that any such interviews were prescribed as Plaintiffs claim here. *See id.* at 37. In fact, the detailed recitation of events and the disagreement among agents regarding how to investigate supports that the course of investigations are a matter of judgment and choice. *See, e.g.*, *id.* at 37–38. The Senate Report's section discussing further recommendations related to the FBI also does not mention any prescriptions that would render the actions non-discretionary. *See id. at* 51–77; *see also id.* at 58

(noting that San Diego Joint Terrorism Task Force could not have compelled Washington Joint

Terrorism Task Force "to take any *specific* action") (emphasis in original); *id.* at 59 (noting San

Diego Joint Terrorism Task Force's "failure to elevate the Hasan matter was poor judgment"

without mentioning any relevant statutes, regulations, or policies).  The authors even explain that:

> We recognize that detection and interdiction of lone wolf terrorists is one of the
> most difficult challenges facing our law enforcement and intelligence agencies.
> *Every day, these agencies are presented with myriad leads that require the exercise
> of sound judgment to determine which to pursue and which to close out.*  Leaders
> must allocate their time, attention, and inherently limited resources on the highest
> priority cases.  In addition, the individual accused of the Fort Hood attack, Army
> Major Nidal Malik Hasan, is a U.S. citizen.  Even where there is evidence that a
> U.S. citizen may be radicalizing, the Constitution appropriately limits the actions
> that government can take.

*Id.* at 7 (emphasis added).  At bottom, the Senate Report does not point to any "binding federal

statute, regulation, or policy" that "specifically prescribe[d] a course of action."  *Martinez*, 587 F.

Supp. 2d at 248 (internal citations and quotation marks omitted).

Nor does the Webster Report relied upon by Plaintiffs indicate that there was a binding

federal statute, regulation, or policy that prescribed how the FBI's investigation was to proceed.

The Webster Report's assessment of the FBI's investigation notes that the FBI had various factors

to consider and that its "governing authorities limit its ability to disseminate information acquired

using FISA and require Agents and Task Force Officers to use the 'least intrusive means' in

conducting assessments and investigations."  Webster Report at 71.  It did not find that there was

"intentional misconduct or the disregard of duties."  *Id.*  The Webster Report also notes throughout

its assessment that there were in fact no relevant policies for many of the steps involved in the

investigation; furthermore, its detailed discussions about whether correct decisions were made at

those steps underscores the discretion and judgment inherent in an investigation.  *See, e.g.*, *id.* at

73 ("Prior to the Fort Hood shootings, the FBI had no written policy on advising DoD about

counterterrorism assessments or investigations of the U.S. military, DoD civilian personnel, or others with known access to DoD facilities. . . . there was no formal procedure and no formal requirement to advise DoD about these assessments and investigations."); *id.* at 75 ("No FBI written policy establishes ownership of interoffice leads."); *id.* at 77 ("There is no formal FBI policy that sets a deadline for the completion of work on Routine leads."); *id.* at 81–82 (discussing reasoning underlying decision not to interview Hasan); *id.* at 84–85 (discussing role of workload and lack of formal policies in investigation).  Rather than support Plaintiffs' argument that the challenged actions do not satisfy the first step of the *Gaubert* test, the Senate Report and Webster Report suggest that these acts were "discretionary in nature" and "acts that involve an element of judgment or choice."  *Martinez*, 587 F. Supp. 2d at 248 (internal quotation marks and citation omitted).

As the decisions challenged by Plaintiffs here are discretionary in nature, and are "decisions grounded in social, economic, and political policy" that Congress intended to shield, *Id.* (internal quotation marks and citation omitted), the Court agrees that the challenged actions fall within the discretionary function exception.  In doing so, the Court again does not make any judgment about whether Defendant, through the FBI, properly exercised its discretion, as "where, as here, the government conduct involves discretion and considerations of public policy, the discretionary function exception immunizes even government abuses of discretion."  *Shuler*, 531 F.3d at 935.  As the Court lacks jurisdiction over Plaintiffs' claims against Defendant based upon actions taken by the FBI, those claims must also be dismissed.

## IV. CONCLUSION

The Court understands—and appreciates—that the horrific event of the shooting at Fort Hood has had a lasting impact on the Harper Plaintiffs.  However, because the Court lacks subject-matter jurisdiction over the remaining claims, it cannot reach the merits of Plaintiffs' claims.  For the foregoing reasons, Defendant United States of America's Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, ECF No. 104, is **GRANTED**.  Plaintiffs' remaining claims asserted in the Further Revised Second Amended Complaint are barred by the discretionary function exception to the FTCA, and the Court therefore lacks subject-matter jurisdiction over them.  An appropriate Order accompanies this Memorandum Opinion.


Date: July 21, 2020                                        _____/s/_____

                                                                        COLLEEN KOLLAR-KOTELLY

                                                                        United States District Judge